**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**FORT LAUDERDALE DIVISION**

| | |
|---|---|
| Wood Mountain Fish LLC; Bagels & Baguettes; Portland Hunt-Alpine Club, LLC; Prime Steakhouse; Mamme Inc.; Rocca Kurt's Brothers Inc.; and Stephen T. Deangelis, Inc., individually and on behalf of all others similarly situated, | Civil No. 19-22128-CIV-SMITH/LOUIS |
| Plaintiffs, | |
| v. | **AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL** |
| Mowi ASA (f/k/a Marine Harvest ASA); Mowi USA, LLC; Mowi Canada West, Inc.; Mowi Ducktrap LLC; Grieg Seafood ASA; Grieg Seafood BC Ltd.; Ocean Quality AS; Ocean Quality North America, Inc.; Ocean Quality USA Inc.; Ocean Quality Premium Brands, Inc.; SalMar ASA; Lerøy Seafood AS; Lerøy Seafood USA Inc.; Cermaq Group AS; Cermaq US LLC; Cermaq Canada Ltd.; and Cermaq Norway AS, | **REDACTED** |
| Defendants. | |

# TABLE OF CONTENTS

I.     NATURE OF THE CASE ................................................................................. 1

II.    JURISDICTION AND VENUE ...................................................................... 5

III.   PARTIES ......................................................................................................... 6

IV.   FACTUAL ALLEGATIONS ........................................................................ 23

     A.    The EC and the DOJ are Investigating Price Increases in the Salmon Market..... 23

     B.    The Influence of Spot Prices in the Salmon Market Make It Susceptible to Collusion. ................................................................................................ 28

     C.    Defendants Engaged in Other Cartel Behavior, Including Constant Communication, and Were Dedicated to Cooperation. ........................ 33

     D.    Defendants' Direct Communications Must Be Viewed in The Context of the Culture of Cooperation Fostered Within the Norwegian Salmon Industry. ......... 43

     E.    During the Class Period, Defendants Engaged in Parallel Pricing Behavior Resulting in Record Profitability. ........................................... 53

     F.    Defendants' Pricing Behavior Is Not Justified By Cost Factors........................... 57

     G.    The Structures and Characteristics of the Market for Salmon Support the Existence of a Collusive Restraint. ...................................... 60

          1.    Industry Concentration Facilitates Collusion. ............................................. 61

          2.    Barriers to New Entry Are High. .................................................................. 63

          3.    Farm-Raised Salmon Is a Commodity Product, and Prices Are Correlated Across the Globe. ......................................................... 67

          4.    Norwegian Companies Dominate the Production of Farm-Raised Salmon, and Defendants Are the Largest Global Producers ..................................... 70

          5.    Farmed Salmon Production Is Highly Inelastic, and the Product is Perishable ..................................................................................... 71

     H.    Defendants' Manipulation of the NQSalmon Index Affected Prices in the United States. ...................................................................................... 72

V.    STATUTES OF LIMITATIONS..................................................................... 76

VI.   CLASS ACTION ALLEGATIONS ............................................................... 77

**VII.   INTERSTATE AND INTRASTATE TRADE AND COMMERCE**............................ **83**

**VIII.   PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY** ................... **83**

**IX.   CAUSES OF ACTION** ................................................................................................ **84**

**X.   PRAYER FOR RELIEF**............................................................................................ **118**

**XI.   JURY DEMAND** ....................................................................................................... **119**

Plaintiffs Wood Mountain Fish LLC; Bagels & Baguettes; Portland Hunt-Alpine Club, LLC; Prime Steakhouse; Mamme Inc.; Rocca Kurt's Brothers Inc.; and Stephen T. Deangelis, Inc. ("Plaintiffs"), individually and on behalf of all others similarly situated (the "Classes," and collectively the "Class," as defined below), upon personal knowledge as to the facts pertaining to themselves, and upon information and belief as to all other matters, and based on the investigation of counsel,[1] bring this class action for damages under the laws of the several states and territories recognizing such a claim, and for injunctive relief pursuant to the federal antitrust laws, and demand a trial by jury on all matters so triable.

## I.      NATURE OF THE CASE

1.      This lawsuit arises from the illegal manipulation of farmed Atlantic salmon prices by a cartel of dominant, primarily Norway-based, producers which artificially raised prices worldwide, including in the United States. In April 2013, these defendant producers engineered a new price index, the Nasdaq Salmon Index, widely known as NQSalmon. Ever since NQSalmon's creation, the index has been subject to Defendants' price manipulation, which has resulted in increased spot prices for Atlantic salmon artificially-heightened prices paid by the proposed class.

---

[1] The investigation of counsel included the review of documents that Defendants produced to Plaintiffs' counsel in response to Plaintiffs' request for material Defendants had produced to the United States Department of Justice ("DOJ") and the European Commission ("EC"). The documents produced to the DOJ and the EC come from the files of Defendants' European offices and their United States subsidiaries. However, the produced documents did not include documents contained in Defendants' Norwegian headquarters, as Norway is not a part of the European Union. Grieg produced no documents. SalMar produced only 480 documents. While Ocean Quality AS produced over 100,000 documents, it did not produce any for certain key custodians, including its managing director and European sales manager. Likewise, Mowi did not produce custodial files for its chief executive officer or chief operating officer during the relevant time period. There are also relatively few documents relating to communications between Defendants and the NQSalmon index which, for the reasons discussed below, formed an essential part of Defendants' anticompetitive conduct. Defendants also did not produce transactional data nor documents concerning their submissions to the NQSalmon index. Finally, because the Cermaq entities are newly added, they have yet to produce any documents in this lawsuit. Plaintiffs expect additional evidence to come to light during discovery in this matter.

Through their manipulation of spot market prices, Defendants artificially stabilized prices even when Russia banned the importation of Norwegian salmon in 2014, and then subsequently increased prices, leading to record profits for Defendants.

2.      Defendants' anti-competitive and collusive conduct has not gone unnoticed. Both European regulators and the U.S. Department of Justice have ongoing investigations of the cartel. A private class action was also filed in this District on behalf of direct purchasers of salmon, in which the Court recently denied Defendants' motions to dismiss. *See* 23 March 2021 Order, *In re Farm-Raised Salmon & Salmon Prods.*, No. 19-21551-CIV-ALTONAGA/Louis [ECF No. 307].

3.      Plaintiffs are indirect purchasers of farm-raised salmon and salmon products derived therefrom, such as salmon fillets or smoked salmon ("farm-raised salmon"), sold by the Defendant salmon-farming companies and/or entities owned or controlled by Defendants. These companies are: "**Mowi**" or "**Marine Harvest**" (specifically, Mowi ASA (f/k/a Marine Harvest ASA); Mowi USA, LLC (f/k/a Marine Harvest USA, LLC); Mowi Canada West, Inc.; and Mowi Ducktrap LLC (f/k/a Ducktrap River of Maine LLC)); **Grieg** (specifically, Grieg Seafood ASA; Grieg Seafood BC Ltd.; Ocean Quality AS; Ocean Quality North America Inc.; Ocean Quality USA Inc.; and Ocean Quality Premium Brands, Inc.; SalMar ASA ("**SalMar**"); **Lerøy** (specifically, Lerøy Seafood AS and Lerøy Seafood USA Inc.); **Cermaq** (specifically, Cermaq Group AS; Cermaq US LLC; Cermaq Canada Ltd.; and Cermaq Norway US).[2] Plaintiffs seek to represent a class of similarly situated indirect purchasers who purchased Defendants' farm-raised salmon between April 10, 2013 and the present, and assert claims under the antitrust and consumer protection laws of each state recognizing a right of action for indirect purchasers harmed by

---

[2] A chart depicting these entities and their relationships, prepared by Plaintiffs' counsel, is submitted herewith as **Exhibit A**.

anticompetitive conduct, as set forth below. Plaintiffs also seek injunctive relief under both the Clayton Act and Sherman Act.

**The EC and DOJ Investigations**

4.      The EC confirmed "that on 19 February 2019 its officials carried out unannounced inspections in several Member States at the premises of several companies in the sector of farmed Atlantic salmon."[3]

5.      The EC commenced its investigation by sending a letter in early February 2019 to the world's dominant suppliers of farm-raised salmon and their affiliates, in which it explained that it had received information that the companies—i.e., the Defendants in this action—are "participat[ing in] or have participated in anti-competitive agreements and/or concerted practices related to different ways of price coordination in order to sustain and possibly increase the prices for Norwegian salmon."[4]

6.      According to the EC investigation, Defendants:

- Coordinated prices and exchanged commercially sensitive information;

- Agreed to purchase salmon from other competitors when these other competitors sell at lower prices; and

- Applied a coordinating strategy to increase spot prices of farmed Norwegian salmon in order to secure higher price levels for long-term contracts.

7.      In November 2019, the DOJ issued criminal subpoenas to entities owned by Defendants Mowi, SalMar, Grieg, and Lerøy regarding the alleged price-fixing of Atlantic salmon. The DOJ's probe relates to the same allegations as the EC investigation.

---

[3] *See* http://europa.eu/rapid/press-release_STATEMENT-19-1310_en.htm (last accessed April 21, 2021).

[4] *See* https://www.undercurrentnews.com/2019/02/21/norways-antitrust-regulator-eyes-salmon-price-fixing-probe-with-interest/ (last accessed April 21, 2021).

**Defendants' Scheme**

8.      As alleged below, Defendants have engaged in extensive anticompetitive conduct to fix, maintain, and raise the price of farmed Atlantic salmon. Defendants coordinated to use their market power and positions on the NQSalmon Advisory Panel to artificially inflate the NQSalmon index, which they used as the basis for the prices they charged their customers. Defendants were able to enforce this anticompetitive pricing agreement by exchanging pricing and other competitively sensitive information with one another, both in-person and through telephone and e-mail.

9.      After establishing the NQSalmon index as the world's effective spot price for their products, Defendants bought and sold salmon from one another through non-arm's length transactions. Defendants then reported those transactions to the NQSalmon index, which publishes the NQSalmon index weekly. By reporting these transactions, Defendants created the appearance of additional demand for salmon, which had the effect of inflating, maintaining, or stabilizing the NQSalmon index price. Subsequently, Defendants used that index price to justify charging higher prices to their customers. Defendants achieved record profits and revenues, even in the face of a 2014 Russian ban of Norwegian salmon that should have caused demand to plummet and prices to crash.

10.     Plaintiffs seek to represent a Class consisting of all persons and entities in the states or territories recognizing the right of indirect purchasers to recover for injuries caused by anticompetitive conduct (set forth below) who indirectly purchased farm-raised salmon produced by one or more Defendants and/or entities owned or controlled by them from April 10, 2013 to the present (the "Class Period"). Excluded from the Class are the Court and its personnel, and any

Defendants and their parent or subsidiary companies. Plaintiffs demand a trial by jury on all matters so triable.

## II.    JURISDICTION AND VENUE

11.    Plaintiffs bring this class action lawsuit pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15 and 26) seeking to enjoin Defendants' anticompetitive conduct; and for such other relief as is afforded under the antitrust laws of the United States for Defendants' violations of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a), 26).

13.    Additionally and alternatively, the Court has subject matter jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action with more than 100 Class members, the amount in controversy exceeds $5 million exclusive of interest and costs, and there is minimal diversity.

14.    The Court also has supplemental jurisdiction over Plaintiffs' and the Class members' state law damages claims pursuant to 28 U.S.C. § 1367 because Plaintiffs' state law claims are so related to the federal claim at the time this matter is brought that they form part of the same case or controversy.

15.    The Court has personal jurisdiction over Defendants pursuant to Fed. R. Civ. P. 4(k) and 15 U.S.C. § 22, which permits a lawsuit to be filed against a corporation in any district where the corporation may be found or transacts business and allows all process in such cases to be served in any district where the corporation may be found.

16.    The Court also has personal jurisdiction over Defendants based on their residency or transaction of business in the State of Florida. Defendants purposefully placed price-fixed farm-raised salmon into the steam of commerce in Florida. Defendants purposefully availed themselves of the

benefits and protections of the laws of Florida and committed tortious acts in Florida. Furthermore, Defendants' subsidiaries in the United States engaged in purposeful activities within Florida that are imputable to their parent companies. Jurisdiction is also appropriate under the "conspiracy theory of jurisdiction" recognized by the Florida Supreme Court. *Execu-Tech Business Sys., Inc. v. New Oji Paper Co., Ltd.*, 752 So. 2d 582 (Fla. 2000). As to the federal claims, this Court has jurisdiction based on Defendants' minimum contacts with the United States.

17.      Venue is proper in this District pursuant to Sections 4, 12, and 16 of the Clayton Act (28 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because, at all times relevant to the Complaint, one or more of the Defendants resided, transacted business, was found, or had agents in this District.

## III.      PARTIES

18.      Plaintiff Wood Mountain Fish LLC ("Wood Mountain Fish") is a Massachusetts company that distributes fish and seafood. Wood Mountain Fish is headquartered at 11 Bluff Head Road, Sharon, MA 02067. During the Class Period, Plaintiff purchased farm-raised salmon indirectly from one or more of the Defendants and has suffered monetary loss as a result of the antitrust violations alleged herein.

19.      Plaintiff Bagels & Baguettes is a Washington, DC restaurant located at 901 New York Avenue NW, Washington, DC 20001. During the Class Period, Bagels & Baguettes purchased farm-raised salmon indirectly from one or more of the Defendants and has suffered monetary loss as a result of the antitrust violations alleged herein.

20.      Plaintiff Portland Hunt-Alpine Club, LLC ("Portland Hunt-Alpine Club") is a Maine restaurant located at 75 Market Street, Portland, ME 04101. During the Class Period, Portland Hunt-Alpine Club purchased farm-raised salmon indirectly from one or more of the Defendants and has suffered monetary loss as a result of the antitrust violations alleged herein.

21.     Plaintiff Prime Steakhouse is a New York restaurant located at 232 West Main Street, Falconer, NY 14733. During the Class Period, Prime Steakhouse purchased farm-raised salmon indirectly from one or more of the Defendants and has suffered monetary loss as a result of the antitrust violations alleged herein.

22.     Plaintiff Mamme Inc., doing business as Sapore Italiano Ristorante ("Sapore") is a California restaurant located at 1447 Burlingame Avenue, Burlingame, CA 94010. During the Class Period, Sapore purchased farm-raised salmon indirectly from one or more of the Defendants and has suffered monetary loss as a result of the antitrust violations alleged herein.

23.     Plaintiff Rocca Kurt's Brothers Inc., doing business as Ristorante Rocca ("Rocca") is a California restaurant located at 1205 Broadway, Burlingame, CA 94010. During the Class Period, Rocca purchased farm-raised salmon indirectly from one or more of the Defendants and has suffered monetary loss as a result of the antitrust violations alleged herein.

24.     Plaintiff Stephen T. Deangelis, Inc., doing business as Golden Goose Market ("Golden Goose Market"), is a grocery market with its principal place of business located at 179 Commercial Street, Boston, MA 02109. During the Class Period, Golden Goose Market purchased farm-raised salmon indirectly from one or more of the Defendants and has suffered monetary loss as a result of the antitrust violations alleged herein.

**Mowi**

25.     Defendant Mowi ASA (f/k/a Marine Harvest ASA) is a Norwegian seafood company with operations in several countries around the world. It has more than 14,000 employees in 25 different countries. Most of its operations are based in Norway, Scotland, Canada, the Faroe Islands, Ireland and Chile, where it produces, processes, and sells farm-raised salmon, and it has

"significant market shares in the jurisdictions in which [it] operate[s]."[5] It also operates processing and value added plants in Europe, Asia, and North America, in which it prepares a range of seafood products. Through its various subsidiaries, Mowi ASA has between 25% and 30% of the global salmon and trout market, making it the world's largest company in the sector. The company is headquartered at Sandviksboder, 77AB, 5035, Bergen, Norway. Mowi ASA is listed on the Oslo Stock Exchange, where it is a constituent of the benchmark OBX Index.

26.     Mowi ASA markets itself, along with its various subsidiaries, as a single unified global company. In 2018, it renamed itself from Marine Harvest to Mowi. It also changed the name for its wholly owned and controlled subsidiaries, including Marine Harvest USA, LLC (renamed to Mowi USA) and Ducktrap River of Maine LLC (renamed to Mowi Ducktrap, LLC).

27.     Mowi sells salmon and processed seafood products to more than 70 markets worldwide, selling more than 6 million meals worldwide each day.

28.     Mowi is closely intertwined with the Lerøy Defendants, described below. Since 2010, the Chairman of the Board of Mowi has been Ole-Eirik Lerøy, who was the CEO of Lerøy from 1991 to 2008. Ole-Eirik is the grandson of the grandson of Lerøy's founder, Hallvard Lerøy, and the son of Hallvard Lerøy Jr., himself a former Lerøy CEO and board member. Ole-Eirik's younger brother, Knut Hallvard Lerøy, was at various times during the Class Period Lerøy's President/Managing Director and its Head of Operations. Ole-Eirik is not the only executive to have joined Mowi from Lerøy. The CEO of Mowi until recently was Alf-Helge Aarskog, who previously served as Executive Vice-President and then CEO of Lerøy. Mowi's current CEO is Ivan Vindheim, who was previously Mowi's CFO and who formerly served in that role at Lerøy.

---

[5] https://issuu.com/hg-9/docs/mowi_annual_report_2018_4e0dacb83168e4?e=19530043/68703955  (last accessed April 22, 2021).

29.      In December 2012, Mowi acquired a 48.5 percent stake in Morpol ASA. It acquired an additional 38.6 percent of the remaining shares in March 2013, before purchasing the remaining shares in November 2013. While the European Commission approved the acquisition, it later fined Mowi for having exercised effective control of Morpol before the acquisition was approved. Mowi later delisted Morpol from the Oslo stock exchange.

30.      Ola Brattvoll has served as both chairman of Morpol ASA and chief operating officer of Mowi. He previously worked for Lerøy ASA.

31.      Morpol ASA specializes in the production of smoked and marinated salmon. It is the "world's undisputed largest buyer of salmon."[6] As a result, it has significant leverage over market prices.



---

[6] https://www.fis.com/fis/worldnews/search_brief.asp?l=e&id=108797&ndb=1 (last accessed March 1, 2021).

32.     As will be described in greater detail below, Morpol's purchasing power is so substantial that it could cause spot prices to increase or decrease based upon its purchasing decisions. Defendants used this power to inflate the price of salmon across the United States and the rest of the world.

33.     Morpol works in conjunction with all of Mowi's operations, including those located in the United States, as shown below:



34.     Mowi's unified global business strategy is further evidenced by its website, in which it describes itself as a "global fully integrated company."[7] The website lists all of Mowi's subsidiaries, including Mowi USA, under the "Contact" tab. It describes each them as part of a single Mowi entity located in 25 countries worldwide. Mowi USA's website contains contact information for only three employees (one of whom is sales manager for Mowi Ducktrap). All job

---

[7] https://mowi.com/blog/new-name-new-website/ (last accessed March 1, 2021).

postings for any opportunity at Mowi in any of its locations can be accessed by visiting Mowi's website. Subsidiaries do not post their openings independent of Mowi.

35.     Mowi organizes its sales and marketing divisions geographically and has 667 employees in the Americas. It also claims to have "significant new product development competence in [its] central markets like the Americas."[8]

36.     Mowi does business in the United States, including Florida, through its wholly owned subsidiary, Defendant Mowi USA (f/k/a Marine Harvest USA). Mowi USA is a Florida limited liability company that maintains its principal place of business at 8550 N.W. 17th Street #105, Miami, Florida 33126. It processes salmon in Florida and Texas and distributes it to wholesalers, retailers and others in Florida and elsewhere in the United States.

37.     Mowi USA does not have its own independent website. It is instead marketed on Mowi ASA's webpage, along with Mowi USA's registered trademarks Rebel Fish and The Salmon Kitchen.com. Mowi's logo is included with this marketing. The interchangeability between Mowi and Mowi USA is such that *Undercurrent News* referred to Mowi USA as the "US downstream division" of Mowi.[9]

38.     Mowi USA's section of the Mowi website states that "[e]veryday fresh fish is flown to Miami and Dallas where we package and ship it across the country."[10] Salmon come from Canada, Chile, and Norway and are processed at facilities in Medley, Florida, and Arlington, Texas. Mowi's Florida facility, at more than 100,000 square feet, is one of its largest in the world.

---

[8] https://issuu.com/hg-9/docs/mowi_annual_report_2018_4e0dacb83168e4?e=19530043/68703955 (last accessed Feb. 11, 2021).
[9] https://www.undercurrentnews.com/2018/01/26/marine-harvest-to-more-than-double-miami-production-with-new-plant/ (last accessed February 8, 2021).
[10] https://mowi.com/contact/office/ (last accessed February 8, 2021).

39.     Mowi indicates it is able to "reach the west coast, east coast and central states within days, enabling us to provide . . . salmon and fish products to the entire US market."[11] Mowi has also entered into a partnership with Walmart for the sale of skin-packed salmon and sells its products to American customers through Amazon.

40.     Mowi availed itself of the laws and privileges of the United States by filing reports with the United States Securities and Exchange Commission. Its predecessor company, Marine Harvest, was also listed on the New York Stock Exchange until 2017.

41.     Defendant Mowi Canada West (f/k/a Marine Harvest Canada, Inc.) is a foreign corporation and wholly-owned subsidiary of Mowi. Marine Harvest Canada processes salmon in British Columbia, Canada, and distributes salmon in Canada and the western United States. Marine Harvest Canada is headquartered at 1334 Island Highway, Suite 124, Campbell River, British Columbia, V9W 8C9, Canada. As noted above, Mowi ASA uses it control over Mowi Canada to ship fresh salmon to the United States.

42.     Defendant Mowi Ducktrap (f/k/a Ducktrap River of Maine LLC) is a Maine limited liability company and wholly-owned subsidiary of Mowi. Mowi Ducktrap sells processed salmon products, such as sliced smoked salmon, under a number of trade names, including Ducktrap and Kendall Brook. These products from Mowi Ducktrap are sold throughout the United States at retailers like Whole Foods. The company has its headquarters at 57 Little River Dr., Belfast, ME 04915.

43.     Mowi's annual report includes subsidiaries in the United States and Canada, including Mowi USA, Mowi Canada, and Mowi Ducktrap. Through financial, investor, and

---

[11] https://issuu.com/hg-9/docs/mowi_annual_report_2018_4e0dacb83168e4?e=19530043/68703955 (last accessed February 8, 2021).

promotional materials, Mowi clearly conveys that it is a single global integrated entity and that Mowi USA, Mowi Canada, and Mowi Ducktrap are all divisions of it. Each Mowi entity is vicariously liable for the conduct of the others because they operate as a single enterprise whose overarching objective is to distribute salmon in the United States. In addition, the presence of each entity in the United States subjects all entities to the jurisdiction of this Court.

44.     Mowi ASA, Mowi USA, Mowi Canada, and Mowi Ducktrap and all former iterations of them under the Marine Harvest brand are collectively referred to hereinafter as Mowi and are vicariously liable for the antitrust violations described for each of them.

**Grieg**

45.     Defendant Grieg Seafood ASA ("Grieg") is a foreign corporation that describes itself as "one of the world's leading fish farming companies, specializing in [A]tlantic salmon." Its "farming facilities are in Norway, Canada and the United Kingdom."[12] The company is headquartered at C. Sundtsgate 17/19, 5004, Bergen, 5004, Norway, and is listed on the Oslo Stock Exchange. Grieg Seafood ASA sells salmon in the United States through its majority-owned sales agent, Ocean Quality AS ("OQ").

46.     Defendant OQ is a foreign corporation engaged in the salmon distribution business, with its headquarters at Grieg-Gaarden, C. Sundtsgate 17/19, N-5004, Bergen, Norway. Grieg owns 60 percent of the outstanding shares of OQ and controls its operations. Bremnes Seashore AS ("Bremnes Seashore") owns the remaining 40 percent of OQ. Grieg describes OQ as its "sales company," "taking care of [Grieg's] fish from the processing plant and all the way to the customers."[13]

---

[12] *See* https://www.griegseafood.no/en/ (last accessed May 21, 2019).
[13] https://newsweb.oslobors.no/obsvc/attachment.obsvc?messageId=474370&attachmentId=181674&obsvc.item=1(last accessed February 12, 2021).

47.     Like Mowi, Grieg employs Lerøy alumni, including at its most senior positions. From 2010 to 2017, OQ's managing director and CEO was Arne Aarhus, who previously worked for Lerøy. He was succeeded by Espen Engevik.

48.     Defendant Ocean Quality North America Inc. ("OQ NA"), a foreign corporation and wholly owned subsidiary of OQ, is headquartered at 4445 Lougheed Highway, 500, Burnaby, BC V5C0E4, Canada. OQ NA facilitates the distribution of farm-raised salmon produced by Grieg and its subsidiaries and Bremnes Seashore throughout the United States. OQ NA has a dedicated sales office headed by General Manager Dennis Bryant, whose direct telephone number bears a Dallas, Texas area code. Its operations were described in a 2014 article:[14]

> Norway-based Grieg Seafood announced the launch of Ocean Quality North America, which will assume exclusive responsibility for all sales and marketing of Grieg Seafood British Columbia's farmed seafood products in North America.
>
> According to Dave Mergle, manager of the new sales organization, the move follows Grieg Seafood in Europe's launch of Ocean Quality for selling and marketing Grieg Seafood's fish a few years ago.
>
> "That model has gone very well so recently the decision was made that this is how it should work everywhere so it's being implemented here in North America," Mergle told SeafoodSource. "What they found was that it's given [Grieg] a lot more proximity to the market and allowed them to get closer to the customers.
>
> "Grieg Seafood farms in British Columbia predominantly serve the North American market. Since its inception, they've used a third party broker, Calkins and burke, for sales and marketing and focused mostly on producing their fish. We've had a great relationship [with our broker] done a nice job for us but we think it hasn't really allowed us to get close to marketplace. We want to bring transparency to the entire chain and deliver more value by being integrated. It will also allow us to start giving our customers more

---

[14] https://www.seafoodsource.com/news/supply-trade/grieg-takes-over-north-america-sales-marketing (last accessed February 12, 2021).

option across our entire portfolio including fish from Scotland and
Norway and accessing the power of the whole Grieg Network."

49.     Defendant Ocean Quality USA Inc. ("OQ USA") is a Delaware corporation and
wholly-owned subsidiary of OQ, with its principal place of business located at 1914 Skillman
Street #110-309, Dallas, Texas, 75206-8559. OQ USA distributes salmon products produced by
Grieg and its subsidiaries throughout the United States. OQ USA is a relatively small operation;
Engevik served as CEO during the same time he was CEO of OQ.[15]

50.     Defendant Ocean Quality Premium Brands, Inc. ("OQ Premium Brands") is a
Delaware corporation and wholly-owned subsidiary of OQ, headquartered at 4445 Lougheed
Highway, 500, Burnaby, BC V5C0E4, Canada. OQ Premium Brands' business purpose, according
to a December 7, 2018 filing with the California Secretary of State, is "MARKETING AND
BRANDING." OQ Premium Brands distributes salmon products produced by Grieg and its
subsidiaries throughout the United States. Effective February 15, 2021, OQ Premium Brands
became known as Grieg Seafood Sales Premium Brands Inc.

51.     The various Grieg subsidiaries are all extensively linked. Grieg has described OQ
as "the sales organization of Grieg Seafood and Bremnes Seafood."[16] OQ's website does not
identify the OQ entities; it merely identifies its sales offices across the world and provides only
two contact people for its North American operations.

52.     Through Defendant Grieg Seafood BC Ltd. ("Grieg BC"), a foreign corporation
and wholly-owned subsidiary of Grieg, Grieg targets and sells its salmon to the United States,
including Florida. Grieg BC is headquartered at 1180 Ironwood Street # 106, Campbell River,

---

[15] http://www.buzzfile.com/business/Ocean-Quality-USA-Inc.-214-984-7412 (last accessed
March 1, 2021).
[16] http://cws.huginonline.com/G/138681/PR/201802/2168508_5.html (last accessed February 12,
2021).

British Columbia, Canada, V9W 5P7. Grieg BC farms salmon on twenty-two sites in British Columbia.

53.     Grieg explained that Grieg BC's location is advantageous and responsible for a 2017 increase in earnings before interest and taxes because "[h]aving production close to the US market is advantageous due to fast deliveries and shorter transport."[17] In 2018, Grieg explained that sales in the United States increased from 9 percent in 2017 to 14 percent in 2018 because of "record high harvest volumes in Grieg Seafood British Columbia."[18]

54.     Grieg BC's most high profile product, Skuna Bay, is sold by its OQ subsidiaries. Grieg has noted that the White House served Skuna Bay at the Inauguration Dinner of President Barack Obama. Skuna Bay is served at more than 2,500 high-end restaurants, including locations in "Los Angeles, Chicago, New York, Washington, D.C., Philadelphia, San Diego, Phoenix, Las Vegas, Denver, Pittsburgh, Cleveland, Indianapolis, Seattle and Minneapolis." Skuna Bay is the also exclusive house purveyor of fresh salmon for the James Beard Foundation. Though it accounts for only five percent of the sales volume for Ocean Quality Canada, Skuna Bay delivers roughly 25 percent of the margin.

55.     Started in 2011, Skuna Bay has now "achieved national U.S. distribution, available in all continental U.S. states . . . and sixteen exclusive distributor relationships across North America.[19] For example, North Star Seafood became Skuna Bay's exclusive distributor in Florida in 2015. North Star Seafood was later acquired by Sysco Corporation, which distributes products

---

[17] http://hugin.info/138681/R/2185432/844586.pdf (last accessed March 1, 2021).

[18] http://hugin.info/138681/R/2241483/884196.pdf (last accessed April 16, 2021).

[19] https://fishchoice.com/business/ocean-quality-north-america-inc#:~:text=Breaking%20new%20ground%20in%20quality,distributor%20relationships%20across%20North%20America. (last accessed February 12, 2021).

to 196 facilities serving 425,000 customers. Louisiana Foods, also owned by Sysco, has a distribution deal to provide Skuna Bay to Texas, Oklahoma, Arkansas, and Louisiana.

56.     The Grieg and OQ entities are vicariously liable for the conduct of the others because they operate as a single enterprise, whose over-arching objective was to distribute salmon within the United States. Grieg, Grieg BC, OQ, OQ NA, OQ USA, and OQ Premium Brands are collectively referred to as Grieg. Grieg ASA is vicariously liable for the conduct of its Norwegian, Canadian, and United States subsidiaries and affiliates in relation to the antitrust violations committed by it as alleged throughout. OQ refers to OQ AS acting on behalf of itself, the other OQ entities, and Grieg ASA, unless otherwise noted.

57.     On May 26, 2020, Grieg announced it was dissolving its OQ partnership with Bremnes to start its own sales organization. Grieg's CEO explained: "*We have set ourselves ambitious goals. We will grow, be more effective and take a more active role throughout the value chain. A crucial part of our downstream strategy is to further strengthen the cooperation between our production network and the sales organization. Fully integrating sales and marketing with current operations, enables us to optimize upstream activities with local customer demand*[.]"[20] Grieg indicated its new sales organization "will partly be based on the Ocean Quality Sales Force."[21]

**SalMar**

58.     Defendant SalMar ASA ("SalMar") is a foreign corporation that describes itself as "one of the world's largest and most efficient producers of Atlantic salmon, and is vertically

---

[20] https://www.globenewswire.com/news-release/2020/05/26/2038738/0/en/Grieg-Seafood-ASA-Grieg-Seafood-establishes-fully-owned-sales-organization-to-support-growth-and-downstream-strategy.html (last accessed February 12, 2021).
[21] *Id.*

integrated along the entire value chain from broodfish, roe and smolt to harvesting, processing and sales."[22] The company is headquartered at Idustriveien 51, N7266, Kverva, Norway. SalMar is listed on the Oslo Stock Exchange.

59.   According to SalMar's website:

SalMar has established a fully integrated system for farming, processing, sales and distribution of farmed salmon and is thus in control of the total value chain.

The salmon that SalMar is producing is sold through an in-house salesforce and/ or through close partners.

Proximity to markets and customers, direct or through partners is important to secure efficient use of a high-quality raw material that has been through a traceable and controlled production process.

InnovaMar is the name of SalMar's new harvesting and processing facility in Frøya, central Norway. It aims to be the world's most innovative and efficient facility for the landing, harvesting and processing of farmed salmon. InnovaMar covers 17,500 m2 of floor space and comprises two departments (harvesting and processing). The facility has the capacity for all kinds of storage. Good internal logistics ensure safe and efficient handling of the products. The increased capacity affords a high level of flexibility with regard to organi[z]ing production and sales.

SalMar produces a wide variety of fresh and frozen salmon products. The customer base is global and includes small and large importers/exporters, as well as larger processing companies and retail chains.[23]

60.   SalMar also sells directly to entities within the United States:

SalMar had direct sales to around 50 different countries in 2017. SalMar's most important geographic market in 2017 was Europe, with Poland, Lithuania and Sweden as the largest individual markets. The second largest market was Asia, with Vietnam, Japan and Singapore as the largest individual markets. After sales to Russia were blocked in 2014, North America has been the third largest market, with the USA as the largest individual market.

---

[22] *See* SalMar 2017 Annual report, http://hugin.info/138695/R/2188425/846513.pdf, at 45 (last accessed April 21, 2021).

[23] *See* https://www.salmar.no/en/sales-distribution/ (last accessed April 21, 2021).

SalMar experienced particularly strong growth in the American market in 2017.[24]

61.     SalMar sells extensively in the United States. North America is the third largest export destination for SalMar products. For example, Platina Seafood, Inc., located in Miami, Florida, purchased 19,894 kg of salmon from SalMar on July 5, 2016. Platina Seafood is owned in part by Johan Andreassen, the former founder of Norwegian fish farmer Villa Organic. It distributes products throughout the United States.

62.     ████████████████████████████████████████████
████████████████████

**Lerøy**

63.     Defendant Lerøy Seafood AS ("Lerøy"), a foreign corporation, is a seafood production and distribution company. The company is the second largest salmon and trout farming company in the world and has fish farms in Hitra, Kristiansund, and Tromsand Scotland (Shetland). The company is headquartered at Thormøhlens gate 51 B, 5006 Bergen, Norway. Lerøy is listed on the Oslo Stock Exchange. The company has sales offices in the United States:

> Our main office is located in Bergen, but we have fishing vessels and fish farms in operation along the entire coast of Norway. We have production and packaging plants in Norway, Sweden, Denmark, Finland, France, the Netherlands, Portugal, Spain and Turkey. We also have sales offices in the USA, Japan and China.[25]

64.     Lerøy was founded by the Lerøy family in the late 19th century and was family-owned until 1997. It is now the world's second-largest producer of Atlantic salmon, and has operations throughout the world.

---

[24] *See* 2017 Annual Report, http://hugin.info/138695/R/2188425/846513.pdf, at 53 (last accessed April 21, 2021).
[25] *See* https://www.leroyseafood.com/en/about-us/about-leroy/ (last accessed February 16, 2021).

65.     Defendant Lerøy Seafood USA Inc. ("Lerøy USA"), a North Carolina corporation and wholly-owned subsidiary of Lerøy, is the U.S. distribution subsidiary for Lerøy's farm-raised salmon business. Lerøy USA's principal place of business is located at 1289 Fordham Blvd., Suite 406, Chapel Hill, NC 27514. It does not have its own website, but is listed on Lerøy's site as a "VAP, sales & distribution" office.[26] Lerøy USA appears to be a small operation; Lerøy's website lists only a single employee contact. Other publications indicate it has only three employees.

66.     Lerøy has availed itself of the laws and privileges of the United States, including by filing forms with the Securities and Exchange Commission. It also benefitted from the sale of depository shares to United States investors.

67.     Each of the Lerøy entities is vicariously liable for the conduct of the others because they operate as a single enterprise, whose overarching objective—as relevant to the claims made in this Complaint—is to distribute salmon within the United States. In addition, the presence of Lerøy USA in the United States subjects all Lerøy entities to the jurisdiction of this Court for the actions giving rise to this litigation.

68.     Lerøy AS and Lerøy USA are collectively referred to herein as "Lerøy" and are vicariously liable for the acts of each other in connection with the antitrust violations described herein.

**Cermaq**

69.     Defendant Cermaq Group AS (f/k/a Cermaq ASA) is a company incorporated and domiciled in Norway and headquartered in Oslo, Norway. Until 2014 it was a publicly traded company on the Oslo Stock Exchange. In October 2014, Mitsubishi Corporation acquired Cermaq

---

[26] https://www.leroyseafood.com/en/contact/our-offices/ (last accessed February 16, 2021).

ASA and delisted it from the stock exchange. Cermaq AS is now wholly owned by Mitsubishi Corporation through its wholly owned subsidiary MC Ocean Holdings Limited.

70.      Cermaq Group AS is the parent company of Cermaq Norway AS, Cermaq Canada Ltd., and Cermaq Childe SA, as shown below:[27]



71.      Cermaq Norway shares an office with Cermaq Group AS in Oslo, and Cermaq Canada is headquartered at 919 Island Hwy #203, Campbell River, BC V9W 2C2, Canada. Cermaq Group AS also owns a 100% controlling interest in Cermaq US LLC, which was formed in 2014.

72.      Cermaq is the "third largest salmon (including coho) farming, processing and sales company in the world," with a total production quantity of around 180 thousand metric tons per year.[28] Cermaq produces more than 2.5 million salmon meals each day. Cermaq supplies salmon and salmon products to more than 70 countries throughout the world, including the United States and Canada.

73.      In 2017, Cermaq appointed Arild Aarke as its head of sales for North America, giving him responsibility for Cermaq's sales offices in Vancouver and Miami. Aarke previously

---

[27] https://www.cermaq.com/assets/Global/PDFs-sustainability/cermaq-integrated-report-2014.pdf (last accessed February 16, 2021).

[28] https://www.mitsubishicorp.com/jp/en/bg/food-industry-group/project/cermaq/#:~:text=The%20third%20largest%20salmon%20(including,thousand%20metric%20tons%20per%20year. (last accessed February 16, 2021).

served as head of Europe's business development. He also previously worked as then-Marine Harvest's global marketing and business development director. Aarke works with both strategic customers in Europe and North America.

74.    Cermaq US LLC has its principal place of business and is located at 5835 Blue Lagoon Drive, Miami, Florida 33126. It was registered as an LLC in July of 2014 in Florida. It has very few employees, and instead operates as an arm of Cermaq's North American operations. Aakre identifies himself as the "General Manager" of Cermaq US LLC, though he continues to work in Oslo at Cermaq's main office. Cermaq's North American operations, including in the United States and Canada, are controlled by the Cermaq Group in Norway.

75.    Cermaq lists the United States as one of its "main markets" for its salmon products.[29] ███████████████████████████████████████████

76.    Cermaq Group AS, Cermaq Norway, Cermaq US LLC, and Cermaq Canada are collectively referred to herein as Cermaq and are vicariously liable for each other's antitrust violations alleged herein.

77.    Defendants' alleged actions in this Complaint were authorized, ordered, or carried out by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs. The respective Defendant parent entities identified herein exercise dominance and control over all of their respective Defendant subsidiary entities and those respective subsidiaries have a unity of purpose and interest with their respective parents. To the extent any respective parent Defendant did not keep a tight rein on its respective subsidiary Defendant(s), it had the power to assert control over the subsidiary if the

---

[29] https://www.cermaq.com/assets/Global/PDFs-sustainability/Cermaq-Sustainability-Report-2018-small.pdf (last accessed February 16, 2021).

latter failed to act in the parent's best interests. Thus, the respective parent and subsidiary Defendants operated as a single economic unit. The subsidiaries played a critical role in the conspiracy in that they (as well as the parent Defendants) sold price-fixed salmon and products derived therefrom to direct purchasers outside Defendants' conspiracy in the United States, including Florida. (These entities and their relationships are depicted in **Exhibit A**.)

78.     When Plaintiffs refer to a corporate family or companies by a single name in their allegations of participation in the conspiracy, Plaintiffs are alleging that one or more employees or agents of entities within the corporate family engaged in conspiratorial acts or meetings on behalf of all of the Defendant companies within that family. The individual participants entered into agreements on behalf of, and reported these meetings and discussions to, their corporate families. As a result, the entire corporate family was represented at any such meetings and discussions by its agents and was a party to the agreements reached by them.

79.     Various persons and/or firms not named as Defendants herein may have participated as co-conspirators in the violations alleged herein and may have performed acts and made statements in furtherance thereof.

80.     Each Defendant acted as the principal, agent, or joint venture of, or for, other Defendants with respect to the acts, violations, and common course of conduct alleged by Plaintiffs.

### IV.    FACTUAL ALLEGATIONS

### A.    <u>The EC and the DOJ are Investigating Price Increases in the Salmon Market.</u>

81.     Both the EC and the DOJ are investigating unlawful anticompetitive behavior in the salmon industry.

82.     The EC's investigation was first reported on February 19, 2019. *Undercurrent News*, which covers the seafood industry, reported that:

[T]he EC has 'received information - from different actors operating at different levels in the salmon market - alleging that Norwegian producers of farmed Atlantic salmon . . . participate or have participated in anti-competitive agreements and/or concerted practices related to different ways of price coordination in order to sustain and possibly increase the prices for Norwegian salmon.'[30]

83.    The EC sent a letter to major salmon producers in early February, alleging that they:

- Coordinated sales prices and exchanged commercially sensitive information;

- Agreed to purchase production from other competitors when these other competitors sell at lower prices; and

- Applied a coordinated strategy to increase spot prices of farmed Norwegian salmon in order to secure higher price levels for long-term contracts.

84.    Thereafter, the EC confirmed the investigation:

The European Commission can confirm that on 19 February 2019 its officials carried out unannounced inspections in several Member States at the premises of several companies in the sector of farmed Atlantic salmon.

The Commission has concerns that the inspected companies may have violated EU antitrust rules that prohibit cartels and restrictive business practices (Article 101 of the Treaty on the Functioning of the European Union). The Commission officials were accompanied by their counterparts from the relevant national competition authorities.[31]

85.    Several Defendants have also confirmed the EC raids. Mowi indicated that the EC

inspected its plants in both Rosyth and Lemmers. Mowi stated in its 2018 annual report that:

In February 2019, The European Commission carried out unannounced inspections at selected premises of several Norwegian salmon companies, including Mowi. The Commission was acting on

---

[30] *See* https://www.undercurrentnews.com/2019/02/20/ec-letter-states-salmon-price-fixing-probe-aimed-at-norway-not-scotland/ (last accessed February 17, 2021).
[31] *See* http://europa.eu/rapid/press-release_STATEMENT-19-1310_en.htm (last accessed April 21, 2021).

concerns that the inspected companies may have violated EU antitrust rules.[32]

86.     Grieg also confirmed the inspection in a February 19, 2019 notice filed with the

Oslo Stock Exchange:

> The European Commission DG (Director General) Competition has today performed an inspection at Grieg Seafood Shetland to explore potential anticompetitive behavior in the salmon industry.
>
> Grieg Seafood aims to be open, transparent and forthcoming and will provide all necessary information requested by the European Commission DG Competition in its investigation.[33]

87.     Lerøy also filed a notice with the Oslo Stock Exchange stating that:

> EU's competition authorities (European Commission Director General Competition) ha[ve] conducted an inspection at the premises of Scottish Sea Farms Ltd. a company owned 50% by Lerøy Seafood Group ASA (LSG). The purpose is, according to the competition authorities, to investigate accusations of anti-competitive cooperation in the salmon market. In connection with the inspection, the EU competition authorities ha[ve] also requested for information from the shareholders in Scottish Sea Farms Ltd.[34]

88.     Finally, SalMar filed the following report with the Oslo Stock Exchange:

> On [the] 19th of February 2019 the European Commission Director General Competition performed an inspection at Scottish Sea Farms Ltd., in which SalMar ASA indirectly owns 50 per cent. SalMar is in constructive dialogue with the Commission in this regard.[35]

89.     While Cermaq has not been investigated by the EU, it has no facilities in any of the

EU's member states.

---

[32] *See* http://hugin.info/209/R/2239765/882920.pdf, at 217 (last accessed April 21, 2021).

[33] *See* https://www.griegseafood.no/investors/stock-exchange-filings/ (last accessed May 21, 2019).

[34] *See* https://www.leroyseafood.com/en/investor/Stockexchangenotices/ (last accessed April 23, 2019).

[35] *See* https://newsweb.oslobors.no/message/470051 (last accessed April 21, 2021).

90.     The EC investigation has shown little sign of slowing down. In June 2020, it was reported that the EC had sent a survey to all customers of the companies under investigation. The survey sought information related to Defendants' pricing practices.

91.     The DOJ is also investigating Defendants' anticompetitive practices. In November 2019, Mowi stated that DOJ was "opening a criminal investigation involving allegations of similar conduct" to that being investigated by the EC.[36] SalMar, Grieg, and Lerøy all confirmed the same, with Grieg and Lerøy indicating that their U.S. subsidiaries, Ocean Quality AS, Ocean Quality USA, Inc., and Ocean Quality Premium Brands, Inc. (Grieg) and Lerøy Seafood USA, Inc. (Lerøy) had received subpoenas.

92.     Investigations like these are not conducted on a whim. The EC must have "reasonable grounds for suspecting an infringement of the competition rules"; "[i]t must be borne in mind that the inspections carried out by the Commission are intended to enable it to gather the necessary documentary evidence to check the actual existence and scope of a given factual and legal situation concerning which it already possesses certain information."[37] The EC cited to multiple sources to support very specific allegations in justifying the raids.

93.     Likewise, the DOJ does not even proceed with a preliminary criminal investigation until there are "sufficiently credible" allegations or suspicions "of a criminal violation."[38] The criminal violation must also be "significant," based on several factors, including the nature of the

---

[36] https://salmonbusiness.com/us-department-of-justice-are-opening-a-criminal-investigation-of-norwegian-salmon-giants/ (last accessed February 17, 2021).

[37] *See* http://curia.europa.eu/juris/document/document_print.jsf?doclang=EN&text=&pageIndex= 0&part=1&mode=lst&docid=129701& occ=first&dir=&cid=663482. (last accessed February 17, 2021).

[38] Antitrust Division Manual (5th ed.), p. III-7, *available at* https://www.justice.gov/atr/file/761166/download (last accessed February 17, 2021).

conduct and the degree of culpability of the conspirators.[39] Requests for preliminary investigations are typically approved by the appropriate Director of Enforcement and the Deputy Assistant Attorney General for Operations.

94.     These investigations are consistent with a long history of anticompetitive behavior in the salmon industry. In 1992, the EC determined that the *Fiskeoppdretternes Salgslag Organization* ("FOS") (Norwegian Fresh Fish Trade Association), Scottish Salmon Growers' Association, Scottish Salmon Farmers Marketing Board and Shetland Salmon Famers Association had agreed to mix the minimum prices of farmed Atlantic Salmon from 1989 to 1991. The EC explained that to combat falling prices attributed to the dumping of Norwegian salmon, these organizations agreed to bring their minimum prices in line with those set by FOS and to take measures to ensure price discipline among members. In 2003, the Australian Competition and Consumer Commission determined that the Tasmanian Salmonid Growers Association and Tassal Limited had agreed to "grade out" at least 10 percent of their supply in order to combat falling salmon prices.[40]

95.     Since the disclosure of these investigations, there has been substantial turnover at key leadership positions for some Defendants. Steven Leask, the Managing Director of OQ AS's operations in the United Kingdom, resigned suddenly in July 2019. Mowi's long-time CEO, Aarskog, and Espen Engevik, CEO of OQ AS, both resigned on November 12, 2019, shortly before the disclosure of the DOJ investigation.

96.     Other Defendants terminated their involvement in entities that had been linked to anticompetitive behavior following the announcement of the EC and DOJ investigations. In May

---

[39] *Id.*
[40] *ACC v. Tasmanian Salmonid Growers Association*, [2003] FCA 788, *available at* https://jade.io/article/107412. (last accessed February 17, 2021).

2020, Grieg ASA terminated its OQ AS joint venture with Bremnes. A few months later, Mowi withdrew from the Global Salmon Initiative, an organization that it founded in 2013 and that includes Grieg, Cermaq, and SalMar as members.

**B.      The Influence of Spot Prices in the Salmon Market Make It Susceptible to Collusion.**

97.      Price indices have long been an important part of the salmon industry. From 1995 to 2008, the salmon industry relied on price indices prepared by the Norwegian Seafood Federation and the Norwegian Seafood Association. In May 2008, the salmon industry created the NOS Price index. The NOS index calculated its benchmark price using the price paid by exporters from external farmers in Norway.

98.      NASDAQ acquired the NOS index in April 2012. Around the same time, key players in the salmon industry began to ████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ██████████████████████

99.      The shift from purchase price to sales prices and the inclusion of vertically integrated salmon producers meant that sales between Defendants and their value-added subsidiaries, like Morpol, could be counted in creating the index price. This change gave substantial power to Defendants to easily manipulate the spot price by selling salmon to their subsidiaries, report those sales to the NQSalmon index to increase spot prices—that is, a reference price for which a particular item can be bought immediately at market—and then use the spot price increase to justify higher prices on their long-term contracts.

100.     NQSalmon launched in April 2013. It remains in effect today, providing a weekly listing of the spot prices for Fresh Atlantic Superior Salmon, Head on Gutted to the European Market. It is composed of a weighted average spot price for head-on superior fresh salmon exported from Norway to the EU by truck. NQSalmon contains 10 separate indices: an index price and average prices for certain weights (i.e. from 1-2 kg to over 9 kg). Prices are reported in Norwegian kroner.

101.     Companies that report their prices to the NQSalmon index are referred to as "Panelists" or "Index Contributors." To qualify as a panelist, the company must: (1) have an exporter's license; (2) frequently sell at least five trucks per week (equal to 5,000 tons per year); (3) enter into an agreement with NASDAQ Clearing that allows for audits on reported prices and volumes. Today, the NQSalmon panelists are composed of 10 exporters that represent between 50 and 60 percent of all Norwegian exports. Panelists must report their prices no later than Tuesday at 2:00 p.m. CET so that they may be released later in the week.

102.     The NQSalmon index is also monitored by an Advisory Group, or Advisory Panel, which is comprised of at least three members, all of which must be Index Contributors. The Advisory Panel must be consulted before NASDAQ Clearing can amend any rules and procedures related to the index.

103.     Membership of the Advisory Panel is a closely guarded secret and Defendants' productions do not identify all members of the Advisory Panel during the time period relevant to this lawsuit. But they do confirm that in April 2015, ███████████████████████ ███ were all members. ███████████████████████ was also a member.

104.     ███████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████████████

█████████████████████████████████████████

███████████████████████████████

105.    The NQSalmon spot price is the most important price for salmon in the world. Not only is the spot price used to set the price for purchases on the spot market, it also serves as the baseline for longer term contract prices. For example, SalMar indicated in its 2018 annual report that its fixed-term contracts are "in line with the spot price (NASDAQ) for the year as a whole." Companies that are not a part of the advisory panel, like ████████████████████ █████████

### Defendants Manipulate NQSalmon

106.    By manipulating the index price through their weekly reports on their spot sales, the Panelists, including Defendants, are able to increase prices across the world, including to customers in the United States. As discussed below, Defendants communicated and coordinated with one another regarding their pricing decisions to ensure that their price manipulation would be successful.

107.    The manipulation of NQSalmon was relatively simple for Defendants. As one economist noted, there is no mechanism in place to ensure "fair reporting."[41] For example, NQSalmon rules claim to impose volume limits on each Panelist to protect against "price manipulation from dominant players."[42] Mowi regularly exceeded these limits without facing any punishment. For example, ██████████████████████████

---

[41] https://nmbu.brage.unit.no/nmbu-xmlui/bitstream/handle/11250/2497330/2016-56_Daumantas%20Bloznelis_(HH).pdf?sequence=1 (last accessed March 1, 2021).
[42] https://salmonprice.nasdaqomxtrader.com/NQSALMONRules160425.pdf (last accessed March 1, 2021).

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████ Adherence to NQSalmon's rules was supposed

to control this impact, but these rules were not enforced.

108.   ████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████

109.   Some salmon buyers realized that NQSalmon was being manipulated within eight

months of its founding. *Undercurrent News* reported in January 2014 that a group of five Polish

salmon processors was considering legal action against Morpol and Marine Harvest for their

conduct in manipulating the spot market.

110.   Alina Piasecka, the purchasing director of the Polish salmon processor Graal S.A.

("Graal"), explained that "[w]e've seen examples of prices falling in the spot market, and exporters

offering fish at increasingly lower prices," but that "[s]uddenly, 15 minutes later there are aren't

fish available, and we find out that Morpol has purchased perhaps 60 truckloads." Graal's CEO,

Boguslaw Kowalski, also said that: "[w]e are seeing that now and again they take advantage of

Morpol to buy at higher prices than that charged by the market, to hike up prices."[43]

111.   Similar behavior has been observed of the other Defendants. In 2017, Stale Hoyem

("Hoyem"), general manager of Suempol Norway (one of the biggest smoked salmon producers

in Poland and Europe) complained that "companies in Norway buy small quantities of salmon to

---

[43] *See* https://www.intrafish.com/news/751597/marine-harvest-accused-of-manipulating-polish-salmon-market (last accessed February 18, 2021).

raise the price for the rest of the players." Hoyem added that "[o]ne last thing that affects prices is that some of the major players choose to create their own purchasing departments buying a truckload here and a truckload there;" he was "suggesting this 'daily' practice is heavily influencing prices on the spot market."[44] Borge Prytz Larsen, the purchasing director at Severnaya, which imports salmon into Russia, agreed: "The big players buy fish, and they then use the price as indicators for other customers."[45]

112.    Defendants fully understood that they could manipulate the spot market to increase the prices they charged their customers. ███████████████████████████ ████████████████████████████████████████████████ ██████████████████████████ To address this, ████████████████████ ███████████████████████████████████

113.    Because of the relatively small number of salmon transactions reported to the NQSalmon index, it was easy for Defendants to knowingly and intentionally manipulate the spot price in order to fix, raise, or stabilize the price of all salmon products, including those products sold both on the spot market and through long-term contracts tied directly to the NQSalmon index price. ████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████

---

[44] *See* https://www.intrafish.com/news/1330269/norwegian-salmon-giants-accused-of-price-manipulation (last accessed February 18, 2021).
[45] *Id.*

114.   ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████

115.   ████████████████████████████████ Because the NQSalmon index was tied to the prices that Defendant set for their own products, purchasers were left paying the supracompetitive prices ████████████████████████████████████

██████

116.   There are no pro-competitive reasons for Defendants to sell such substantial quantities of salmon to Morpol. Most Defendants had their own value-added subsidiaries to which they could sell salmon. ████████████████████████████████

████████████████████████████████████████████

██████████ Morpol therefore had no reason to purchase salmon from other companies on the spot market, let alone at supracompetitive prices. The only rational reason that Morpol behaved as it did was so it could generate the appearance of additional demand for salmon and thus increase salmon prices to higher levels than would exist in a truly competitive market.

**C.**     **Defendants Engaged in Other Cartel Behavior, Including Constant Communication, and Were Dedicated to Cooperation.**

117.   Defendants had close relationships to one another, which expanded beyond their development of the NQSalmon index. Defendants freely discussed carving up geographic territories, limiting supply, and setting the price of farm-raised salmon—both before and after Russia implemented a ban against Norwegian salmon that took effect in 2014.

118.    ███████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████ This

was not a mere discussion. On March 5, 2013, just before NQSalmon debuted ████████

███████████████████████████████████████████████

████████████████████████████████████

119.    In mid-2013, news of an intended Russian ban on Norwegian salmon expected to

begin in early 2014 began to circulate in the business press. This ban was no minor issue. SalMar's

2012 annual report, released in early 2013 while SalMar and Lerøy were meeting to discuss

territorial divisions in Western Europe, makes clear how important the Russian market was to their

business: "Russia, which was SalMar's third largest market, imported by itself around 5 per cent

of SalMar's 2012 volumes."[46] In fact, "[v]olume growth in Russia totaled 26 per cent."[47]

120.    Lerøy's public-facing reports from this same time period confirm that Defendants

recognized the growing importance of the Russian market to Norwegian salmon and therefore to

Defendants' financial health:

- Lerøy's 2012 fourth quarter financial report admitted: "Russia now represents a large and growing market for Atlantic salmon and salmon trout. Admission to this market is an important factor for the Group and the general demand for salmon and salmon trout."[48]

- Lerøy's 2012 Annual Report, dated March 21, 2013, similarly recognized that the "markets showing the greatest

---

[46] SalMar Annual Report 2012, at 50-51.

[47] *Id*. at 50.

[48] https://www.leroyseafood.com/globalassets/02-documents/rapporter/kvartalsrapporter/q42012.pdf (last accessed March 1, 2021).

growth are currently Japan with 38% and Russia with 36%."[49]



121. ████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████

122. ████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████

123. ████████████████████████████████████████

████████████████████████████████████████████████

████████ Russia announced that its ban on Norwegian salmon would take effect in 2014.

124.   That news not only did not deter Defendants, it in fact provided an early acid test of the strength of Defendants' cartel. The Russian government had removed its consumer demand for Norwegian salmon. But salmon producers have little ability to change supply in the short run. The Russian embargo posed the challenge to Defendants of keeping prices steady even as other potential buyers should have been able to take advantage of the resulting glut of supply, which should have resulted in lower prices. Yet prices did not decrease. Defendants succeeded in implementing coordinated policies to maintain price.

---

[49] https://www.leroyseafood.com/globalassets/02-documents/english/reports/annual-reports/annual-report-2012.pdf (last accessed March 1, 2021).



125.

126.

127.

128.

129.

130.



131. ███████████████████████████████████████████████████

███████████

132. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████

133. ███████████████████████████████

134.     On August 6, 2014, Russia banned the import of Norwegian salmon. The ban was extended in June 2015. The impact of this ban was substantial, eliminating 10 percent of Norway's salmon market. The industry publication *Intrafish* later calculated the losses to be as much as $2.3 billion. More than three years after the ban was imposed, Russia's ambassador to Norway indicated that "[f]rom an economic point of view, Norway lost a billion dollars from the fish trade with Russia. There were attempts from Oslo to find new markets, great hopes were associated with China, but the Russian market was not replaced."[50]

---

[50] https://www.intrafish.com/marketplace/1673343/norways-seafood-firms-have-lost-nearly-usd-3-billion-since-russian-ban (last accessed February 18, 2021) (emphasis added).

135.    Through cooperation and coordination, including, as described above, however, Defendants were able to maintain and even increase salmon prices after the ban was announced in 2014, and then again in 2015 when it was extended, as reflected in the chart below:[51]





136.



[51] https://ml.globenewswire.com/Resource/Download/1766f220-c83b-499a-a46e-3941577e038b (last accessed April 7, 2021).

137.    After the Norwegian Seafood Council discussion, each Defendant downplayed the impact of the Russian ban on it individually and on the market generally.

138.    On August 20, 2014, Lerøy issued its Second Quarter 2014 financials, and addressed the Russian ban on Norwegian salmon, suggesting its impact would be only short-term for Lerøy, as follows:[52]

(a)    About Risks and Uncertainties, Lerøy stated:

Norwegian fish farming and the fish processing industry in Norway and the EU have a history of exposure to the risk represented by the constant threat of long-term political trade barriers imposed by the European Commission. ***It is also a fact that Russia has increasingly become a major market for Atlantic salmon and salmon trout. The political trade barriers now imposed on Norwegian seafood to Russia are an embodiment of political risk for the industry. This new situation represents a short-term obstacle to the Group's marketing goals.*** However, the market for high-quality seafood is global and is experiencing strong growth, and this provides grounds for an optimistic outlook, indicating that the Group has the perfect position for sustaining a positive development. (Emphasis added.)

(b)    For example, about the Market Situation and Outlook, Lerøy stated:

In previous interim reports, the Group has underlined the risk represented by political trade barriers. Russia introduced a ban on the import of Norwegian salmon and trout on 7 August 2014. Russia is one of the most important markets globally for salmon and trout. The ban represents a short-term challenge for the Norwegian seafood industry, as it does for the industry in Russia. The Group is working hard to increase sales to alternative markets. Despite this, ***the new situation in Russia will undoubtedly have an impact on Lerøy's earnings when compared with earnings generated before the ban was introduced. At the time of writing, it remains difficult to precisely predict the consequences of the ban.*** (Emphasis added.)

---

[52] https://www.leroyseafood.com/globalassets/02-documents/english/reports/quarterly-reports/q2-2014-report.pdf (last accessed March 2, 2021).

139.    On August 25, 2014, SalMar issued its second quarter report on its financial results.

It, too, spoke to the claimed price impact of the Russian ban on Norwegian salmon, stating:[53]

> [S]almon prices have, historically, proved highly volatile, with major fluctuations occurring within relatively short intervals. The most recent changes in the political climate with respect to international trade with Russia could have a significant short-term impact on the market balance. With a high proportion of output destined for the spot market, changes in price will have an immediate effect on the company's earnings.

140.    SalMar's second quarter report also discussed its declining presence in France:[54]

> Exports of Norwegian salmon to France continued to fall in the second quarter, with the total volume ending at 32,500 tonnes. This corresponds to a fall of 9 per cent compared with the second quarter last year.

141.    ████████████████████████████████████████

████████████████████████

142.    On August 28, 2014, Mowi issued its second quarter financial statements, and described in its Market Overview, the Russian ban on Norwegian salmon, stating:[55]

> The development in Russia continued to be weak in the quarter. Please note that the ongoing sanctions imposed by Russia were introduces after the end of the quarter. ***Over the last twelve months, Russia constituted about 7% of the global market for Atlantic salmon. The sanctions are anticipated to impact the traditional trade patterns for producing regions***. [Emphasis added.]

143.    In its Q2 2014 Presentation of its quarterly results, Mowi described the effect of the Russian ban as creating "short term market turbulence."[56]

---

[53] http://hugin.info/138695/R/1850975/646434.pdf (last accessed April 7, 2021).
[54] *Id.*
[55] http://hugin.info/209/R/1851306/646617.pdf (last accessed Feb. 16, 2021).
[56] *Id.*

144.     Noting that Russia's consumption of salmon constituted 100,000 tons from Norway and the UK, Mowi described the immediate versus future impact of the Russian ban on prices for salmon, stating:[57]

> The situation is putting the industries logistical and marketing skills to a serious test in the short term, as ***spot price have dropped to a level of around NOK 30. However, the forward market for the fourth quarter 2014 and 2015 remains strong, with price of NOK 39 and NOK 41 respectively***. [Emphasis added.]

145.     Of course, the impact of the Russian ban was muted due to the cooperation and agreements between and among the Defendants. As Cermaq candidly noted in its Integrated Report 2014:[58]

> Operationally we had our ***best year ever in our Norwegian operations, despite the significant challenges in the marketplace following the Russian import embargo*** for the last five months of the year.

> \* \* \*

> For the salmon business, however, I firmly believe that the global demand growth will continue, and probably even faster than before in certain countries.

> ***From what I can understand, we cannot expect that Russia will rebound as a significant market for salmon in the near future. Still, there are ample opportunities to compensate for this***, both through growth in existing markets and development of new. Therefore ***market access is not a significant limiting factor, neither for Cermaq nor for the industry as such***. [Emphasis added.]

146.     ████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

---

[57] *Id.*

[58] https://www.cermaq.com/assets/Global/PDFs-sustainability/cermaq-integrated-report-2014.pdf (last accessed March 1, 2021).

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████

147.   ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████

148.   ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████████████████

149.   ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████

150.   ███████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████

### D.     Defendants' Direct Communications Must Be Viewed in The Context of the Culture of Cooperation Fostered Within the Norwegian Salmon Industry.

151.     Defendants created opportunities to meet and speak with each other in seemingly benign settings. The industry is already small and tight-knit. Mowi, for example, has several former Lerøy executives in its senior ranks, including a member of Lerøy's founding family, Ole Eirik Lerøy, who left the family company following a 2008 takeover. His younger brother, Knut Hallvard Lerøy, remains in the senior ranks of Lerøy.[59] SalMar and Lerøy collaborate through the SSF joint venture. But Defendants added to their opportunities to communicate through their membership in trade associations, some of which they founded themselves, most notably, Norwegian Seafood Council; and National Atlantic Seafood Forum; Norwegian Seafood Federation; International Salmon Farmers' Association; and Global Salmon Initiative.

152.     Through these trade associations, Defendants discussed or had access to sensitive market and pricing information, and have had private opportunities to reach cooperative agreements, rather than engage in competitive conduct.

#### Global Salmon Initiative

153.     Defendants' commitment to cooperation is also reflected in the activities of the Global Salmon Initiative ("GSI"). The original members of the GSI included Mowi, Grieg, Lerøy, and SalMar. Aarskog, the former CEO of Mowi, came up with the idea for the GSI in 2012—contemporaneous with the creation of the NQSalmon Index—and Aarskog was GSI's Co-Chair. As explained on GSI's website:[60]

> In 2012, a small group of CEOs from salmon farming companies from Norway, Chile and Scotland attended a talk about improving environmental reputation. Inspired by stories from other sectors, these CEOs decided to continue the discussions and look at ways

---

[59] https://salmonbusiness.com/leroy-this-is-were-it-all-started/ (last accessed Feb. 18, 2021)
[60] https://globalsalmoninitiative.org/en/about-us/ (last accessed March 1, 2021).

they could break down barriers to environmental improvement in the salmon aquaculture sector.

They quickly realized that when one company performs poorly, it harms the reputation of all. It became clear that instead of using environmental performance as a means of competition, they would secure greater advantages and economic success by working together to lift the performance of the sector as a whole.

The GSI was launched in August 2013. Now with 13 members, with operations covering 8 countries – Australia, Canada, Chile, Faroe Islands, Ireland, New Zealand, Norway, and the United Kingdom the group represents approximately 50% of the global farmed salmon sector.

154.    Marine Harvest co-founded the GSI with other leading farm salmon companies. Other members included Defendants SalMar, Grieg, Lerøy, and Cermaq. All five of the defendant groups were represented within GSI.

155.    In 2014, GSI represented 70% of the salmon industry.

156.    The GSI explicitly referred to its activities as "precompetitive collaboration." The closer cooperation of Defendants (particularly their executives) through the GSI strengthened the substantial intercompetitor relationships that already existed and allowed Defendants to successfully implement the anticompetitive conduct alleged herein. Aarskog of Mowi is on record as stating that the efforts of the GSI could be utilized as a means of increasing prices.

157.    In July 2020, Mowi, which had created and championed the GSI for over seven years, suddenly abandoned it in the wake of the ongoing antitrust investigations on two continents.

**Norwegian Seafood Council**

158.    The Norwegian Seafood Council ("NSC"), which is based in Tromsø, Norway, has offices in 12 countries (including an office in Boston) and bills itself as "the industry's main source for market insight based on statistics, trade information, consumption and consumer insight."

159.     The NSC licenses the "Seafood From Norway" trademark utilized by Norwegian seafood producer-exporters. The NSC conducts a co-funded "Joint Marketing Program" that utilizes this trademark.

160.     The NSC utilizes "advisory groups" that meet periodically and give it input and opinions regarding its work; among the members of such groups are Knut Hallvard Lerøy of Lerøy (and brother of now-chairman of Mowi's board, Ole-Eirik Lerøy), Witzøe of SalMar, Arne Aarhus of Ocean Quality, and Erik Holvik of Mowi. As explained in detail below, the data analytics firm SAS Data Management ("SAS") has created a database and analytical tools for the NSC that allow industry members to share current individualized competitor data, including price data. With NQSalmon acting as a global spot price, and a reference for other pricing, the cartel needed only to have confidence that its members were not discounting from the spot price in their individual contracts. Business analytics exchanged through this and other trade groups allowed the cartel to monitor pricing to ensure that the collusively set spot price translated smoothly to higher contract prices.

161.     In addition to Defendants' participation in the NSC as members, NSC Management and Board of Directors include current and former representatives of Lerøy and Nova Sea, a subsidiary of Mowi.

162.     SAS Data Management Customer Stories page describes the NSC:[61]

> Sensitive market insight
>
> The Norwegian Seafood Council employs around 17 people to work on analysis and reporting on a daily basis. The analysis department has recently set up a new database to give businesses access to sensitive market statistics, including an overview of their own

---

[61] https://www.sas.com/no_no/customers/norwegian-seafood-council.html (last accessed January 27, 2021).

> market shares and a comparison of their prices with those of competitors.

* * *

> The Norwegian Seafood Council works to increase the value and reputation of Norwegian seafood. Every year, 500 marketing projects are conducted in at least 25 different markets. The Council's customers are Norwegian seafood players such as fish exporters and the authorities.

163.    On that same page, Jan Ståle Lauritzen, Data Warehouse Manager at the Norwegian Seafood Council is quoted, stating: "We [Norwegian Seafood Council] compile the statistics and give exporters decision-making tools relating to price, product, trends and needs in the countries where they want to establish a presence."[62]

164.    The NSC published an article on its use of SAS Data Management. In that article, the authors on behalf of the NSC, wrote:[63]

> The Norwegian seafood council (NSC) works together with the Norwegian fisheries and aquaculture industries to develop markets for Norwegian seafood. … Our activities focus on three main areas: marketing, communication and risk management and market insight. NSC is the industry's main source for market insight based on statistics like trade information, consumption figures and consumer insight.

165.    The article also discussed how the NSC uses the SAS Data Management system to develop and share "Seafood Insight," stating:[64]

---

[62] https://www.sas.com/no_no/customers/norwegian-seafood-council.html (last accessed January 27, 2021).

[63] Kia Uuskartano, Tor Erik Somby, Norwegian seafood council, "A Sea of Data—Gaining Competitive Advantage by Creating a Portal of Seafood Insights in SAS® Visual Analytics Designer and SAS® Information Delivery Portal," (Paper 9120-2016), available at https://support.sas.com/resources/papers/proceedings16/9120-2016.pdf. (last accessed Jan. 27, 2021).

[64] *Id.*

Almost all seafood information can be put in to numbers; from the weekly export price of fresh salmon, to the preference for a product in a certain demographic group of customers.

… All of our data is now gathered in a platform which we call "Seafood Insight". Seafood Insight gathers all of the available market information data in SAS Visual Analytics Designer - based reports available in the SAS Information Delivery Portal to be further distributed to the Norwegian seafood industry.

166.    Egil Ove Sundheim, director of NSC, attended the Global Seafood Market Conference on January 27, 2015 and led the Global Pelagics Panel with others including a Business Development representative of Ulner Barry. The conference also provided a reception for attendees at the conclusion of the first day's events.

167.    Agribusiness data-analytics enterprises similar to SAS Data Management have been at the heart of an increasing number of antitrust cases in the agricultural sector. The data they compile and distribute can be used by major producers to monitor one another's production and to control supply and ultimately price. In the United States, the use of agribusiness data analytics has facilitated the perpetuation of major antitrust conspiracies in the broiler chicken market (resulting in 10 federal criminal indictments, one federal guilty plea, and over $300 million in civil settlements thus far), pork (resulting in over $57 million in civil settlements thus far), and poultry worker compensation in the chicken and turkey markets (complaint proceeded past motion to dismiss on March 10, 2021 in the District of Maryland alleging information sharing through Agri Stats and accounting firm WMS & Company, Inc.).

168.    

169.

███████████████████████████████████████████████ *See generally supra*

¶¶ 117-50 (discussing Russian ban and Defendants' response and coordinated activity).

**National Atlantic Seafood Forum**

170.    "The North Atlantic Seafood Forum is the world's largest seafood business

conference, and a leading executive meeting place for the seafood industry."[65]

171.    The North Atlantic Seafood Forum ("NASF") holds a three-day conference

annually in March. Originally held in Oslo, since 2011, the NASF has held the conference in

Bergen.

172.    The program for the 2015 NASF conference highlighted social events, noting:

> The NASF meeting place consists of many different arenas for
> meeting the delegates in an unstressed atmosphere.
>
> Take part in the NASF social programme and use these networking
> opportunities.

173.    The 2015 NASF conference scheduled networking opportunities throughout the

day, scheduled dinner and cocktails, and also provided invitation only executive meetings and a

Speakers' VIP Reception.

174.    Defendants' representatives attended this conference, and in Mowi's case, its

Chairman, Ole Eirik Lerøy (not to be confused with his little brother Knut Hallvard Lerøy, a

current Lerøy executive)—as one of the global seafood industry captains—presented "The View

from the Bridge." SalMar's CEO Nordhammer presented "Growth potential within existing

licenses in Norway." Per Grieg Jr. of Grieg Seafood presented "How solid is the basis for future

---

[65] https://prod.dfox.com/public/images/0000438021/000/080/0000804137.pdf (last accessed
February 17, 2021).

growth in salmon farming," and Aarskog, Mowi's CEO presented "some thoughts" about Marine Harvest Group 5 years in the future, in 2020.[66]

175.    Representatives of other trade associations through which Defendants communicated attended as well, notably NSF's CEO Geir Ove Ystmark.

176.    Panel discussions topics also included "Global Salmon Supply, Market and Prices," and "Salmon markets in Russia after the 2014 embargo – what's next?"[67]

177.    The 2016 NASF conference, held from March 1-3, 2016, followed a similar format to the 2015 conference, including scheduling networking opportunities throughout the day, dinner and cocktails, and an invitation only executive meetings and a Speakers' VIP Reception.

178.    The 2016 conference again offered a panel "Global Salmon Supply, Market and Prices," that included a "½ day industry workshop - Expansion of global salmon trade and production."[68]

179.    Marine Harvest's Ola Brattvoll addressed the "Outlook for global salmon demand," and Aarskog presented a panel discussion on "Opportunities and challenges in the salmon market going forward."[69]

180.    Lerøy's and SalMar's CEOs (Henning Beltestad and Leif Inge Nordhammer, respectively), also attended and participated in panel discussions.

181.    ████████████████████████████████████████

---

[66] http://www.nor-seafood.com/Menu/Programme; https://prod.dfox.com/public/images/0000438021/000/080/0000804137.pdf (last accessed February 17, 2021).
[67] http://www.nor-seafood.com/Menu/Programmehttps://prod.dfox.com/public/images/0000438021/000/080/0000804137.pdf (last accessed February 17, 2021).
[68] https://prod.dfox.com/public/images/0000438021/000/084/0000846923.pdf (last accessed February 17, 2021).
[69] *Id.*

**Norwegian Seafood Federation (f/k/a "FHL")**

182.     Another Norwegian industry group of note is the Norwegian Seafood Federation ("NSF"), in which the Norwegian Defendants are members. Its former Chairman was Ole-Eirik Lerøy, the Chairman of the Board of Mowi since 2010. The Deputy Managing Director of the NSF is Trond Davidsen.

183.     Defendants Cermaq, Grieg, Lerøy, Marine Harvest, and SalMar are each members of NSF.

184.     Benefits of membership in the Norwegian Seafood Federation include the Federation acting as the industry's representative in a number of councils and committees and providing opportunities for industry members to meet. For the two years prior to 2014, NSF has arranged year end working dinners bringing together the leaders of the largest Norwegian salmon companies. █████████████████████████████████████████████████████████████
███████████████████████████████████████

185.     They evidently availed themselves of opportunities to meet with other NSF members. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████

**International Salmon Farmers' Association**

186.     The International Salmon Farmers' Association ("IFSA") describes itself as "an umbrella organization comprised of national and regional associations from around the world." The NASF is one of those associations.[70]

187.     Trond Davidsen holds executive positions at both the IFSA and the NASF. Davidsen serves as the Deputy Managing Director of the Norwegian Seafood Federation while helming the IFSA as its President.

**Other Meetings**

188.     In 2016 the industry held a "record breaking" Aquaculture & Cold Harvest Conference, in St. John's, Canada.[71] Attendance included over 400 delegates attending from more than 20 countries. Mark Lane, Executive Director of the Newfoundland Aquaculture Industry Association, projected this to be the largest aquaculture conference in Canadian history based on advanced registration for the conference.

189.     Trond Davidsen was the keynote speaker on day two of the Conference. Davidsen's speech, entitled "Producing Healthy Sustainable Food for the World," noted the recent industry switch from competition to cooperation:[72]

> I was part of the trade disputes since mid 1990's and I can still remember how the parties in the processes were able to also take care of the personal relations across the borders. We had days over in Europe where the Scots, the Irish and the Norwegians had been in tough meetings with the European Commission in daytime, before we all went out for dinner in the evening and having an enjoyable time together. Some were actually **really good friends, spending their holidays together**. And these **good relations made**

---

[70] See http://www.salmonfarming.org/who-we-are/overview/ (last accessed January 27, 2021).

[71] https://www.yumpu.com/en/document/read/55947640/aquaculture-canada-and-cold-harvest-conference-program-2016, at page 44.

[72] http://www.salmonfarming.org/producing-healthy-sustainable-food-for-the-world/

it much easier to shift focus and work together when the trade wars ended.

\*\*\*

We have without doubt moved from battling each other in trade wars to cooperating and finding solutions on common challenges to feeding a growing world population – such as sea lice, feed resources, technology and knowledge in general.

Of course, a general good market situation has removed some of the stress in the salmon industry. But it seems also to be a fact that a continuously increasing cross border activity in the industry has moved the whole industry into a new way of thinking. We had cross border activities in the past as well, with Norwegian salmon companies involved in operations in Scotland, Ireland and the US.

However, the way the salmon business has developed in the last years – with a vast increase in cross border ownership and operations – will probably decrease the risk of any battles between the producing countries in the future. I am convinced that the increased business integration strengthens the whole industry, improves our operations and makes us even more suited to produce healthy and valuable products to a growing population.

\*\*\*

I know for sure that all parties involved in the salmon business agree that the potential for further growth is tremendous – and that we need to develop our industry to meet the global demand rather than fight each other. (Emphasis added.)

190.    Davidsen's reference to "trade wars" or "battles" or "fight[ing]" in this speech are code words for price competition. As explained below, salmon is a commodity product. The way producers can compete with respect to the sale of such a commodity product is on the dimension of price. But as can be seen from the foregoing discussion of meetings among Defendants' top executives, Davidsen's remarks accurately reflected that the "cooperation" among ostensible competitors was not limited to merely combatting sea lice, discussing feed resources, or talking about technology. Indeed, in 2018 Aarskog encouraged Mowi's competitors in Chile to embrace

additional environmental compliance measures as cover to increase salmon prices and specifically

EBIT per kilo of salmon produced.

191.    Expanding on the need for industry cooperation, Davidsen explained in his 2016

keynote address:

> Geir Molvik, the CEO of Cermaq, "was very clear on the strength
> of cooperation when he was interviewed by a Norwegian newspaper
> two weeks ago. 'Success criteria number 1 in our industry is the
> ability to cooperate and have a lack of secrets. As an example, it is
> a unique situation when we arrange a cleanerfish seminar with more
> than 350 participants and person after person enter the scene-
> sharing experiences and failures, without any filter. This brings the
> industry further.'

192.    Defendants would also meet at other conference such as those run by the Global

Aquaculture Alliance, an organization dedicated to promoting responsible aquaculture practices

and feeding the world through responsible and sustainable aquaculture.

**E.    During the Class Period, Defendants Engaged in Parallel Pricing Behavior Resulting in Record Profitability.**

193.    The effect of Defendants' anticompetitive conduct is apparent



194.

---

[73] Not all Defendants produced pricing data and those that did (Mowi, OQ, and Lerøy) did not produce transactional-level pricing.

[74]







195.    By manipulating the NQSalmon index and using that index to set prices, Defendants were able to reap record profits to the detriment of Plaintiffs and their fellow class members. Mowi reported that its EBIT levels nearly doubled since the creation of the NQSalmon index:[75]



[75] http://hugin.info/209/R/2177429/840178.pdf (page 30) (last accessed February 8, 2021).

196.     Grieg similarly reported that its EBIT per kg gutted weight of fish (in Norwegian Kroner) has increased during the course of the conspiracy. According to Grieg's 2017 Annual Report, its EBIT was 0.7 Kroner/kg in 2015, 18.0 Kroner/kg in 2016, and 14.4 Kroners/kg in 2017. Grieg's Q4 2018 Quarterly Report reports an EBIT per kg (in Norwegian Kroner) of 14.72 for 2018.

197.     Lerøy has also experienced substantial increases in EBIT/kg (measured in Norwegian Kroner), increasing from 8.8 Kroner in 2015 to 18.9 Kroner in 2016, and 23.6 Kroner in 2017. In 2018, Lerøy's EBIT/kg was 19.6.

198.     Beginning in 2013 (the year the NQSalmon index went live), SalMar repeatedly reported that high salmon prices resulted in record profits. In its 2013 annual report, SalMar reported that "2013 was another record year for SalMar. The combination of higher harvested volumes and high salmon prices boosted the Group's overall revenues to NOK 6.25 billion, while operating profit came to NOK 1.26 billion."[76] The next year, SalMar reported "another record year" that was "[o]nce again . . . a combination of a higher harvested volume and higher salmon prices."[77] SalMar's operating profits increased to NOK 1.88 billion. In 2015, SalMar "posted very strong results" resulting from "good salmon prices [that] led to higher sales revenues."[78] In 2016, it stated that its "financial value creation reached a level never previously achieved" and reported a net profit of NOK 2,561 billion."[79] Finally, SalMar again reported "record high" financial results with a net profit of NOK 2,3 billion, which reflected "high salmon prices and good profitability . . . in the entire industry."[80]

---

[76] https://hugin.info/138695/R/1781477/609511.pdf (last accessed February 17, 2021).
[77] https://hugin.info/138695/R/1917403/685882.pdf (last accessed February 17, 2021).
[78] https://hugin.info/138695/R/2008391/742845.pdf (last accessed February 17, 2021).
[79] https://hugin.info/138695/R/2099113/799618.pdf (last accessed February 17, 2021).
[80] https://hugin.info/138695/R/2188425/846513.pdf (last accessed February 17, 2021).

199.    Cermaq also repeatedly reported record earnings from high salmon prices in the years following implementation of the NQSalmon index. In 2013, the year the NQSalmon index went live, Cermaq stated that its operating revenues increased 57 percent. Cermaq attributed this to "a surge in market prices for all salmonid species during the year, in particular in the second half."[81] The following year, Cermaq stated that it had its "best year ever in [its] Norwegian operations," despite the challenges posed by the Russian ban.[82] In 2015, Cermaq reported a growth in operating revenues that resulted "mainly from higher market prices in the European market combined with a positive impact from the weak NOK."[83] Finally, in 2016, Cermaq Norway "delivered its best annual EBIT result ever," which it attributed to "[l]imited global supply and market prices at record high levels."[84] The stock prices of Mowi, Grieg, SalMar, and Lerøy have also all risen dramatically since early 2013.

200.    The parallel pricing and record profits that Defendants reported during the class period are further indication of their anticompetitive conduct.

**F.      Defendants' Pricing Behavior Is Not Justified By Cost Factors.**

201.    From the start of the Class Period, with the change in spot price index from NOS to NQSalmon, the price Defendants extracted from their products rose dramatically. The following chart shows the clear difference in pre-Class Period and Class Period pricing. The shading reflects the Class Period, and the red vertical line reflects the raids that publicly revealed the European Union cartel investigation:

---

[81] https://www.cermaq.com/assets/Global/PDFs-sustainability/Cermaq_Annual_Report_2013_web.pdf (last accessed February 17, 2021).
[82] https://www.cermaq.com/assets/Global/PDFs-sustainability/cermaq-integrated-report-2014.pdf (last accessed February 16, 2021).
[83] https://www.nsd.no/polsys/data/filer/aarsmeldinger/AE_2015_19821.pdf (last accessed February 17, 2021).
[84] https://www.nsd.no/polsys/data/filer/aarsmeldinger/AE_2016_19821.pdf (last accessed February 8, 2021).



202.    Defendants have asserted that cost increases justify their price increases, but their own data disproves that purported justification. For example, the following chart from Mowi indicates that the "cost in box" of producing salmon (per kilogram) has increased approximately half of one Euro (or less) during the Class Period.[85]



---

[85] *See* http://hugin.info/209/R/2177429/840178.pdf at 246 (last accessed February 8, 2021).

203.    Defendants' cost in box per kilogram increased modestly, if at all, each year, and only approximately 26% from the start of the Class Period through the EU raids. This is consistent with the relatively level pattern of the older NOS index. However, with the introduction of the easily-manipulated NQSalmon index, prices spiked and remained much higher, even in the absence of a large cost increase.

204.    The biggest single production cost for producers of farmed salmon is feed. As Mowi notes in its 2018 Handbook, "[h]istorically, the two most important ingredients in fish feed have been fish meal and fish oil. The use of these two marine raw materials in feed production has been reduced in favour of ingredients such as soy, sunflower, wheat, corn, beans, peas, poultry by-products (in Chile and Canada) and rapeseed oil. This substitution is mainly due to heavy constraints on the availability of fish meal and fish oil."[86] The following chart from that Handbook, however, shows that these feed components either stabilized or declined in the period since mid-2015, and do not explain the price increase over the Class Period, which has been shaded in gray.[87]



---

[86] *See* http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at 62 (last accessed February 17, 2021).
[87] *Id*. at 57.

205.    As the foregoing charts reflect, the price increases for salmon, viewed in relation to production costs, represent a structural break from past practices. Indeed, in prior periods, the Norwegian farmed salmon industry has been accused of dumping their product overseas at unreasonably low prices.

206.    Nor can it reasonably be claimed that increased demand caused prices to increase. The Russian import ban eliminated 10 percent of Norway's salmon, causing $2.4 billion in losses. But, according to Mowi's 2018 investor handbook, the planning cycle for a given year of a fish takes place many years in advance, making it impossible for producers to adjust supply on short notice. Yet despite the supply of salmon remaining the same and demand dropping precipitously, Defendants were able to conspire with one another to increase prices beyond what they experienced before the Russian import ban.

G.    **The Structures and Characteristics of the Market for Salmon Support the Existence of a Collusive Restraint.**

207.    The structure and other characteristics of the market for farm-raised salmon make collusion both particularly attractive to Defendants and particularly likely to succeed.

208.    The DOJ has explained that collusion is likely to incur in industries that contain some or all of the following factors:[88]

> Collusion is more likely to occur if there are few sellers. The fewer the number of sellers, the easier it is for them to get together and agree on prices, bids, customers, or territories. Collusion may also occur when the number of firms is fairly large, but there is a small group of major sellers and the rest are "fringe" sellers who control only a small fraction of the market.
>
> The probability of collusion increases if other products cannot easily be substituted for the product in question or if there are restrictive specifications for the product being procured.

---

[88] https://www.justice.gov/atr/price-fixing-bid-rigging-and-market-allocation-schemes (last accessed February 17, 2021).

> The more standardized a product is, the easier it is for competing firms to reach agreement on a common price structure. It is much harder to agree on other forms of competition, such as design, features, quality, or service.
>
> Repetitive purchases may increase the chance of collusion, as the vendors may become familiar with other bidders and future contracts provide the opportunity for competitors to share the work.
>
> Collusion is more likely if the competitors know each other well through social connections, trade associations, legitimate business contacts, or shifting employment from one company to another.
>
> Bidders who congregate in the same building or town to submit their bids have an easy opportunity for last-minute communications.

209. These factors are all present here. The farmed salmon industry is dominated by a few top producers and is composed of a commodity product that is not substitutable with other forms of salmon. Defendants had numerous opportunities to collude with one another through trade associations and meetings. They are also headquartered in Bergen, Norway, and employees regularly move from one company to one another.

### 1. Industry Concentration Facilitates Collusion.

210. A highly concentrated market is more susceptible to collusion and other anticompetitive practices than less concentrated markets.

211. Here, there has been significant (and rapid) consolidation of salmon farming operations around the globe in recent years, as Mowi reports:[89]

---

[89] *See* http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at 37 (last accessed February 17, 2021).



The graph shows the number of players producing 80% of the farmed salmon and trout in each major producing country.

During the last decade the salmon farming industry has been through a period of consolidation in all regions and this is expected to continue.

Historically, the salmon industry has been made up by many small firms. As illustrated above, this has been the case in Norway, and to some degree in Scotland and Chile.

212.    The Norwegian Defendants dominate this market, again as shown by Mowi's own figures:[90]

## Industry Structure

### 6.1 Top 5-10 players of farmed Atlantic salmon

| | Top 10 - Norway | H.Q. | Top 5 - United Kingdom | H.Q. | Top 5 - North America | H.Q. | Top 10 - Chile | H.Q. |
|---|---|---|---|---|---|---|---|---|
| 1 | Marine Harvest | 210 200 | Marine Harvest | 60 200 | Cooke Aquaculture | 57 000 | Salmones Multiexport | 58 700 |
| 2 | Salmar | 135 200 | Scottish Seafarms | 31 000 | Marine Harvest | 39 400 | Cermaq** | 54 000 |
| 3 | Lerøy Seafood | 132 000 | The Scottish Salmon Co. | 25 300 | Cermaq** | 21 000 | Marine Harvest | 44 900 |
| 4 | Cermaq** | 48 000 | Cooke Aquaculture | 20 000 | Northern Harvest | 12 500 | Empresas Aquachile | 43 300 |
| 5 | Grieg Seafood | 40 900 | Grieg Seafood | 12 100 | Grieg Seafood | 9 600 | Pesquera Los Fiordos | 41 000 |
| 6 | Nova Sea | 40 700 | | | | | Australis Seafood | 39 100 |
| 7 | Nordlaks | 40 000 | | | | | Camanchaca | 30 800 |
| 8 | Norway Royal Salmon | 31 900 | | | | | Blumar | 27 000 |
| 9 | Alsaker Fjordbruk | 25 000 | | | | | Nova Austral | 24 500 |
| 10 | Bremnes Seashore | 24 000 | | | | | Invermar | 23 200 |
| | Top 10 | 727 900 | Top 5 | 148 600 | Top 5 | 139 500 | Top 10 | 386 500 |
| | Total | 1 087 000 | Total | 156 900 | Total | 145 500 | Total | 521 200 |
| | Share of total | 67 % | Share of total | 95 % | Share of total | 96 % | Share of total | 74 % |

Note: All figures in tonnes GWT for 2017
* UK and North American industry are best described by top 5 producers.
** Cermaq is a fully owned subsidiary of Mitsubishi Corporation

---

[90] *See* http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at 36 (last accessed January 26, 2021).

213.    The consolidation in the salmon market is further amplified by the fact that, as alleged above, Mowi had substantial control over Grieg and possessed a significant ownership interest in Nova Sea.

214.    SalMar and Lerøy are also joint owners of SSF, a fact that also is conducive to collusion. The DOJ and FTC have explained:[91]

> [M]arketing collaborations may involve agreements on price, output, or other competitively significant variables, or on the use of competitively significant assets, such as an extensive distribution network, that can result in anticompetitive harm. Such agreements can create or increase market power or facilitate its exercise by limiting independent decision making; by combining in the collaboration, or in certain participants, control over competitively significant assets or decisions about competitively significant variables that otherwise would be controlled independently; or by combining financial interests in ways that undermine incentives to compete independently. For example, joint promotion might reduce or eliminate comparative advertising, thus harming competition by restricting information to consumers on price and other competitively significant variables.

### 2.    Barriers to New Entry Are High.

215.    A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supracompetitive pricing. When, however, there are significant barriers to entry, new entrants are much less likely to enter the market. The market for farming salmon has high barriers to entry.

216.    The production process for salmon is costly and complex. Mowi has diagrammed the process for breeding and growing farm-raised salmon as follows:[92]

---

[91] https://www.ftc.gov/sites/default/files/documents/public_events/joint-venture-hearings-antitrust-guidelines-collaboration-among-competitors/ftcdojguidelines-2.pdf. The fact that SalMar and Leroy have referred to SSF as a joint venture is irrelevant to assessing its anticompetitive effect. *Timken Roller Bearing Co. v. United States*, 341 U.S. 593, 598 (1951) (last accessed February 17, 2021).
[92] *See* https://www.mowi.com/product/seafood-value-chain/ (last accessed April 23, 2019).



217.    A report commissioned by the European Union titled "Developing Innovative Market Orientated Prediction Toolbox to Strengthen the Economic Sustainability and Competitiveness of European Seafood on Local and Global markets" further depicts how salmon is processed[93]:



---

[93] *See* European Union's Horizon 2020 research and innovation program, "Deliverable No. 3.4 - Report on evaluation of industry dynamics opportunities and threats to industry."

218.    The lengthy and expensive process of producing farmed salmon operates as a substantial barrier to entry. The extensive capital required to enter the market weeds out many who would otherwise enter.

219.    Mowi's 2018 Investor's Handbook notes that there are relatively few locations in the world that provide the right mix of oceanic conditions for salmon farming and a political environment willing to allow the practice. Moreover, even if new entry could occur in the right geographic location, no additional salmon supply could be brought on line in the short run:[94]



04      **Salmon Supply**
4.3 Few coastlines feasible for salmon farming

The main coastal areas adopted for salmon farming are depicted on the above map. The coastlines are within certain latitude bands on the Northern and Southern Hemisphere.

A key condition is a temperature range between above zero and 18-20ºC. The optimal temperature range for salmon is between 8 and 14ºC.

Salmon farming also requires a certain current to allow a flow of water through the farm. The current must however be below a certain level to allow the fish to move freely around in the sites. Such conditions are typically found in waters protected by archipelagos and fjords and rule out several coastlines.

Certain biological parameters are also required to allow efficient production. The biological conditions vary significantly within the adopted areas and are prohibitive for certain other areas.

Political willingness to permit salmon farming and to regulate the industry is also required. Licence systems have been adopted in all areas where salmon farming is carried out.

---

[94] *See* http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at 26 (last accessed February 17, 2021).

220.     Mowi explains that "[i]n all salmon producing regions, the relevant authorities have a licensing regime in place. In order to operate a salmon farm, a license is the key prerequisite. The licenses constrain the maximum for each company and the industry as a whole."[95]

221.     Moreover, wild caught salmon cannot reasonably constrain prices for farm-raised salmon. National Public Radio summarized the breeding and cost advantages that farm-raised salmon have over wild caught salmon in an August 29, 2017 article:

> **Why Are Atlantic Salmon Raised In The Pacific Northwest?**
>
> Atlantic salmon are not native to the Pacific Northwest. For years, they have been bred to become easier to farm — they're more 'highly domesticated,' according to the Washington Department of Fish and Wildlife. Most commercial fish farms raise Atlantic salmon.
>
> The WDFW says Atlantic salmon is a 'favored species' to farm in cold marine waters because the species grows quickly and consistently, is resistant to disease, and is something people like to eat. Farmed Atlantic salmon are more docile than wild fish.
>
> Atlantic salmon also have been bred to more 'efficiently turn feed into flesh,' says Michael Rust, the science adviser for NOAA's office of aquaculture.
>
> What used to cost several dollars per pound to grow, worldwide, now costs about $1.25, Rust says. That makes for higher profits.
>
> In the U.S., Washington and Maine are the two largest Atlantic salmon producing states, but they're small beans compared to salmon farms in Canada, Norway and Chile. Atlantic salmon today, Rust says, probably grow twice as fast as when aquaculture first started. [96]

---

[95] *See* http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at 69 (last accessed February 17, 2021).

[96] *See* https://www.npr.org/sections/thesalt/2017/08/29/546803147/why-are-atlantic-salmon-being-farmed-in-the-northwest (last accessed February 17, 2021).

222.    Wild caught salmon is generally twice as expensive per pound as farm-raised salmon.

### 3.    Farm-Raised Salmon Is a Commodity Product, and Prices Are Correlated Across the Globe.

223.    Mowi explains that salmon production is a "commodity" business: "As in most commodity industries, the producers of Atlantic salmon are experiencing large volatility in the price achieved for the product."[97] A report issued in 2018 by the European Union confirms this point:

> The output of most salmonid aquaculture, and Atlantic salmon in particular, is highly commoditi[z]ed *i.e.* there is little differentiation between farms and competition is based purely on price. These products, mostly head-on gutted fresh fish, serve as raw material for further processing. In that situation, large enterprises which can reduce costs of production through economies of scale and offer the lowest price, have a competitive advantage.[98]

224.    Commodity products are fungible and consumers and other purchasers have a variety of supply options which makes raising prices by any one supplier difficult in the absence of a conspiracy.

225.    Furthermore, according to Grieg, salmon prices are linked across the globe, and the Defendants and others closely follow these prices. Mowi also recognizes that "price correlation across regional markets is generally strong for Atlantic salmon."[99] Mowi further explains that arbitrage between regions is one of the factors constraining prices for Atlantic salmon. Accordingly, fixing prices of salmon in one market will affect prices globally.

---

[97] *See* http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at 33 (last accessed February 17, 2021).
[98] *See* European Union's Horizon 2020 research and innovation program, "Deliverable No. 3.4 - Report on evaluation of industry dynamics opportunities and threats to industry," at 4.
[99] *See* http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at 31 (last accessed February 17, 2021).

226.    In fact, Mowi tracks the correlation of salmon prices globally in the normal course of its business. The company illustrates this graphically[100]:



227.    This point was also recognized in a 2016 report issued by the Oslo Fish Pool (a salmon financial contracts exchange) and DNB Foods & Seafood (which is part of Norway's largest financial services organization) titled "World market for salmon: pricing and currencies."[101] The report pointed out that Norwegian farmed salmon gate prices are "strongly

---

[100] *Id.* at 33.

[101] *See* http://fishpool.eu/wp-content/uploads/2016/04/final-dag.pdf (last accessed May 21, 2019).

linked" and that the collusion by Defendants on those Norwegian prices directly affected prices

for farmed salmon raised elsewhere pursuant to the "law of one price."[102]

     228.    Indeed, the 2016 report noted:[103]



     229.    The 2016 report further elaborates on the economic principle of the "law of one

price" as it relates to the farm-raised salmon market in the Unites States:[104]

---

[102] Mowi operates salmon farms in Chile, as well as Norway.

[103] *See* http://fishpool.eu/wp-content/uploads/2016/04/final-dag.pdf (last accessed May 21, 2019).

[104] *See id.*



## The law of one price
### *Norwegian and Chilean prices are linked*

- Price US = Norwegian farm gate price + air freight cost Atlantic
- Price US = Chilean farm gate price + air freight cost Americas
- Chilean farm gate price = Norwegian farm gate price + difference in freight cost Atlantic vs Americas

230.     Additionally, while the U.S. imports some farm-raised Salmon from Canada, U.S. demand far outstrips what Canada can supply, and the considerable shortfall is met by imports from Chile and Norway, both of which are directly affected by Defendants' collusion on price:

### 4.    Norwegian Companies Dominate the Production of Farm-Raised Salmon, and Defendants Are the Largest Global Producers

231.     A January 3, 2018 article in *salmonbusiness.com*—an industry publication—tracks Norway's dominance in the salmon industry:[105]

---

[105] *See* https://salmonbusiness.com/norways-market-share-shrinking/ (last accessed February 17, 2021).



### 5.    Farmed Salmon Production Is Highly Inelastic, and the Product is Perishable

232.    Mowi acknowledges that:

> Due to the long production cycle and the short shelf life of the fresh product (about 3 weeks), the spot price clears on the basis of the overall price/quantity preference of customers. As salmon is perishable and marketed fresh, all production in one period has to be consumed in the same period. In the short term, the production level is difficult and expensive to adjust as the planning/production cycle is three years long. Therefore, the supplied quantity is very inelastic in the short term, while demand also shifts according to the season. This has a large effect on the price volatility in the market.[106]

233.    Accordingly, in the absence of coordinated conduct among producers, Defendants are price-takers. They are unable to reduce supply in the short term to raise prices unilaterally, and they must sell during a very short window while their product is fit for human consumption. These

---

[106] *See* http://marineharvest.no/globalassets/investors/handbook/2018-salmon-industry-handbook.pdf, at 32 (last accessed February 17, 2021).

market constraints make the market more susceptible to collusion than markets where goods are not perishable and production levels can be rapidly modulated.[107]

### H. **Defendants' Manipulation of the NQSalmon Index Affected Prices in the United States.**

234.    The United States is the second largest global market for salmon behind only the EU, as Mowi reports in the graphic reflected below:[108]



235.    A December 12, 2018 article from the industry publication *Intrafish* further explains:

> Salmon import volumes into the United States through October rose 10.5 percent, reaching 272,676 metric tons, according to new figures released by the National Marine Fisheries Service (NMFS).

---

[107] *See* 2017 Mowi Annual Report, http://hugin.info/209/R/2177429/840178.pdf, at 35 ("Although the market price of salmon is established through supply and demand for the product, in the short term, salmon producers are expected to be price takers. The long production cycle and a short time window available for harvesting leave salmon farmers with limited flexibility to manage their short-term supply.") (last accessed February 8, 2021).
[108] *See* http://hugin.info/209/R/2234685/879436.pdf (last accessed May 21, 2019).

The value of Atlantic salmon imports rose as well, by 9.5 percent, to reach $2.9 billion (€2.6 billion), up from $2.6 billion (€2.3 billion) during the same period last year.[109]

236.    Because the Norwegian parent entities exercised substantial control over United States prices, their anticompetitive conduct had considerable effect on United States sales.

237.    ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████

238.    ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████

239.    ██████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[109] *See* https://www.intrafish.com/marketplace/1654239/us-imports-of-fresh-salmon-fillets-spike (last accessed February 18, 2021).



240. ████████████████████████████████████████

241. ████████████████████████████████████████

242.     Defendants' control of their subsidiaries' prices made perfect sense for them. Without imposing these price controls, Defendants would lose out on a substantial portion of their profits from their anticompetitive conduct. Defendants would have reduced the value of their product worldwide if they let their United States subsidiaries charge lower prices. Recognizing this, they took several steps to ensure they had final approval over United States sales and pricing.

243.     It is well recognized that in a multi-level chain of distribution, such as exists here, an overcharge is felt throughout the chain of distribution. As noted antitrust scholar Professor

Herbert Hovenkamp stated in his treatise *Federal Antitrust Policy, The Law of Competition and Its Practice* 564 (1994):

> A monopoly overcharge at the top of a distribution chain generally results in higher prices at every level below. For example, if production of aluminum is monopolized or cartelized, fabricators of aluminum cookware will pay higher prices for aluminum. In most cases they will absorb part of these increased costs themselves and pass part along to cookware wholesalers. The wholesalers will charge higher prices to the retail stores, and the stores will do it once again to retail consumers. Every person at every stage in the chain likely will be poorer as a result of the monopoly price at the top.
>
> Theoretically, one can calculate the percentage of any overcharge that a firm at one distributional level will pass on to those at the next level.

244. Similarly, Professor Jeffrey K. MacKie-Mason has stated, it is "well known in economic theory and practice, [that] at least some of the overcharge will be passed on by distributors to end consumers."

245. Consequently, while the direct purchasers were the first to pay supra-competitive prices, some or all of the overcharge was passed along the distribution chain and absorbed by Plaintiffs and Class Members when they purchased from non-Defendants.

246. Commonly used and well-accepted economic models can be used to measure both the extent and the amount of the supra-competitive charge passed through the chain of distribution. Thus, the economic harm to Plaintiffs and the class members can be quantified.

247. The purpose of the conspiratorial conduct of the Defendants and their co-conspirators was to raise, fix, or maintain the price of farm-raised salmon and, as a direct and foreseeable result. Plaintiffs and the Classes paid supracompetitive prices for farm-raised salmon during the Class Period.

## V.      STATUTES OF LIMITATIONS

248.      Plaintiffs' and the class members' claims are not barred by any applicable statute of limitations. Plaintiffs were, in fact, unaware of Defendants' price-fixing scheme. Further, Defendants' conspiracy was both self-concealing and actively fraudulently concealed by Defendants. Plaintiffs had no reason to investigate and were not placed on inquiry notice, and in any event, they could not have learned of Defendants' conspiracy through the exercise of due diligence until the EC announced its investigation in February 2019.

249.      Furthermore, the scope, extent, and nature of Defendants' anticompetitive conduct was unknown until they produced their DOJ and FTC document productions to Plaintiff. Without these productions, Plaintiff could not identify who was responsible for setting the NQSalmon index or who was a member of the NQSalmon's advisory panel. In addition, even when the NQSalmon index performed quality assurance checks, companies like Mowi concealed important information. Even today, Defendants have produced a small number of the documents that are relevant to this lawsuit.

250.      Defendants also represented to the public that the salmon market was competitive. In 2018, Lerøy reported that "[e]verything we do is ultimately to benefit our customers" and that its actions were based on "competitive processes."[110] Marine Harvest claimed that salmon farmers "face[d] competition from other producers of seafood" and the "bases on which we compete include: price."[111]

251.      Mowi has also noted in its annual reports that "[a]lthough the market price of salmon is established through supply and demand for the product, in the short term, salmon

---

[110]https://www.leroyseafood.com/globalassets/02-documents/english/reports/annual-reports/annual-report-2018 (last accessed February 17, 2021).
[111] https://sec.report/Document/0001628280-16-013974/ (last accessed February 17, 2021).

producers are expected to be price takers."[112] Similarly, in Grieg's 2017 annual report, it stated: "Salmon farmers are in general price takers as the salmon market primarily is a fresh market supplied by producers that have a short time window available for harvesting."[113]

252.    In addition, when questioned about reports that Polish salmon processors were complaining about Morpol's spot market purchases, Mowi denied the accuracy of the reports.

253.    Defendants also utilized trade associations, which would appear to the public to be legitimate and thus provide cover for their conduct, to engage in private communications in furtherance of their conspiracy, as described in more detail above.

254.    As a result, the anticompetitive conduct alleged throughout was self-concealing and Plaintiffs could not have discovered it through due diligence prior to the disclosure of the EC investigation.

## VI.    CLASS ACTION ALLEGATIONS

255.    Plaintiffs, as specifically identified herein, also bring claims asserted in this action on behalf of themselves and on behalf of all others similarly situated under Federal Rules of Civil Procedure, Rules 23(a), (b)(2), and (b)(3), seeking damages and injunctive relief pursuant to various the state antitrust, unfair competition, and consumer protection laws of the states listed below on behalf of the following classes (the State Classes, each of which is individually described and further defined):

(a)    **Alabama class:** All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Alabama during the Class Period.

---

[112] https://issuu.com/hg-9/docs/mowi_annual_report_2018_4e0dacb83168e4?e=19530043/68703955 (last accessed February 8, 2021).
[113] http://grieg17.digirapport.no/?page_id=637 (last accessed February 17, 2021).

(b)     **Arizona class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Arizona during the Class Period.

(c)     **Arkansas class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Arkansas during the Class Period.

(d)     **California class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of California during the Class Period.

(e)     **District of Columbia class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the District of Columbia during the Class Period.

(f)     **Florida class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Florida during the Class Period.

(g)     **Guam class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the Territory of Guam during the Class Period.

(h)     **Hawaii class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Hawaii during the Class Period.

(i)     **Illinois class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Illinois during the Class Period.

(j)     **Iowa class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Iowa during the Class Period.

(k)     **Kansas class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Kansas during the Class Period.

(l)     **Maine class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Maine during the Class Period.

(m)     **Massachusetts class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Massachusetts during the Class Period.

(n)     **Michigan class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Michigan during the Class Period.

(o)     **Minnesota class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Minnesota during the Class Period.

(p)     **Mississippi class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Mississippi during the Class Period.

(q)     **Missouri class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Missouri during the Class Period.

(r)     **Montana class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Montana during the Class Period.

(s)     **Nebraska class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Nebraska during the Class Period.

(t)     **Nevada class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Nevada during the Class Period.

(u)     **New Hampshire class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of New Hampshire during the Class Period.

(v)     **New Mexico class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of New Mexico during the Class Period.

(w)     **New York class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of New York during the Class Period.

(x)     **North Carolina class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of North Carolina during the Class Period.

(y)     **North Dakota class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of North Dakota during the Class Period.

(z)     **Oregon class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Oregon during the Class Period.

(aa)    **Rhode Island class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Rhode Island during the Class Period.

(bb)    **South Carolina class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of South Carolina during the Class Period.

(cc)    **South Dakota class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of South Dakota during the Class Period.

(dd)    **Tennessee class:** All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Tennessee during the Class Period.

(ee)    **Utah class**: All persons and entities who resided in, or are citizens of, the State of Utah, who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Utah during the Class Period.

(ff)    **Vermont class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Vermont during the Class Period.

(gg)    **Virginia class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Virginia during the Class Period.

(hh)    **West Virginia class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of West Virginia during the Class Period.

(ii)    **Wisconsin class**: All persons and entities who indirectly purchased, for resale, Defendants' farm-raised salmon in the State of Wisconsin during the Class Period.

256.    Plaintiffs also bring their claims asserted in this action on behalf of themselves and on behalf of all others similarly situated under Federal Rules of Civil Procedure, Rules 23(a) and (b)(2), seeking injunctive relief pursuant to the federal antitrust laws on behalf of a nationwide class defined as follows:

> **Nationwide class**: All persons and entities in the United States or its territories who indirectly purchased, for resale, Defendants' farm-raised salmon during the Class Period.

257.   Excluded from each of the Classes are Defendants, their parent companies, subsidiaries and affiliates, any co-conspirators, federal governmental entities and instrumentalities of the federal government, states and their subdivisions, agencies and instrumentalities, all judges assigned to this matter, all jurors in this matter, and all persons and entities who only purchased farm-raised salmon directly.

258.   Each of the Classes is so numerous that joinder of all members would be impracticable. While Plaintiffs do not know the exact number of members of each of the Classes, Plaintiffs believe there are at least thousands of members in each of the Classes.

259.   Common questions of law and fact exist as to all members of each of the Classes. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all members of each of the Classes, thereby making appropriate relief with respect to each Class as a whole. Such questions of law and fact common to the Classes include, but are not limited to:

    (a)    Whether Defendants and their co-conspirators engaged in a combination and conspiracy to fix, raise, maintain or stabilize the prices of farm-raised salmon sold in the United States and in each of the States alleged herein;

    (b)    The identity of the participants of the alleged conspiracy;

    (c)    The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

    (d)    Whether Defendants' alleged conduct violated various state antitrust and restraint of trade laws;

    (e)    Whether Defendants' alleged conduct violated various state consumer protection and unfair competition laws;

(f)     Whether the conduct of Defendants and co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiffs and the members of the Classes;

(g)     The effect of Defendants' alleged conduct on the prices of farm-raised salmon sold in the United States during the Class Period; and

(h)     The appropriate relief for the Classes, including injunctive and equitable relief.

260.     Plaintiffs' claims are typical of the claims of the members of the respective Classes Plaintiffs seek to represent, and Plaintiffs will fairly and adequately protect the interests of the respective classes Plaintiffs seek to represent. Plaintiffs and all members of the Classes that Plaintiffs seek to represent were similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for farm-raised salmon purchased indirectly from the Defendants and/or their co-conspirators.

261.     Plaintiffs' claims arise out of the same common course of conduct giving rise to the claims of the other members of each of the Classes that each Plaintiff seeks to represent. Plaintiffs' interests are coincident with, and not antagonistic to, those of the other members of the respective Classes that Plaintiffs seek to represent. Plaintiffs are represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

262.     The questions of law and fact common to the members of each of the Classes predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

263.     Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual

actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that it might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

264.    The prosecution of separate actions by individual members of the Classes would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VII.    INTERSTATE AND INTRASTATE TRADE AND COMMERCE

265.    Hundreds of millions of dollars of transactions in farm-raised salmon are entered into each year in interstate commerce in the United States and the payments for those transactions flowed in interstate commerce.

266.    Defendants' manipulation of the market had a direct, substantial, and foreseeable impact on interstate commerce in the United States.

267.    Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices for farm-raised salmon.

268.    Defendants' unlawful conduct described herein caused inflated prices for farm-raised salmon, which also had substantial intrastate effects.

## VIII.    PLAINTIFFS AND THE CLASS SUFFERED ANTITRUST INJURY

269.    Defendants' antitrust conspiracy had the following effects, among others:

(a)    Price competition has been restrained or eliminated with respect to the pricing of farm-raised salmon;

(b)    The prices of farm-raised salmon have been fixed, raised, maintained, or stabilized at artificially inflated levels;

(c)    Plaintiffs and the Classes have paid higher prices for farm-raised salmon as a direct, foreseeable and proximate result of Defendants' conduct;

(d)    Purchasers of farm-raised salmon have been deprived of the benefits of free and open competition; and

(e)    Purchasers of farm-raised salmon paid artificially inflated prices.

270.    The purpose of the conspiratorial and unlawful conduct of Defendants and their co-conspirators was to fix, raise, stabilize and/or maintain the price of farm-raised salmon.

271.    The precise amount of the overcharge impacting the prices of farm-raised salmon paid by Plaintiffs and the Class can be measured and quantified using well-accepted models used by economists.

272.    By reason of the alleged violations of the antitrust laws, Plaintiffs and the members of the Class have sustained injury to their businesses or property, having paid higher prices for farm-raised salmon than they would have paid in the absence of Defendants' illegal contract, combination, or conspiracy and, as a result, have suffered damages in an amount presently undetermined. This is an antitrust injury of the type that the antitrust laws were meant to punish and prevent.

## IX.    CAUSES OF ACTION

### <u>COUNT I</u>
### Violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3)
### (Conspiracy in Restraint of Trade – Injunctive Relief)

273.    Plaintiff repeats the allegations set forth in paragraphs 1-271 above as if fully set forth herein.

274.    From at least April 10, 2013, until the effects of their unlawful conduct cease, Defendants and their co-conspirators entered into and engaged in a contract, combination, or

conspiracy with regards to farm-raised salmon in unreasonable restraint of trade in violation of Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3).

275.    The contract, combination or conspiracy consisted of an agreement among Defendants and their co-conspirators to fix, raise, stabilize or maintain at artificially high levels the prices they charged for farm-raised salmon in the United States and elsewhere.

276.    In formulating and effectuating this conspiracy, Defendants and their coconspirators did those things that they combined and conspired to do, including:

(a)    exchanging competitively sensitive information among themselves, with the aim to fix, increase, maintain, or stabilize prices of farm-raised salmon in the United States and elsewhere;

(b)    participating in meetings and conversations among themselves during which they agreed to charge prices at certain levels, and otherwise to fix, increase, maintain, or stabilize prices of farm-raised salmon in the United States and elsewhere;

(c)    participating in meetings and conversations among themselves to implement, adhere, and police the agreements they reached;

(d)    engaging in conduct designed to raise and stabilize the prices of farm-raised salmon sold on the spot market and pursuant to contracts.

277.    Defendants and their co-conspirators engaged in the actions described above for the purpose of carrying out their unlawful agreements to fix, maintain, raise, or stabilize prices of farm-raised salmon.

278.    Defendants' conspiracy had the following effects, among others:

(a)    Price competition in the market for farm-raised salmon has been restrained, suppressed, and/or eliminated;

(b)    Prices for farm-raised salmon provided by Defendants and their co-conspirators have been fixed, raised, maintained, and stabilized at artificially high, non-competitive levels throughout the United States and elsewhere; and

(c)   Plaintiffs and members of the Class who purchased farm-raised salmon indirectly from Defendants and their co-conspirators have been deprived of the benefits of free and open competition.

279.   Plaintiffs and members of the Class have been injured and will continue to be injured in their business and property by paying more for farm-raised salmon indirectly purchased from Defendants and their co-conspirators than they would have paid and will pay in the absence of the conspiracy.

280.   The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

281.   Plaintiffs and members of the Class are entitled to an injunction against Defendants, preventing and restraining the violations alleged herein.

## STATE DAMAGES CLAIMS

### COUNT II
### Alabama Code §§ 6-5-60 et seq.
### (On Behalf of the Alabama Class)

282.   The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

283.   By reason of the conduct alleged herein, Defendants violated Alabama Code §§ 65-60 et seq.

284.   Title 6 of the Alabama Code regulates civil practice. Chapter 5 Article 5 thereof generally prohibits unlawful trusts, combines, or monopolies. Alabama Code §§ 6-5-60 et seq.

285.   Alabama Class members purchased farm-raised salmon within the State of Alabama during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

286.   Under Alabama law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Alabama Code based on the facts alleged in this Complaint. Alabama Code §§ 6-5-60 et seq.

287.    Defendants combined, contracted, understood and agreed in the market for farm-raised salmon in an unlawful manner, with the effect of restraining trade, increasing the price of farm-raised salmon and hindering competition in the sale of farm-raised salmon, in violation of Alabama Code §§ 6-5-60 et seq.

288.    Defendants' farm-raised salmon were sold throughout the State of Alabama. During the Class Period, Defendants' illegal conduct substantially affected Alabama commerce.

289.    Members of the Alabama Class were injured and are threatened with injury with respect to purchases of farm-raised salmon in Alabama in that they paid and will pay supra-competitive prices for farm-raised salmon due to Defendants' unlawful conduct, and are entitled to all forms of relief available under Alabama Code §§ 6-5-60 et seq.

## COUNT III
### Arizona Rev. Stat. §§ 44-1401 et seq.
### (On Behalf of the Arizona Class)

290.    The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

291.    By reason of the conduct alleged herein, Defendants have violated Arizona Rev. Stat. § 44-1401, et seq.

292.    Arizona Class members purchased farm-raised salmon within the State of Arizona during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

293.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the farm-raised salmon market, a substantial part of which occurred within Arizona.

294.    Defendants' violations of Arizona law were flagrant.

295.    Defendants' unlawful conduct substantially affected Arizona's trade and commerce.

296.     As a direct and proximate result of Defendants' unlawful conduct, members of the Arizona Class have been injured in their business or property and are threatened with further injury in that they paid and will pay supra-competitive prices for farm-raised salmon due to Defendants' unlawful conduct.

297.     By reason of the foregoing, members of the Arizona Class are entitled to seek all forms of relief available under Arizona Revised Stat. § 44-1401, et seq.

### COUNT IV
### California Business and Professions Code §§ 16720, 16750
### (On Behalf of the California Class)

298.     The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

299.     By reason of the conduct alleged herein, Defendants have violated California Bus. & Prof. Code §§ 16700, et seq. and California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, et seq.

300.     California Class members purchased farm-raised salmon within the State of California during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

301.     Defendants entered into and engaged in a continuing unlawful trust in restraint of the trade and commerce as alleged herein in violation of California Bus. & Prof. Code §§ 16700, 16720, et seq. In order to maintain the price of farm-raised salmon at supra-competitive levels at the California Class's expense, Defendants have combined and conspired to restrain and exclude competition in the Relevant Market.

302.     Defendants' anticompetitive conduct was knowing and willful and constitutes a flagrant violation of Section §§ 16700, et seq.

303.    There is no pro-competitive justification for this anticompetitive conduct that outweighs its anticompetitive effects. Any possible pro-competitive benefits for such conduct could have been obtained by less restrictive alternatives.

304.    Defendants' anticompetitive conduct injured, and continues to injure members of the California Class in their business or property in that they paid and will pay supra-competitive prices for farm-raised salmon due to Defendants' anticompetitive conduct.

305.    Injury to members of the California Class was a direct, foreseeable, and proximate result of Defendants' anticompetitive conduct.

306.    As a result of Defendants' violation of Section 16700, et seq., the California Class seeks treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a).

**COUNT V**
**District of Columbia Code Ann. §§ 28-4501 et seq.**
**(On Behalf of the District of Columbia Class)**

307.    The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

308.    The policy of District of Columbia Code, Title 28, Chapter 45 (Restraints of Trade) is to "promote the unhampered freedom of commerce and industry throughout the District of Columbia by prohibiting restraints of trade and monopolistic practices."

309.    District of Columbia Class members purchased farm-raised salmon within the District of Columbia during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

310.    Under District of Columbia law, indirect purchasers have standing to maintain an action under the antitrust provisions of the District of Columbia Code based on the facts alleged in this Complaint, because "any indirect purchaser in the chain of manufacture, production or

distribution of goods... shall be deemed to be injured within the meaning of this chapter." D.C. Code § 28-4509(a).

311.     Defendants contracted, combined or conspired to act in restraint of trade within the District of Columbia, in violation of D.C. Code § 28-4501, et seq.

312.     Members of the District of Columbia Class were injured and are threatened with further injury with respect to purchases of farm-raised salmon in the District of Columbia in that they paid and will pay supra-competitive prices for farm-raised salmon due to Defendants' unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, and interest, reasonable attorneys' fees and costs.

**COUNT VI**
**Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. §§ 501.201(2), et seq.**
**(On Behalf of the Florida Class)**

313.     The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

314.     By reason of the conduct alleged herein, Defendants have violated Fla. Stat. § 501.201(2), et seq.

315.     The Florida Deceptive & Unfair Trade Practices Act, Florida Stat. §§ 501.201, *et seq.* (the "FDUTPA"), generally prohibits "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce," including practices in restraint of trade. Florida Stat. § 501.204(1).

316.     The primary policy of the FDUTPA is "[t]o protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Florida Stat. § 501.202(2). The members of the Florida class are covered by this statute.

317.     A claim for damages under the FDUTPA has three elements: (1) a prohibited practice; (2) causation; and (3) actual damages.

318.     Under Florida law, indirect purchasers have standing to maintain an action under the FDUTPA based on the facts alleged in this Complaint. Fla. Stat. § 501.211(a) ("...anyone aggrieved by a violation of this [statute] may bring an action...").

319.     Florida Class members purchased farm-raised salmon within the State of Florida during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

320.     Defendants entered into a contract, combination or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the in the farm-raised salmon market, a substantial part of which occurred within Florida.

321.     Defendants established, maintained or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for farm-raised salmon, for the purpose of excluding competition or controlling, fixing or maintaining prices in Florida at a level higher than the competitive market level, beginning at least as early as 2013 and continuing through the date of this filing.

322.     Accordingly, Defendants' conduct was an unfair method of competition, and an unfair or deceptive act or practice within the conduct of commerce within the State of Florida.

323.     Defendants' unlawful conduct substantially affected Florida's trade and commerce.

324.     As a direct and proximate cause of Defendants' unlawful conduct, Plaintiffs and the members of the Florida Class have been injured in their business or property by virtue of overcharges for farm-raised salmon and/or products derived therefrom, and are threatened with further injury.

325.     By reason of the foregoing, Plaintiffs and the members of the Florida Class is entitled to seek all forms of relief, including injunctive relief pursuant to Florida Stat. §501.208 and declaratory judgment, actual damages, reasonable attorneys' fees and costs pursuant to Florida Stat. § 501.211.

**COUNT VII**
**Hawaii Antitrust Act**
**Haw. Rev. Stat. § 480-1,** *et seq.*
**(On Behalf of the Hawaii Class)**

326.     The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

327.     By reason of the conduct alleged herein, Defendants have violated Haw. Rev. Stat. § 480-1, *et seq.*

328.     Hawaii Class members purchased farm-raised salmon within the State of Hawaii during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

329.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the farm-raised salmon market, a substantial part of which occurred within Hawaii.

330.     Defendants' violations of Hawaii law were flagrant.

331.     Defendants' unlawful conduct substantially affected Hawaii's trade and commerce.

332.     As a direct and proximate result of Defendants' unlawful conduct, members of the Hawaii Class have been injured in their business or property and are threatened with further injury in that they paid and will pay supra-competitive prices for farm-raised salmon due to Defendants' unlawful conduct.

333.     By reason of the foregoing, members of the Hawaii Class are entitled to seek all forms of relief available under Haw. Rev. Stat. § 480-1, *et seq.*

## COUNT VIII
### Illinois Antitrust Act
### 740 Ill. Comp. Stat. Ann. 10/3(1), et seq.
### (On Behalf of the Illinois Class)

334.    The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

335.    By reason of the conduct alleged herein, Defendants have violated 740 Ill. Comp. Stat. Ann. 10/3(1), *et seq.*

336.    The Illinois Antitrust Act, 740 ILCS 10/1, *et seq.*, aims "to promote the unhampered growth of commerce and industry throughout the State by prohibiting restraints of trade which are secured through monopolistic or oligarchic practices and which act or tend to act to decrease competition between and among persons engaged in commerce and trade." 740 ILCS 10/2.

337.    Plaintiffs purchased farm-raised salmon within the State of Illinois during the Class Period. But for Defendants' conduct set forth herein, the price for Defendants' products would have been lower, in an amount to be determined at trial.

338.    Under the Illinois Antitrust Act, indirect purchasers have standing to maintain an action for damages based on the facts alleged in this Complaint. 740 ILCS 10/7(2).

339.    Defendants made contracts or engaged in a combination or conspiracy with each other, though they would have been competitors but for their prior agreement, for the purpose of fixing, controlling, or maintaining prices for farm-raised salmon within the intrastate commerce of Illinois.

340.    Defendants further unreasonably restrained trade or commerce and established, maintained, or attempted to acquire monopoly power over the market for farm-raised salmon in Illinois for the purpose of excluding competition, in violation of 740 ILCS 10/1, et seq.

341.     Plaintiffs and members of the Class were injured with respect to purchases of farm-raised salmon in Illinois and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, and costs.

## COUNT IX
### Illinois Consumer Fraud and Deceptive Business Practices Act
### 815 Ill. Comp. Stat. Ann. 505/10a, et seq.
### (On Behalf of the Illinois Class)

342.     The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

343.     By reason of the conduct alleged herein, Defendants have violated 740 Ill. Comp. Stat. Ann. 505/10a et seq.

344.     Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in market for farm-raised salmon, a substantial part of which occurred within Illinois.

345.     Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the relevant markets, a substantial part of which occurred within Illinois, for the purpose of excluding competition or controlling, fixing, or maintaining prices in the market for farm-raised salmon.

346.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Illinois.

347.     Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to Plaintiffs and members of the Classes.

348.     Defendants' unlawful conduct substantially affected Illinois's trade and commerce.

349.     As a direct and proximate cause of Defendants' unlawful conduct, the Plaintiffs and members of the Illinois Class have been injured in their business or property and are threatened with further injury. The members of the Illinois class are within the scope of the Illinois statute.

350.     By reason of the foregoing, Plaintiffs and members of the Illinois Class are entitled to seek all forms of relief, including actual damages or any other relief the Court deems proper under 815 Ill. Comp. Stat. Ann. 505/10a, et seq.

## COUNT X
**Iowa Code §§ 553.1 et seq.**
**(On Behalf of the Iowa Class)**

351.     The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

352.     The Iowa Competition Law aims to "prohibit[] restraint of economic activity and monopolistic practices." Iowa Code § 553.2.

353.     Iowa Class members purchased farm-raised salmon within the State of Iowa during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

354.     Defendants contracted, combined or conspired to restrain trade in the market for farm-raised salmon, a substantial part of which occurred in Iowa, for the purpose of excluding competition or controlling, fixing or maintaining prices for farm-raised salmon, in violation of Iowa Code § 553.1, et seq.

355.     Defendants' violations of Iowa law were willful or flagrant.

356.     Defendants' unlawful conduct substantially affected Iowa's trade and commerce.

357.     Members of the Iowa Class were injured and are threatened with further injury with respect to purchases of farm-raised salmon in Iowa in that they paid and will pay supra-competitive prices for farm-raised salmon a due to Defendants' unlawful conduct, and are entitled to all forms of relief, including actual damages, exemplary damages for willful conduct, reasonable attorneys' fees and costs, and injunctive relief.

## COUNT XI
### Kansas Stat. Ann §§ 50-101 et seq.
### (On Behalf of the Kansas Class)

358.    The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

359.    The Kansas Restraint of Trade Act aims to prohibit practices which, inter alia, "tend to prevent full and free competition in the importation, transportation or sale of articles imported into this state." Kan. Stat. Ann. § 50-112.

360.    Kansas Class members purchased farm-raised salmon within the State of Kansas during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

361.    Under the Kansas Restraint of Trade Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Kan. Stat. Ann § 50-161(b).

362.    Defendants combined capital, skill or acts for the purposes of creating restrictions in trade or commerce of farm-raised salmon, increasing the price of farm-raised salmon, preventing competition in the sale of farm-raised salmon, or binding themselves not to sell farm-raised salmon, in a manner that established the price of farm-raised salmon and precluded free and unrestricted competition among themselves in the sale of farm-raised salmon, in violation of Kan. Stat. Ann. § 50-101, et seq.

363.    Defendants' unlawful conduct substantially affected Kansas's trade and commerce.

364.    Members of the Kansas Class were injured and will continue to be injured with respect to purchases of farm-raised salmon in Kansas in that they paid and will pay supra-competitive prices for farm-raised salmon due to Defendants' unlawful conduct, and are entitled to all forms of relief, including actual damages, reasonable attorneys' fees and costs, and injunctive relief.

## COUNT XII
### Michigan Compiled Laws Ann. §§ 445.771 et seq.
### (On Behalf of the Michigan Class)

365.    The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

366.    The Michigan Antitrust Reform Act aims "to prohibit contracts, combinations, and conspiracies in restraint of trade or commerce . . . [and] to provide remedies, fines, and penalties for violations of this act." Mich. Act 274 of 1984.

367.    Michigan Class members purchased farm-raised salmon within the State of Michigan during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

368.    Under the Michigan Antitrust Reform Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Mich. Comp. Laws. § 452.778(2).

369.    Defendants contracted, combined, or conspired, a substantial part of which occurred in Michigan, to restrain trade or commerce in the market for farm-raised salmon, in violation of Mich. Comp. Laws § 445.772, et seq.

370.    Defendants' unlawful conduct substantially affected Michigan's trade and commerce.

371.    Members of the Michigan Class were injured and are threatened with injury with respect to purchases of farm-raised salmon in Michigan in that they paid and will pay supra-competitive prices for farm-raised salmon a due to Defendants' unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, interest, costs, reasonable attorneys' fees, and injunctive or other appropriate equitable relief.

## COUNT XIII
### Minnesota Ann. Stat. §§ 325D.49 et seq.
### (On Behalf of the Minnesota Class)

372.    The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

373.     The Minnesota Antitrust Law of 1971 aims to prohibit any contract, combination or conspiracy when any part thereof was created, formed, or entered into in Minnesota; any contract, combination or conspiracy, wherever created, formed or entered into; whenever any of these affect Minnesota trade or commerce.

374.     Minnesota Class members purchased farm-raised salmon within the State of Minnesota during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

375.     Under the Minnesota Antitrust Act of 1971, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. Minn. Stat. § 325D.56.

376.     Defendants contracted, combined or conspired in unreasonable restraint of trade or commerce in the market for farm-raised salmon within the intrastate commerce of and outside of Minnesota; established, maintained, used or attempted to establish, maintain or use monopoly power over the trade or commerce in the market for farm-raised salmon within the intrastate commerce of and outside of Minnesota; in violation of Minn. Stat.§ 325D.49, et seq.

377.     Defendants' unlawful conduct substantially affected Minnesota's trade and commerce.

378.     As a direct and proximate result of Defendants' unlawful conduct, the members of the Minnesota Class have been injured in their business or property and are threatened with further injury in that they paid and will pay supra-competitive prices for farm-raised salmon due to Defendants' unlawful conduct

379.     By reason of the foregoing, the Minnesota Class is entitled to seek all forms of relief available under Minnesota Stat. §§ 325D.49, et seq.

## COUNT XIV
### Mississippi Code Ann. §§ 75-21-1 et seq.
### (On Behalf of the Mississippi Class)

380.    The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

381.    Title 75 of the Mississippi Code regulates trade, commerce and investments. Chapter 21 thereof generally prohibits trusts and combines in restraint or hindrance of trade, with the aim that "trusts and combines may be suppressed, and the benefits arising from competition in business [are] preserved" to Mississippians. Miss. Code Ann. § 75-21-39.

382.    Mississippi Class members purchased farm-raised salmon within the State of Mississippi during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

383.    Trusts are combinations, contracts, understandings or agreements, express or implied, when inimical to the public welfare and with the effect of, inter alia, restraining trade, increasing the price or output of a commodity, or hindering competition in the production or sale of a commodity. Miss. Code Ann. § 75-21-1.

384.    Under Mississippi law, indirect purchasers have standing to maintain an action under the antitrust provisions of the Mississippi Code based on the facts alleged in this Complaint. Miss. Code Ann. § 75-21-9.

385.    Defendants combined, contracted, understood and agreed in the market for farm-raised salmon in a manner inimical to public welfare, with the effect of restraining trade, increasing the price farm-raised salmon and hindering competition in the sale of farm-raised salmon, in violation of Miss. Code Ann. § 75-21-1(a), et seq. 270.

386.    Defendants' farm-raised salmon sold in stores throughout the State of Mississippi. During the Class Period, Defendants' illegal conduct substantially affected Mississippi commerce.

387.    Members of the Mississippi Class were injured and are threatened with injury with respect to purchases of farm-raised salmon in Mississippi in that they paid and will pay supra-competitive prices for farm-raised salmon an due to Defendants' unlawful conduct, and are entitled to all forms of relief available under Miss. Code Ann. § 75-21-21, et seq.

### COUNT XV
**Montana Unfair Trade Practices and Consumer Protection Act**
**Mont. Code §§ 30-14-101, *et seq.***
**(On Behalf of the Montana Class)**

388.    The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

389.    By reason of the conduct alleged herein, Defendants have violated the Missouri Merchandising Practices Act, Mo. Stat. §§ 407.010, et seq.

390.    Missouri Class members purchased farm-raised salmon within the State of Missouri during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

391.    Defendants entered into a contract, combination, or conspiracy between two or more persons in restraint of trade or commerce in the farm-raised salmon market, a substantial part of which occurred within Missouri.

392.    Defendants' unlawful conduct substantially affected Missouri's trade and commerce.

393.    Defendants concealed, suppressed, and omitted to disclose material facts to members of the Missouri Class concerning Defendants' unlawful activities and artificially inflated prices for farm-raised salmon. They concealed, suppressed, and omitted facts would have been important to members of the Missouri Class as they related to the cost of products they purchased.

394.    Defendants misrepresented the real cause of price increases and/or the absence of price reductions in farm-raised salmon by making public statements that were not in accord with the facts.

395.    Defendants' statements and conduct concerning the price of their products were deceptive as they had the tendency or capacity to mislead members of the Missouri Class to believe that they were purchasing at prices established by a free and fair market.

396.    As a direct and proximate result of Defendants' unlawful conduct, members of the Missouri Class have been injured in their business or property and are threatened with further injury in that they paid and will pay supra-competitive prices for farm-raised salmon due to Defendants' unlawful conduct.

397.    Accordingly, members of the Missouri Class seek all relief available under Missouri's Merchandising Practices Act, specifically Mo. Rev. Stat. § 407.020, which prohibits "the act, use or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce" as further interpreted by the Missouri Code of State Regulations, 15 CSR 60-7.010, et seq., 15 CSR 60-8.010, et seq., and 15 CSR 60-9.010, et seq., and Mo. Rev. Stat. § 407.025, which provides for the relief sought in this count.

## COUNT XVI
### Nebraska Rev. Stat. §§ 59-801 et seq.
### (On Behalf of the Nebraska Class)

398.    The allegations in paragraphs 1-271 are incorporated as if fully stated herein

399.    Chapter 59 of the Nebraska Revised Statute generally governs business and trade practices. Sections 801 through 831 thereof, known as the Junkin Act, prohibit antitrust violations such as restraints of trade.

400.     Nebraska Class members purchased farm-raised salmon within the State of Nebraska during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

401.     Under Nebraska law, indirect purchasers have standing to maintain an action under the Junkin Act based on the facts alleged in this Complaint. Neb. Rev. Stat. § 59-821.

402.     Defendants contracted, combined or conspired in restraint of trade or commerce of farm-raised salmon within the intrastate commerce of Nebraska, through agreements to fix prices, and otherwise control trade, in violation of Neb. Rev. Stat. § 59801, et seq.

403.     Defendants' unlawful conduct substantially affected Nebraska's trade and commerce.

404.     Members of the Nebraska Class were injured and will continue to be injured with respect to purchases of farm-raised salmon in Nebraska in that they paid and will pay supra-competitive prices for farm-raised salmon due to Defendants' unlawful conduct, and are entitled to all forms of relief, including actual damages or liquidated damages in an amount which bears a reasonable relation to the actual damages which have been sustained, as well as reasonable attorneys' fees, costs, and injunctive relief.

### COUNT XVII
### Nevada Rev. Stat. Ann. §§ 598A.010 et seq.
### (On Behalf of the Nevada Class)

405.     The allegations in paragraphs 1-271 are incorporated as if fully stated herein

406.     The Nevada Unfair Trade Practice Act ("NUTPA") states that "free, open and competitive production and sale of commodities . . . is necessary to the economic well-being of the citizens of the State of Nevada." Nev. Rev. Stat. Ann. § 598A.030(1).

407.    Nevada Class members purchased farm-raised salmon within the State of Nevada during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

408.    The policy of NUTPA is to prohibit acts in restraint of trade or commerce, to preserve and protect the free, open and competitive market, and to penalize all persons engaged in anticompetitive practices. Nev. Rev. Stat. Ann. § 598A.030(2). Such acts include, inter alia, price fixing, and division of markets. Nev. Rev. Stat. Ann. § 598A.060.

409.    Under Nevada law, indirect purchasers have standing to maintain an action under NUTPA based on the facts alleged in this Complaint. Nev. Rev. Stat. Ann. § 598A.210(2).

410.    Defendants fixed prices by agreeing to establish prices for farm-raised salmon in Nevada, and within the intrastate commerce of Nevada, constituting a contract, combination or conspiracy in restraint of trade in violation of Nev. Rev. Stat. Ann. § 598A, et seq.

411.    Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

412.    Members of the Nevada Class were injured and are threatened with injury with respect to purchases of farm-raised salmon in Nevada in that at least thousands of sales of Defendants' farm-raised salmon took place in Nevada, purchased by Nevada consumers at supra-competitive prices caused by Defendants' conduct.

413.    Accordingly, members of the Nevada Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

414.    In accordance with the requirements of § 598A.210(3), notice of this action was mailed to the Nevada Attorney General by Plaintiffs.

**COUNT XVIII**
**Nevada Deceptive Trade Practices Act**
**Nev. Rev. Stat. § 598.0903, *et seq.***
**(On Behalf of the Nevada Class)**

415.     The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

416.     By reason of the conduct alleged herein, Defendants have violated Nev. Rev. Stat. § 598.0903, et seq.

417.     Defendants engaged in a deceptive trade practice with the intent to injure competitors and to substantially lessen competition.

418.     Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce in the market for farm-raised salmon, a substantial part of which occurred within Nevada, for the purpose of excluding competition or controlling, fixing, or maintaining prices.

419.     Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of Nevada.

420.     Defendants' conduct amounted to a fraudulent act or practice committed by a supplier in connection with a consumer transaction.

421.     Defendants' unlawful conduct substantially affected Nevada's trade and commerce.

422.     Defendants' conduct was willful.

423.     As a direct and proximate cause of Defendants' unlawful conduct, the members of the Nevada Class have been injured in their business or property and are threatened with further injury.

424.     By reason of the foregoing, the Nevada Class is entitled to seek all forms of relief, including damages, reasonable attorneys' fees and costs, and a civil penalty of up to $5,000 per violation under Nev. Rev. Stat. § 598.0993.

### COUNT XIX
### New Hampshire Rev. Stat. §§ 356:1 et seq.
### (On Behalf of the New Hampshire Class)

425.     The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

426.     Title XXXI of the New Hampshire Statutes generally governs trade and commerce. Chapter 356 thereof governs combinations and monopolies and prohibits restraints of trade. N.H. Rev. Stat. Ann. §§ 356:2, 3.

427.     New Hampshire Class members purchased farm-raised salmon within the State of New Hampshire during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

428.     Under New Hampshire law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.H. Rev. Stat. Ann. § 356:11(II).

429.     Defendants fixed, controlled or maintained prices for farm-raised salmon, constituting a contract, combination or conspiracy in restraint of trade, a substantial part of which occurred in New Hampshire, in violation of N.H. Rev. Stat. Ann. § 356:1, et seq.

430.     Members of the New Hampshire Class were injured and are threatened with injury with respect to purchases of farm-raised salmon in New Hampshire in that they paid more and will continue to pay more for farm-raised salmon than they otherwise would in the absence of Defendants' unlawful conduct, and are entitled to all forms of relief, including actual damages sustained, treble damages for willful or flagrant violations, reasonable attorneys' fees, costs, and injunctive relief.

## COUNT XX
### New Mexico Stat. Ann. §§ 57-1-1 et seq.
### (On Behalf of the New Mexico Class)

431.     The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

432.     The New Mexico Antitrust Act aims to prohibit restraints of trade and monopolistic practices. N.M. Stat. Ann. 57-1-15.

433.     New Mexico Class members purchased farm-raised salmon within the State of New Mexico during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

434.     Under New Mexico law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.M. Stat. Ann. § 57-1-3.

435.     Defendants contracted, agreed, combined or conspired to restrain trade for farm-raised salmon within the intrastate commerce of New Mexico, in violation of N.M. Stat. Ann. § 57-1-1, et seq.

436.     Defendants' unlawful conduct substantially affected New Mexico's trade and commerce.

437.     Members of the New Mexico Class were injured and will continue to be injured with respect to purchases of farm-raised salmon in New Mexico in that they paid more and will continue to pay more for farm-raised salmon than they otherwise would in the absence of Defendants' unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, costs, and injunctive relief.

## COUNT XXI
### The Donnelly Act, New York General Bus. Law §§ 340 et seq.
### (On Behalf of the New York Class)

438.     The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

439.     Article 22 of the New York General Business Law general prohibits monopolies and contracts or agreements in restraint of trade, with the policy of encouraging competition or the free exercise of any activity in the conduct of any business, trade or commerce in New York. N.Y. Gen. Bus. Law § 340(1).

440.     New York Class members purchased farm-raised salmon a within the State of New York during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

441.     Under New York law, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.Y. Gen. Bus. Law § 340(6).

442.     Defendants restrained competition in the free exercise of the conduct of the business of farm-raised salmon within the intrastate commerce of New York, in violation of N.Y. Gen. Bus. Law § 340, et seq.

443.     Defendants' unlawful conduct substantially affected New York's trade and commerce.

444.     Members of the New York Class were injured and are threatened with further injury with respect to purchases of farm-raised salmon in New York in that they paid more and will continue to pay more for farm-raised salmon than they otherwise would in the absence of Defendants' unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, costs not exceeding $10,000, and reasonable attorneys' fees.

## COUNT XXII
### North Carolina General Stat. §§ 75-1 et seq.
### (On Behalf of the North Carolina Class)

445.     The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

446.     By reason of the conduct alleged herein, Defendants have violated N.C. Gen. Stat. § 75-1.1, et seq.

447.   North Carolina class members purchased farm-raised salmon within the State of North Carolina during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

448.   Defendants entered into a contract or combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce in the farm-raised salmon market, a substantial part of which occurred within North Carolina.

449.   Defendants' conduct was unfair, unconscionable, or deceptive within the conduct of commerce within the State of North Carolina.

450.   Defendants' trade practices are and have been immoral, unethical, unscrupulous, and substantially injurious to consumers.

451.   Defendants' conduct misled consumers, withheld material facts, and resulted in material misrepresentations to members of the North Carolina class.

452.   Defendants' unlawful conduct substantially affected North Carolina's trade and commerce.

453.   As a direct and proximate result of Defendants' unlawful conduct, members of the North Carolina Class have been injured in their business or property and are threatened with further injury in that they paid more and will continue to pay more for farm-raised salmon than they otherwise would in the absence of Defendants' unlawful conduct.

454.   By reason of the foregoing, members of the North Carolina Class are entitled to seek all forms of relief available, including treble damages, under N.C. Gen. Stat. § 75-1, et seq.

## COUNT XXIII
### North Dakota Century Code §§ 51-08.1-01 et seq.
### (On Behalf of the North Dakota Class)

455.   The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

456.     The North Dakota Uniform State Antitrust Act generally prohibits restraints on or monopolization of trade. N.D. Cent. Code § 51-08.1, et seq.

457.     North Dakota class members purchased farm-raised salmon within the State of North Dakota during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

458.     Under the North Dakota Uniform State Antitrust Act, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. N.D. Cent. Code § 51-08.1-08.

459.     Defendants contracted, combined or conspired in restraint of in the market for farm-raised salmon, a substantial part of which occurred within North Dakota, for the purposes of excluding competition or controlling, fixing or maintaining prices for farm-raised salmon, in violation of N.D. Cent. Code §§ 51-08.1-02, 03.

460.     Defendants' violations of North Dakota law were flagrant.

461.     Defendants' unlawful conduct substantially affected North Dakota's trade and commerce.

462.     Members of the North Dakota Class were injured and will continue to be injured with respect to purchases in North Dakota in that they paid more and will continue to pay more for farm-raised salmon than they otherwise would in the absence of Defendants' unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages for flagrant violations, costs, reasonable attorneys' fees, and injunctive or other equitable relief.

## COUNT XXIV
### Oregon Revised Statutes §§ 646.705 et seq.
### (On Behalf of the Oregon Class)

463.     The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

464.     Chapter 646 of the Oregon Revised Statutes generally governs business and trade practices within Oregon. Sections 705 through 899 thereof govern antitrust violations, with the policy to "encourage free and open competition in the interest of the general welfare and economy of the state." Or. Rev. Stat. § 646.715.

465.     Oregon Class members purchased farm-raised salmon within the State of Oregon during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

466.     Under Oregon law, indirect purchasers have standing under the antitrust provisions of the Oregon Revised Statutes to maintain an action based on the facts alleged in this Complaint. Or. Rev. Stat. § 646.780(1)(a).

467.     Defendants contracted, combined, or conspired in restraint of trade or commerce of farm-raised salmon, a substantial part of which occurred within Oregon, in violation of Or. Rev. Stat. § 646.705, et seq.

468.     Defendants' unlawful conduct substantially affected Oregon's trade and commerce.

469.     Members of the Oregon Class were injured with respect to purchases of farm-raised salmon within the intrastate commerce of Oregon, or alternatively to interstate commerce involving actual or threatened injury to persons located in Oregon, in that they paid more and will continue to pay more for farm-raised salmon than they otherwise would in the absence of Defendants' unlawful conduct.

470.     Members of the Oregon Class are entitled to all forms of relief, including actual damages, treble damages, reasonable attorneys' fees, expert witness fees and investigative costs, and injunctive relief.

## COUNT XXV
### Rhode Island Antitrust Act, Rhode Island Gen. Law §§ 6-36-1 et seq.
### (On Behalf of the Rhode Island Class)

471.   The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

472.   The Rhode Island Antitrust Act aims to promote the unhampered growth of commerce and industry throughout Rhode Island by prohibiting unreasonable restraints of trade that hamper, prevent or decrease competition. R.I. Gen. Laws § 6-36- 2(a)(2).

473.   Rhode Island Class members purchased farm-raised salmon within the State of Rhode Island during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

474.   Under the Rhode Island Antitrust Act, as of July 15, 2013, indirect purchasers have standing to maintain an action based on the facts alleged in this Complaint. R.I. Gen. Laws § 636-11(a).

475.   Defendants contracted, combined and conspired in restraint of trade of farm-raised salmon within the intrastate commerce of Rhode Island, for the purpose of excluding competition or controlling, fixing or maintaining prices within the intrastate commerce of Rhode Island, in violation of R.I. Gen. Laws § 6-36-1, et seq.

476.   Members of the Rhode Island Class were injured and will continue to be injured with respect to purchases of farm-raised salmon in Rhode Island in that they paid more and will continue to pay more for farm-raised salmon than they otherwise would in the absence of Defendants' unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, reasonable costs, reasonable attorneys' fees, and injunctive relief.

**COUNT XXVI**
**South Carolina Unfair Trade Practices Act**
**S.C. Code Ann. §§ 39-5-10,** *et seq.*
**(On Behalf of the South Carolina Class)**

477.    The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

478.    By reason of the conduct alleged herein, Defendants have violated S.C. Code Ann. §§ 39-5-10.

479.    Defendants have entered into a contract, combination, or conspiracy between two or more persons in restraint of, or to monopolize, trade or commerce in the market for farm-raised salmon, a substantial part of which occurred within South Carolina.

480.    Defendants established, maintained, or used a monopoly, or attempted to establish a monopoly, of trade or commerce, for the purpose of excluding or limiting competition or controlling or maintaining prices in the market for farm-raised salmon, a substantial part of which occurred within South Carolina.

481.    Defendants' conduct was conducted with the intent to deceive South Carolina consumers regarding the nature of Defendants' actions within the stream of South Carolina commerce.

482.    Defendants' conduct was unfair or deceptive within the conduct of commerce within the State of South Carolina.

483.    Defendants' conduct misled consumers, withheld material facts, and had a direct or indirect impact upon Plaintiffs' and Class members' ability to protect themselves. The members of the South Carolina Class are within the scope of the South Carolina statute.

484.    Defendants' unlawful conduct substantially affected South Carolina trade and commerce.

485.     Defendants' unlawful conduct substantially harmed the public interest of the State of South Carolina, as a significant number of members of the public purchase and consume farm-raised salmon.

486.     South Carolina Class members purchased farm-raised salmon within the State of South Carolina during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

487.     As a direct and proximate result of Defendants' unlawful conduct, members of the South Carolina Class have been injured in their business or property and are threatened with further injury in that they paid and will pay supra-competitive prices for farm-raised salmon due to Defendants' unlawful conduct.

488.     By reason of the foregoing, members of the South Carolina Class are entitled to seek all forms of relief available under S.C. Code Ann. §§ 39-5-10.

## COUNT XXVII
### South Dakota Codified Laws §§ 37-1-3.1 et seq.
### (On Behalf of the South Dakota Class)

489.     The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

490.     Chapter 37-1 of the South Dakota Codified Laws prohibits restraint of trade, monopolies and discriminatory trade practices. S.D. Codified Laws §§ 37-1- 3.1, 3.2.

491.     South Dakota Class members purchased farm-raised salmon within the State of South Dakota during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

492.     Under South Dakota law, indirect purchasers have standing under the antitrust provisions of the South Dakota Codified Laws to maintain an action based on the facts alleged in this Complaint. S.D. Codified Laws § 37-1-33.

493.     Defendants contracted, combined or conspired in restraint of trade or commerce of farm-raised salmon within the intrastate commerce of South Dakota, in violation of S.D. Codified Laws § 37-1, et seq.

494.     Defendants' unlawful conduct substantially affected South Dakota's trade and commerce.

495.     Members of the South Dakota Class were injured and will continue to be injured with respect to purchases of farm-raised salmon in South Dakota in that they paid more and will continue to pay more for farm-raised salmon a than they otherwise would in the absence of Defendants' unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, taxable costs, reasonable attorneys' fees, and injunctive or other equitable relief.

## COUNT XXVIII
### Tennessee Code Ann. §§ 47-25-101 et seq.
### (On Behalf of the Tennessee Class)

496.     The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

497.     By reason of the conduct alleged herein, Defendants have violated Tennessee Code Ann. §§ 47-25 101, et seq.

498.     Tennessee Class members purchased farm-raised salmon within the State of Tennessee during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

499.     Defendants have entered into arrangements, contracts, agreements, trusts, or combinations with persons or corporations designed to, or which tend to, advance or control the price or the cost to end users in the farm-raised salmon market throughout Tennessee.

500.     Defendants' unlawful conduct affects Tennessee commerce to a substantial degree by causing Tennessee consumers to pay inflated prices for farm-raised salmon.

501.     As a direct and proximate cause of Defendants' unlawful conduct, members of the Tennessee Class have been injured in their business or property and are threatened with further injury in that they paid more and will continue to pay more for farm-raised salmon than they otherwise would in the absence of Defendants' unlawful conduct.

502.     By reason of the foregoing, members of the Tennessee Class are entitled to seek all forms of relief available under Tennessee Code Ann. §§ 47-25-101, et seq.

<u>COUNT XXIX</u>
**Utah Code Ann. §§ 76-10-3101 et seq.**
**(On Behalf of the Utah Class)**

503.     The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

504.     The Utah Antitrust Act aims to "encourage free and open competition in the interest of the general welfare and economy of this state by prohibiting monopolistic and unfair trade practices, combinations and conspiracies in restraint of trade or commerce . . . ." Utah Code Ann. § 76-10-3102.

505.     Utah Class members purchased farm-raised salmon within the State of Utah during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

506.     Under the Utah Antitrust Act, indirect purchasers who are either Utah residents or Utah citizens have standing to maintain an action based on the facts alleged in this Complaint. Utah Code Ann. § 76-10-3109(1)(a).

507.     Defendants contracted, combined or conspired in restraint of trade or commerce of farm-raised salmon, in violation of Utah Code Ann. § 76-103101, et seq.

508.     Members of the Utah Class who are either Utah residents or Utah citizens were injured and will continue to be injured with respect to purchases of farm-raised salmon in Utah in that they paid more and will continue to pay more for farm-raised salmon than they otherwise would

in the absence of Defendants' unlawful conduct, and are entitled to all forms of relief, including actual damages, treble damages, costs of suit, reasonable attorneys' fees, and injunctive relief.

## COUNT XXX
### Vermont Stat. Ann. §§ 2453 et seq.
### (On Behalf of the Vermont Class)

509.    The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

510.    By reason of the conduct alleged herein, Defendants have violated the Vermont Statutes Annotated.

511.    Vermont Class members purchased farm-raised salmon within the State of Vermont during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

512.    Defendants' conduct has and had anticompetitive effects in the farm-raised salmon market, as supra-competitive prices for farm-raised salmon are passed on to end users.

513.    Defendants' unlawful conduct substantially affected Vermont's trade and commerce.

514.    As a direct and proximate result of Defendants' unlawful conduct, members of the Vermont Class have been injured in their business or property and are threatened with further injury in that they paid and will continue to pay more for farm-raised salmon than they otherwise would in the absence of Defendants' unlawful conduct.

515.    By reason of the foregoing, members of the Vermont Class are entitled to seek all forms of relief available under Vermont Stat. Ann. 9 § 2453 et seq.

## COUNT XXXI
### West Virginia Code §§ 47-18-1 et seq.
### (On Behalf of the West Virginia Class)

516.    The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

517.    The violations of federal antitrust law set forth above also constitute violations of section 47-18-1 of the West Virginia Code.

518.    West Virginia Class members purchased farm-raised salmon within the State of West Virginia during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

519.    During the Class Period, Defendants engaged in a continuing contract, combination or conspiracy, a substantial part of which occurred in West Virginia, with wholesalers in unreasonable restraint of trade and commerce and other anticompetitive conduct alleged above in violation of W. Va. Code § 47-18-1, et seq.

520.    Defendants' anticompetitive acts described above were knowing, willful and constitute violations or flagrant violations of the West Virginia Antitrust Act.

521.    Defendants' unlawful conduct substantially affected West Virginia's trade and commerce.

522.    As a direct and proximate result of Defendants' unlawful conduct, members of the West Virginia Class have been injured in their business and property in that they paid more for farm-raised salmon than they otherwise would have paid in the absence of Defendants' unlawful conduct.

523.    As a result of Defendants' violation of Section 47-18-3 of the West Virginia Antitrust Act, members of the West Virginia Class seek treble damages and their cost of suit, including reasonable attorneys' fees, pursuant to section 47-18-9 of the West Virginia Code.

## COUNT XXXII
### Wisconsin Stat. §§ 133.01 et seq.
### (On Behalf of the Wisconsin Class)

524.    The allegations in paragraphs 1-271 are incorporated as if fully stated herein.

525.    Wisconsin Class members purchased farm-raised salmon within the State of Wisconsin during the Class Period. But for Defendants' conduct set forth herein, the price of farm-raised salmon would have been lower.

526.    Under Wisconsin law, indirect purchasers have standing under the antitrust provisions of the Wisconsin Statutes to maintain an action based on the facts alleged in this Complaint. Wis. Stat. § 133.18(a).

527.    Defendants contracted, combined or conspired in restraint of trade or commerce of farm-raised salmon, a substantial part of which occurred within Wisconsin, with the intention of injuring or destroying competition therein, in violation of Wis. Stat. § 133.01, et seq.

528.    Members of the Wisconsin Class were injured with respect to purchases of farm-raised salmon in Wisconsin in that the actions alleged herein substantially affected the people of Wisconsin, with consumers in Wisconsin paying substantially higher prices for Defendants' farm-raised salmon in Wisconsin.

529.    Accordingly, members of the Wisconsin Class are entitled to all forms of relief, including actual damages, treble damages, costs and reasonable attorneys' fees, and injunctive relief.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs individually and as members of the proposed Federal Injunctive Class and the State Classes pray that:

A.  This Court find that Defendants' conduct constitutes violations of the Sherman Act, 15 U.S.C. §§ 1, 2 and the Clayton Act, 15 U.S.C. § 14;

B.  This Court award injunctive relief to the proposed injunctive Class under Section 16 of the Clayton Act, 15 U.S.C. § 26, and award damages and all appropriate relief to the proposed damage Classes in the indirect purchaser states;

C.  Plaintiffs recover reasonable attorneys' fees and costs as allowed by law;

D.  Plaintiffs recover pre-judgment and post-judgment interest at the highest rate allowed by law; and

E.  Plaintiffs be granted such other and further relief as the Court deems just and equitable.

## XI.    JURY DEMAND

Plaintiffs demand a trial by jury as to all matters so triable.

Respectfully submitted,

Dated: April 22, 2021

/s/Jayne A. Goldstein
Jayne A. Goldstein (FL Bar No. 144088)
**MILLER SHAH LLP**
1625 North Commerce Parkway, Suite 320
Fort Lauderdale, FL 33326
Telephone: (954) 515-0123
Facsimile: (866) 300-7367
jagoldstein@millershah.com

*Liaison Counsel for Indirect Purchaser Class*

Heidi M. Silton (*pro hac vice*)
Kristen G. Marttila (*pro hac vice*)
Maureen Kane Berg (*pro hac vice*)
Joseph C. Bourne (*pro hac vice* pending)
**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
hmsilton@locklaw.com
kgmarttila@locklaw.com
mkberg@locklaw.com
jcboune@locklaw.com

Fred Taylor Isquith, Sr. (*pro hac vice*)
**ZWERLING, SCHACHTER & ZWERLING LLP**
41 Madison Avenue, 32nd Floor
New York, NY 10010
Telephone: (212) 223-3900
ftisquith@zsz.com

*Interim Co-Lead Class Counsel for the Indirect Purchaser Class*

Thomas H. Burt (*pro hac vice*)
**WOLF HALDENSTEIN ADLER FREEMAN &
HERZ LLP**
270 Madison Avenue
New York, NY 10016
Telephone: (212) 545-4600
Facsimile: (212) 545-4653
burt@whafh.com

Elizabeth C. Pritzker (*pro hac vice*)
**PRITZKER LEVINE LLP**
180 Grand Avenue
Oakland, CA 94612
Telephone: (415) 692-0772
Facsimile: (415) 366-6110
ecp@pritzkerlevine.com

Richard J. Vita (*pro hac vice*)
**VITA LAW OFFICES P.C.**
100 State Street, Suite 900
Boston, MA 02109
Telephone: (617) 426-6566
rjv@vitalaw.com

Samuel J. Dubbin, P.A. (FL Bar No. 328189)
**DUBBIN & KRAVETZ, LLP**
1200 Anastasia Avenue, Suite 300
Coral Gables, FL 33134
Telephone: (305) 357-9004
sdubbin@dubbinkravetz.com

Adam J. Zapala (*pro hac vice*)
Elizabeth T. Castillo (*pro hac vice* forthcoming)
Reid W. Gaa (*pro hac vice* forthcoming)
**COTCHETT, PITRE & MCCARTHY, LLP**
San Francisco Airport Office Center
840 Malcolm Road, Suite 200
Burlingame, CA 94010
Telephone: (650) 697-6000
Facsimile: (650) 697-0577
azapala@cpmlegal.com
ecastillo@cpmlegal.com
rgaa@cpmlegal.com

Jonathan Cuneo (*pro hac vice*)
Blaine Finley (*pro hac vice*)
**CUNEO GILBERT & LADUCA, LLP**
4725 Wisconsin Avenue, NW, Suite 200
Washington, DC 20016
Telephone: (202) 789-3960
Facsimile: (202) 789-1813
jonc@cuneolaw.com
bfinley@cuneolaw.com

Daniel C. Hedlund (*pro hac vice*)
Michelle J. Looby (*pro hac vice*)
Kaitlyn Dennis (*pro hac vice* forthcoming)
**GUSTAFSON GLUEK PLLC**
Canadian Pacific Plaza, Suite 2600
120 South Sixth Street
Minneapolis, MN 55402
Telephone: (612) 333-8844
dhedlund@gustafsongluek.com
mlooby@gustafsongluek.com
kdennis@gustafsongluek.com

Fred T. Isquith, Jr. (*pro hac vice*)
**ISQUITH LAW**
220 East 80th Street
New York, NY 10075
Telephone: (607) 277-6513
isquithlaw@gmail.com

*Counsel for Indirect Purchaser Class*

# EXHIBIT A

| Defendant Group | Parent | Wholly-Owned Subsidiaries | Related Entities |
|---|---|---|---|
| Mowi | Mowi ASA (f/k/a Marine Harvest ASA) | • Mowi USA LLC (f/k/a Marine Harvest USA)<br>• Mowi Canada West, Inc.<br>• Mowi Ducktrap LLC (f/k/a Ducktrap River of Maine LLC) | • Morpol ASA (48.5% share owned by Mowi ASA) |
| Grieg | Grieg Seafood ASA | • Grieg Seafood BC Ltd.<br>• Ocean Quality North America Inc. ("OQ NA")<br>• Ocean Quality USA Inc. ("OQ USA")<br>• Ocean Quality Premium Brands, Inc. ("OQ Premium Brands") | • Ocean Quality AS (majority Grieg-owned US sales agent) |
| SalMar | SalMar ASA | | |
| Lerøy | Lerøy Seafood AS | • Lerøy Seafood USA Inc. | |
| Cermaq | Cermaq Group AS | • Cermaq US LLC<br>• Cermaq Canada Ltd.<br>• Cermaq Norway US<br>• Cermaq Chile AS | |