**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
FORT LAUDERDALE DIVISION**

| | |
|---|---|
| Wood Mountain Fish LLC, *et al.*, | Civil No. 19-22128-CIV-SMITH/LOUIS |
| Plaintiffs, | |
| v. | |
| Mowi ASA (f/k/a Marine Harvest ASA), *et al.*, | |
| Defendants. | |

**INDIRECT PURCHASER PLAINTIFFS' MOTION FOR AN AWARD OF
ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES AND
COSTS AND INCORPORATED MEMORANDUM OF LAW**

### TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................. 1

II.    BACKGROUND ................................................................................................... 1

III.   LEGAL STANDARD............................................................................................ 5

IV.   ARGUMENT ........................................................................................................ 6

     A.    The Common Fund Doctrine Governs the Fee Award in this Case. ...................... 6

     B.    The Court Should Approve Class Counsel's Request for Attorneys'
            Fees from the Settlement Fund. ........................................................................... 7

            1.    *Johnson* factors related to Class Counsel's time and labor
                   weigh in favor of a 30% fee award. ........................................................... 7

            2.    Factors related to the difficulty of the case and skill required
                   similarly weigh in favor of IPPs' requested fee award. ............................9

            3.    The fee sought by IPPs is customary for a complex class
                   action in the Eleventh Circuit and on par with similar
                   antitrust cases nationwide. ......................................................................12

            4.    Class Counsel obtained a significant recovery for the class
                   and achieved a successful result in light of the risks
                   presented by this case................................................................................14

     C.    The Court Should Approve Class Counsel's Request for
            Reimbursement of Litigation Expenses. .............................................................. 16

V.    CONCLUSION.................................................................................................... 17

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re Aggrenox Antitrust Litig.*,
   Case No. 3:18-MD-00850, 2018 WL 10705542 (D. Conn. July 19, 2018)............................13

*Allapattah Servs., Inc. v. Exxon Corp.*,
   454 F. Supp. 2d. 1185 (S.D. Fla. 2006) ...................................................................................9

*Amason v. Pantry, Inc.*,
   Case No. 7:09-cv-02117, 2014 WL 12600263 (N.D. Ala. July 3, 2014) ................................13

*Behrens v. Wometco Enters., Inc.*,
   118 F.R.D. 534 (S.D. Fla. 1988)......................................................................................14, 16

*Boeing Co. v. Van Gemert*,
   444 U.S. 472 (1980).................................................................................................................6

*In re Broiler Chicken Antitrust Litig.*,
   290 F. Supp. 3d 772 (N.D. Ill. 2017) ...............................................................................10, 13

*In re Broiler Chicken Antitrust Litig.*,
   No. 16 C 8637, 2022 WL 6124787 (N.D. Ill. Oct. 7, 2022)............................................13, 15

*California v. ARC Am. Corp.*,
   490 U.S. 93 (1989)...................................................................................................................9

*Camden I Condominium Ass'n, Inc. v. Dunkle*,
   946 F.2d 768 (11th Cir. 1991) ....................................................................................... *passim*

*Camp v. City of Pelham*,
   No. 2:10-cv-01270, 2015 WL 12746716 (N.D. Ala. Dec. 16, 2015) .....................................12

*In re Checking Account Overdraft Litig.*,
   Case No. 1:09-MD-02036, 2020 WL 4586398 (S.D. Fla. Aug. 10, 2020)................................5

*In re Checking Account Overdraft Litig.*,
   No. 1:09-MD-02036, 2015 WL 12641970 (S.D. Fla. May 22, 2015) .....................................14

*Cifuentes v. Regions Bank*,
   No. 11-cv-23455, 2014 WL 1153772 (S.D. Fla. Mar. 20, 2014) ...........................................12

*Comeens v. HM Operating, Inc.*,
   No. 6:14-cv-00521, 2016 WL 4398412 (N.D. Ala. Aug. 18, 2016).......................................12

*Diakos v. HSS Sys., LLC*,
   Civil Action No. 14-61784, 2016 WL 3702698 (S.D. Fla. Feb. 5, 2016) ..............................12

*In re Domestic Drywall Antitrust Litig.*,
   No. 13-MD-2437, 2019 WL 1258832 (E.D. Pa. Mar. 19, 2019)..........................................9, 15

*Duque v. 130 NE 40th St., LLC*,
   Case No. 14-23965-CIV, 2016 WL 7442797 (S.D. Fla. Jan. 27, 2016)................................12

*In re Dynamic Random Access Memory (DRAM) Antirust Litig.*,
   MDL No. 1486, 2013 WL 12387371 (N.D. Cal. Nov. 5, 2013)............................................14

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
   999 F.3d 1247 (11th Cir. 2021) .......................................................................................5, 6

*In re Flonase Antitrust Litig.*,
   291 F.R.D. 93 (E.D. Pa. 2013)..............................................................................................13

*Gevaerts v. TD Bank, N.A.*,
   Case No. 11:14-cv-20744, 2015 WL 6751061 (S.D. Fla. Nov. 5, 2015) ...................12, 14, 16

*Greco v. Ginn Dev. Co., LLC*,
   635 F. App'x 628 (11th Cir. 2015) .......................................................................................14

*Ill. Brick Co. v. Illinois*,
   431 U.S. 720 (1977)................................................................................................................9

*In re Interior Molded Doors Indirect Purchaser Antitrust Litig.*,
   No. 3:18-cv-00850, 2021 WL 5195089 (E.D. Va. July 27, 2021)...................................13, 15

*James v. JPMorgan Chase Bank, N.A.*,
   Case No. 15-cv-2424-T-23JSS, 2017 WL 2472499 (M.D. Fla. June 5, 2017)......................12

*Johnson v. Georgia Highway Express, Inc.*,
   488 F.2d 714 (5th Cir. 1974) ........................................................................................ *passim*

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
   No. 14-md-02542, 2021 WL 2328431 (S.D.N.Y. June 7, 2021)....................................13, 15

*In re Lithium Ion Batteries Antitrust Litig.*,
   No. 13-MD-02420, 2020 WL 7264559 (N.D. Cal. Dec. 10, 2020)...................................13, 15

*Lloyd v. James E. Albertelli, P.A.*,
   No. 20-cv-60300, 2020 WL 7295767 (S.D. Fla. Dec. 10, 2020)............................................16

*McKenzie v. Cooper, Levins & Pastko, Inc.*,
   990 F.2d 1183 (11th Cir. 1993) ..............................................................................................5

*Morgan v. Public Storage*,
   301 F. Supp. 3d 1237 (S.D. Fla. 2016) ........................................................................12, 16

*In re Motorsports Merch. Antitrust Litig.*,
   112 F. Supp. 2d 1329 (N.D. Ga. 2000) .........................................................................9, 14

*In re Nexium Antitrust Litig.*,
   777 F.3d 9 (1st Cir. 2015)....................................................................................................9

*Pierre-Val v. Buccaneers Ltd. P'ship*,
   No. 8:14-cv-01182, 2015 WL 12843849 (M.D. Fla. Dec. 7, 2015) ....................................12

*In re Pool Prods. Distrib. Mkt. Antitrust Litig.*,
   MDL No. 2328, 2015 WL 4528880 (E.D. La. July 27, 2015)..........................................9, 13

*In re Pork Antitrust Litig.*,
   Civil No. 18-1776, 2022 WL 4238416 (D. Minn. Sept. 14, 2022).......................................13

*In re Processed Egg Prods. Antitrust Litig.*,
   No. 08-md-2002, 2012 WL 5467530 (E.D. Pa. Nov. 9, 2012)..............................................13

*Saccoccio v. JP Morgan Chase Bank, N.A.*,
   297 F.R.D. 683 (S.D. Fla. 2014) ........................................................................................14

*In re Southeastern Milk Antitrust Litig.*,
   Master File No. 2:08-MD-1000,
   2013 WL 2155387 (E.D. Tenn. May 17, 2013)...................................................................15

*Sullivan v. DB Investments, Inc.*,
   667 F.3d 273 (3d Cir. 2011)..................................................................................................9

*In re Sunbeam Sec. Litig.*,
   176 F. Supp.2d 1323 (S.D. Fla. 2001) ...........................................................................11, 12

*Thorpe v. Walter Inv. Mgmt. Corp.*,
   Case No. 1:14-cv-20880, 2016 WL 10518902 (S.D. Fla. Oct. 17, 2016) .................11, 12, 14

*Vogenberger v. ATC Fitness Cape Coral, LLC*,
   No. 2:14-cv-436-FTM-29CM, 2015 WL 1883537 (M.D. Fla. Apr. 24, 2015) ......................13

*Warren v. Cook Sales, Inc.*,
   No. 15-cv-0603, 2017 WL 325829 (S.D. Ala. Jan. 23, 2017) ..............................................12

*Waters v. Int'l Precious Metals Corp.*,
   190 F.3d 1291 (11th Cir. 1999) ................................................................................5, 6, 12, 16

**Other Authorities**

Fed. R. Civ. P. 23(h) ...................................................................................................................5

Fed. R. Civ. P. 30(b)(6)............................................................................................................3, 8

I.      **INTRODUCTION**

After over three years of litigation, Indirect Purchaser Plaintiffs ("IPP(s)" or "Plaintiffs") have obtained a $33 million settlement for the class of indirect salmon purchasers in this case. This settlement, which avoids years of additional expenses and the risks inherent in a complex antitrust action, was possible only because of the significant amount of work IPPs put into this case. In addition to conducting an in-depth investigation into Defendants' conduct prior to filing and amending their complaint, IPPs reviewed hundreds of thousands of documents, many in Norwegian. IPPs invested substantial time and effort through dispositive motion practice, discovery requests, discovery motion practice, document review, depositions, status conferences, and expert analysis. In doing this work, IPPs took on risks specific to indirect purchaser actions.

For this work, IPPs now seek an award of attorneys' fees and reimbursement of litigation expenses from the settlement fund. Under the common fund doctrine used by the Eleventh Circuit, district courts award fees in class cases based on a percentage of the total recovery. IPPs respectfully request a fee award of $9,900,000, which is 30% of the $33 million gross settlement fund, and reimbursement of $1,278,166.09 for reasonable and necessary litigation expenses. The fee requested is at or below fee awards in similar antitrust cases nationwide and class actions in this district.

II.     **BACKGROUND**

Plaintiff, Wood Mountain Fish, LLC,[1] filed this case on May 24, 2019, alleging unlawful coordination among Norwegian salmon producers, resulting in higher charges to indirect purchasers of farm-raised salmon and salmon products ("Salmon"). Complaint ("Compl.") ¶ 1, ECF No. 1.[2] As IPPs described in their complaint, the European Commission had begun investigating Defendants for potential antitrust violations. *Id.* ¶ 32. The Court appointed the law firms of Zwerling, Schachter & Zwerling, LLP (Fred T. Isquith, Sr.) and Lockridge Grindal Nauen P.L.L.P. (Heidi M. Silton) to serve as Interim Co-Lead Class Counsel ("Class Counsel"). ECF Nos. 24, 92, 168.

After IPPs filed this case, Defendants produced documents that they had previously produced to government investigators. In September 2020, IPPs set up a review team and coding

---

[1] Wood Mountain Fish, LLC, has been voluntarily dismissed from this case. *See* ECF No. 271.

[2] Unless otherwise indicated, all ECF citations in this brief refer to the docket in this case.

manual and reviewed tens of thousands of pages of those documents, many of which were in Norwegian. Amended Complaint at 1 n.1, ECF No. 178. This review, combined with Plaintiffs' continued review of relevant economic and industry literature, allowed them to make significant refinements to the complaint further supporting their claims. On April 22, 2021, IPPs amended their complaint based, in part, on their in-depth review and analysis of Defendants' materials, adding defendants Cermaq Group AS, Cermaq US LLC, Cermaq Canada Ltd., and Cermaq Norway AS. *Id.* ¶¶ 69–76.

IPPs filed the Second Amended Complaint ("SAC") on July 30, 2021, also adding parties and noting an ongoing antitrust investigation by the U.S. Department of Justice ("DOJ"). SAC ¶ 95, ECF No. 217. Plaintiffs alleged that Defendants leveraged their market power to fix, maintain, and raise the price of Salmon by exchanging pricing and other competitively sensitive information with one another. *Id.* ¶ 8. The primary mechanism for this coordination was the development and manipulation of the Nasdaq Salmon price index, NQSalmon. *Id.* ¶ 9. Plaintiffs brought claims for injunctive relief under Sections 1 and 3 of the Sherman Act and claims for damages under the laws of 32 states, the District of Columbia, and Guam. *Id.* ¶¶ 277–575. After discussing the claims and issues with prospective clients and analyzing their documents to determine whether they could serve as class representatives, IPPs added plaintiffs. *Id.* ¶¶ 18–28. The Plaintiffs that were ultimately appointed as Settlement Class Representatives are Portland Hunt-Alpine Club, LLC; Prime Steakhouse; Mamme Inc.; Rocca Kurt's Brothers Inc.; Stephen T. Deangelis, Inc.; Amy Mehaffey; Nautical Okoboji LLC; People's Food Cooperative, Inc.; Classic City Catering, Inc. and Bama Seafood, Inc. Order Granting Preliminary Approval ("Preliminary Approval Order") at 6, ECF No. 341.

IPPs had moved to consolidate the indirect case with another case filed by direct purchaser plaintiffs ("DPPs") of Salmon. *See* Complaint, *In re Farm-Raised Salmon & Salmon Prods. Antitrust Litig.*, Case No. 19-cv-21551 (S.D. Fla. Apr. 23, 2019), DPP ECF No. 1.[3] That motion was denied, but the parties in both cases coordinated discovery under the oversight of Magistrate Judge Louis. ECF No. 14. Judge Altonaga denied Defendants' motion to dismiss the DPP action in June 2021 and discovery proceeded in that case. DPP ECF No. 307. In the IPP action,

---

[3] In this brief, all references to documents filed in the DPP action, *In re Farm-Raised Salmon*, 19-cv-21551, will be referred to as "DPP ECF No. ##."

Defendants moved to dismiss the SAC and that motion remained under advisement when the parties reached a settlement. In the meantime, IPPs' discovery continued in earnest to maximize efficiencies with the DPP case. IPPs attended numerous discovery conferences to ensure their interests were represented in discovery negotiations between DPPs and Defendants. *E.g.*, DPP ECF Nos. 463, 471, 478.

Through agreements with the DPPs and Defendants, IPPs gained access to more than 872,000 documents. IPPs hired Norwegian-language translators to review and translate Defendants' documents, established a document review protocol, managed weekly calls with the review team, and reviewed documents translated by the reviewers. IPPs conducted this review on an ongoing basis from November 2021 until a settlement was reached. Through that process, IPPs worked with Norwegian-language reviewers to craft targeted searches for evidence in the case. IPPs created discovery requests unique to each defendant, in addition to new global requests.

IPPs' work only intensified in the months leading up to the settlement. IPPs jointly deposed 10 of Defendants' corporate representatives under Rule 30(b)(6) with DPPs and one after DPPs had reached a settlement. These depositions, in conjunction with document review, allowed IPPs to identify more avenues for discovery. IPPs propounded an additional 19 requests for production and three interrogatories. IPPs identified production gaps and began the meet-and-confer process to obtain additional discovery from each defendant. One of these disputes advanced to motion practice and a hearing, and IPPs moved to compel production of documents held by custodians that a defendant had not previously produced. As a basis for their motion, IPPs identified specific translated evidence that demonstrated how the custodians they sought to add appeared to be key players in Defendants' alleged conspiracy. ECF Nos. 290, 305.

In addition to pursuing discovery from Defendants, IPPs served 17 subpoenas on third parties that held documents and data relevant to show how Defendants' Salmon was distributed to IPPs in the United States. To obtain the documents subpoenaed, IPPs engaged in numerous meet-and-confers with those third parties and reviewed the documents and data produced.

While reviewing Defendants' productions, IPPs simultaneously reviewed documents to respond to Defendants' discovery requests, including 34 requests for production, for which each Plaintiff identified responsive documents. It required considerable labor to identify and review the potentially responsive documents because many Plaintiffs are small businesses, including family-owned businesses and a sole proprietorship, that did not use sophisticated record-keeping

practices. For example, caterer Amy Mehaffey's records were stored on a personal computer and on paper in boxes. Restaurant Prime Steakhouse's records were all on paper in banker's boxes. IPPs engaged a vendor to assist with electronic document collection. In total, IPPs reviewed over 50,000 documents and produced a first set of responsive records to Defendants on June 22, 2022.

IPPs retained an expert to analyze Defendants' sales transaction data and assess the class-wide antitrust impact of Defendants' alleged conduct on the proposed class. IPPs' expert, Dr. Michael A. Williams, performed an initial analysis to ensure the relevant information was obtained in discovery, including research and discussion with counsel regarding the Salmon production and distribution market and identification of the third parties whose sales data would be needed for the damages model. IPPs arranged for Defendants' data to be analyzed and processed into a usable format, sharing these data-cleaning costs with the DPPs, ultimately reducing the costs IPPs (and DPPs) would have otherwise incurred.

To mediate the case, IPPs and Defendants engaged the Honorable Edward Infante, retired Chief Magistrate Judge for the Northern District of California. After several weeks of intense and hard-fought negotiations following an in-person mediation session and additional sessions by video conference and telephone, IPPs reached a global settlement agreement with all Defendants, which was executed on September 8, 2022. *See* Decl. of Heidi M. Silton in Supp. of Mot. for Prelim. Approval ("Silton Decl.") Ex. 1 ("Settlement Agreement") at 26–31, ECF No. 336-2. The Settlement Agreement releases all claims in this case in exchange for a $33 million payment, inclusive of class recovery amounts, fees, and costs. *Id.* ¶¶ 1.s, 1.w, 2a, 16.

IPPs sought preliminary approval of the settlement, preliminary certification of the settlement class, and approval of a notice program on October 6, 2022. ECF No. 336. The Court granted preliminary approval on November 17, 2022, preliminarily certifying the Settlement Class. Preliminary Approval Order at 1; Settlement Agreement ¶ 6. The Settlement Class excludes the Court, its personnel, and any Defendants and their parent, subsidiary, or affiliated companies. Preliminary Approval Order at 5; Settlement Agreement ¶ 6. The claims released by this agreement are described in full in paragraph 1.s of the Settlement Agreement, and include all claims "related to or arising from conduct alleged in the Complaint," with the exception of the following claims: "(a) Claims based on negligence, personal injury, bailment, failure to deliver lost goods, damaged or delayed goods, product defects, breach of product warranty, or breach of contract; or (b) Claims based upon a Releasing Party's purchase(s) of farm-raised Atlantic salmon occurring outside of

the United States or its territories for use or consumption outside of the United States or its territories." Settlement Agreement ¶ 1.s.

The Court approved the notice and exclusion process described in the Settlement Agreement, which will be overseen by a third-party Settlement Administrator. Preliminary Approval Order at 6–9; Settlement Agreement ¶¶ 7–8. Defendants have paid the settlement amount into an escrow account, consistent with the Settlement Agreement. Settlement Agreement ¶ 2.b. At the conclusion of the notice period established by the Court, Plaintiffs will move for final approval of the settlement, seek certification of the settlement class, and dismissal of the litigation. If approved by the Court, the Settlement Agreement will release the Defendants from all claims by the Settlement Class related to the conduct alleged in this case. *Id.* ¶ 9. Under the terms of the Settlement Agreement, attorneys' fees for class counsel, who have prosecuted this case for the benefit of the class on a contingent basis, may not exceed 30% of the Settlement Fund. *Id.* ¶ 14.a. IPPs and Defendants agreed that IPPs may seek reimbursement of litigation expenses from the Settlement Fund. *Id.* ¶ 14.b. The parties also agreed that the costs of the class settlement notice program may be paid from the Settlement Fund in an amount not to exceed $500,000. *Id.* ¶ 2.c. The Court has preliminarily approved a *pro rata* distribution of the settlement proceeds to eligible Settlement Class members in proportion to the total amount of the net Settlement Fund. Preliminary Approval Order at 2.

## III.  LEGAL STANDARD

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "The district court 'has great latitude in formulating attorney's fees awards subject only to the necessity of explaining its reasoning so that we can undertake our review.'" *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1293 (11th Cir. 1999) (quoting *McKenzie v. Cooper, Levins & Pastko, Inc.*, 990 F.2d 1183, 1184 (11th Cir. 1993)). A district court's award of attorneys' fees is reviewed for abuse of discretion. *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1278 (11th Cir. 2021). Before expenses are awarded out of a class settlement fund, class counsel must "establish that the costs are reasonable and necessary to the prosecution of the case." *Waters*, 190 F.3d at 1298 (internal alterations omitted).

IV.     **ARGUMENT**

A.      **The Common Fund Doctrine Governs the Fee Award in this Case.**

"It is well established that when a representative party has conferred a substantial benefit upon a class, counsel is entitled to attorneys' fees based upon the benefit obtained." *In re Checking Account Overdraft Litig.*, Case No. 1:09-MD-02036, 2020 WL 4586398, at *16 (S.D. Fla. Aug. 10, 2020). The Eleventh Circuit follows the common fund doctrine, which allows courts to award attorneys a reasonable fee as a percentage of a common fund obtained for a class. *Camden I Condominium Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991); *see In re Equifax Inc.*, 999 F.3d at 1280 ("*Camden I* and the percentage method remain the law in this Circuit."). The doctrine originates in the equitable power of the federal courts to ensure individuals who obtain a benefit from a case are not "unjustly enriched at the successful litigant's expense." *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). "The majority of common fund fee awards fall between 20% to 30% of the fund." *Camden I*, 946 F.2d at 774.

Because this settlement involves a common fund obtained for the benefit of the class, the Court should apply the common fund doctrine to determine the appropriate fee award using the factors adopted by the Eleventh Circuit. In *Camden I*, the Eleventh Circuit directed district courts to weigh several factors set forth in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717–19 (5th Cir. 1974), to evaluate the fairness of the percentage awarded. *Camden I*, 946 F.2d at 775; *see Waters*, 190 F.3d at 1294. These factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the questions involved; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and the length of the professional relationship with the client; (12) awards in similar cases.

*Camden I*, 946 F.2d at 772 n.3. "The factors the district court considers will vary according to the circumstances presented in each case." *Waters*, 190 F.3d at 1298. While *Camden I* did not establish specific factors to evaluate litigation expenses, the Eleventh Circuit requires "class counsel to establish that the costs are reasonable and necessary to the prosecution of the case." *Id.* (internal alterations omitted).

6

**B.    The Court Should Approve Class Counsel's Request for Attorneys' Fees from the Settlement Fund.**

Under the *Johnson* factors, a 30% fee award is appropriate in this case. That percentage accurately reflects the efforts and skill of class counsel, the complexity of the case, the results obtained with the settlement, and awards in similar cases. *See Camden I*, 946 F.2d at 772 n.3.

1.    *Johnson* factors related to Class Counsel's time and labor weigh in favor of a 30% fee award.

The first *Johnson* factor, "the time and labor required," weighs in favor of the fee award sought here. *See Camden I*, 946 F.2d at 772 n.3. Since this action was filed, IPPs have invested significant time, energy, and resources into zealously advocating for the class. This work began prior to filing the case on May 24, 2019, when IPPs conducted market analysis and research into Defendants' conduct. IPPs then obtained discovery Defendants had produced to government investigators, which included tens of thousands of pages of documents, mostly in Norwegian. Am. Compl. at 1 n.1, ECF No. 178. By conducting their own analysis of this discovery, and after establishing a review team, a coding manual and translating documents, IPPs raised significant new allegations. *See, e.g.*, *id.* ¶¶ 26–40, 43, 48, 51–57, 66–78, 90–109, 112–214, 235–53. IPPs added new allegations and Plaintiffs in the SAC, filed on July 30, 2021. *E.g.*, SAC ¶¶ 24–29.

Because the DPP and IPP actions had not been formally consolidated, and in an effort to be efficient, IPPs pushed ahead with discovery to keep up with the schedule in the DPP action, starting discovery in earnest before the motion to dismiss was fully briefed. IPPs coordinated with DPPs to share some document review resources and a document review platform, but otherwise independently developed and implemented their own discovery strategy to prosecute this case. For example, IPP counsel reviewed key evidence translated by Norwegian-language reviewers on an ongoing basis and directed reviewers to conduct additional searches, note possible gaps in the production, and identify key witnesses and missing custodians. IPPs initiated meet-and-confer processes with each defendant related to discovery gaps and additional custodians. Because DPPs and Defendants had negotiated most custodians before IPPs had begun discovery and without IPP involvement, IPPs conducted an independent analysis of each defendant's personnel to identify individuals likely to have relevant evidence and sought documents from those custodians' records. A dispute with SalMar relating to custodians advanced to motion practice and oral argument before Magistrate Judge Louis. *See* ECF No. 322. While the negotiations with other defendants did not

require motion practice before the case settled, the dispute with SalMar is indicative of the level of work, time, and advocacy invested by IPP counsel.[4] IPPs were prepared to pursue discovery against all Defendants throughout this litigation with similar rigor. IPPs attended numerous discovery conferences originally calendared only in the DPP case to gain insights and ensure that IPP interests were represented in any discovery negotiations with Defendants. *See, e.g.*, DPP ECF Nos. 463, 471, 478.

IPPs conducted 11 depositions of defendant witnesses under Rule 30(b)(6), 10 of which were done jointly with DPPs. Questioning witnesses and participating in each of these depositions allowed IPPs to leverage the discovery timeline in the DPP case to obtain evidence early and gain information that allowed them to identify additional avenues for discovery. These depositions required considerable preparation and negotiation, especially to manage the challenges presented by deposing foreign citizens in translation during the global pandemic. IPPs led in the creation and negotiation of a highly customized deposition protocol to account for these realities. *See* ECF No. 261-1. These efforts early in the case helped to ensure that depositions ran efficiently and allowed IPPs to obtain critical evidence.

IPP counsel also conducted extensive third-party discovery, which is critical in an indirect antitrust action where IPPs must obtain evidence showing how the overcharge was passed down the chain of commerce. IPPs served 17 subpoenas on third parties and engaged in negotiations with those third parties to obtain relevant information, after consulting with their expert to identify the data needed.

While managing discovery of Defendants and third-party discovery, IPP counsel assisted their clients with document collection and conducted all of the document review necessary to respond to Defendants' discovery requests. This collection process was particularly time intensive, as many IPPs kept their records on paper, which also made document review more challenging. IPP counsel reviewed over 50,000 documents to prepare for productions to Defendants.

These efforts of IPP counsel over three years of litigation, including the aggressive push for discovery, helped obtain an early settlement in this case—avoiding years of protracted

---

[4] In that dispute, IPPs conducted an exhaustive review of SalMar's discovery, collected documents that had been produced to date, and provided translations of those documents. ECF No. 305. IPPs had begun similar work to ensure a productive meet-and-confer process with all Defendants.

litigation and obtaining a substantial recovery for the class. This factor weighs in favor of the 30% fee award requested.

        2.    <u>Factors related to the difficulty of the case and skill required similarly weigh in favor of IPPs' requested fee award.</u>

This case involves complex issues related to both federal and state antitrust law, civil procedure, foreign privacy law, and economic theory. In particular, indirect antitrust actions come with additional risks and complications. IPP counsel were well-equipped to handle these challenges with deep experience in complex antitrust litigation and the unique skills necessary to bring an indirect antitrust action. For these reasons, the second, third, fourth, seventh, and ninth *Johnson* factors weigh in favor of the award here. *See Camden I*, 946 F.2d at 772 n.3.

"An antitrust class action is arguably the most complex action to prosecute." *In re Motorsports Merch. Antitrust Litig.*, 112 F. Supp. 2d 1329, 1337 (N.D. Ga. 2000). This indirect purchaser action is no different and involves numerous difficult legal questions. *See Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d. 1185, 1206 (S.D. Fla. 2006) ("Courts in this Circuit recognize that large class actions involving various legal theories are, by their nature, very difficult."). Unlike a direct action that arises exclusively under federal antitrust law, an indirect action for damages arises under the laws of U.S. jurisdictions with *Illinois Brick* repealer statutes. *See Ill. Brick Co. v. Illinois*, 431 U.S. 720, 736 (1977) (holding that only direct purchasers may bring actions for damages under federal antitrust laws); *California v. ARC Am. Corp.*, 490 U.S. 93, 105–06 (1989) (holding that *Illinois Brick* did not preempt state antitrust laws permitting indirect purchaser recovery). Indirect actions are even more complex than direct antitrust actions, particularly with respect to class certification and damages. *See In re Domestic Drywall Antitrust Litig.*, No. 13-MD-2437, 2019 WL 1258832, at *3 (E.D. Pa. Mar. 19, 2019) (weighing risks associated with indirect antitrust action in favor of settlement); *see, e.g.*, *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 304–05 (3d Cir. 2011) (en banc) (considering and rejecting objections specific to an indirect action); *In re Nexium Antitrust Litig.*, 777 F.3d 9, 26 (1st Cir. 2015) (observing that "determining whether and when certification of indirect purchaser class actions may bear the added complexity entails considerable thought and effort"). Because the laws of 34 jurisdictions are at issue in this case, IPPs faced significant legal complexity. *See In re Pool Prods. Distrib. Mkt. Antitrust Litig.*, MDL No. 2328, 2015 WL 4528880, at *7, 21 (E.D. La. July 27, 2015) (increasing fee award from the benchmark based on the complexity of analyzing laws

of four different states in indirect antitrust case). *Cf. In re Broiler Chicken Antitrust Litig.*, 290 F. Supp. 3d 772, 810–12 (N.D. Ill. 2017) (weighing arguments unique to state laws and indirect antitrust actions).

In addition to the complexities inherent in an indirect antitrust class action, this case involved foreign defendants and evidence that was primarily in Norwegian. Defendants raised issues related to European and Norwegian privacy laws to object to discovery. For example, the process for conducting depositions under U.S. law in Norway would have required several months of advance notice, and Defendants objected to producing witnesses for 30(b)(6) depositions outside of Norway because of risks related to COVID-19. While the parties ultimately reached agreements on most of these issues with respect to 30(b)(6) depositions, as this case advanced toward fact depositions, it is likely Defendants would have raised similar procedural hurdles. Defendants have objected to discovery requests and raised burden objections over purported obligations under Norwegian and European privacy laws. These circumstances have required IPPs to negotiate with Defendants to learn the basis for their objections, research the applicability and scope of the foreign laws Defendants cited, and continue negotiating or advance to motion practice.

The Co-Lead Class Counsel appointed by the Court, as well as other IPP counsel, were well-equipped to handle all of these challenges. The individuals directing the work and reporting to the Court and the law firms of Zwerling, Schachter & Zwerling, LLP (Fred Isquith Sr.) and Lockridge Grindal Nauen P.L.L.P. (Heidi Silton), have decades of experience in complex litigation and have represented plaintiffs in dozens of antitrust class actions.[5] Ms. Silton at Lockridge Grindal Nauen currently represents or has recently represented classes of consumers, indirect purchasers, and direct purchasers in numerous major antitrust cases, including in the following cases: *In re Generic Pharmaceuticals Pricing Antitrust Litigation*, No. 2:16-md-02724-CMR (E.D. Pa.); *In re Packaged Seafood Products Antitrust Litigation*, No. 15-md-2670 (S.D. Cal.); *Staley v. Gilead Sciences, Inc.*, No. 3:19-cv-02573 (N.D. Cal.); *In re Potash Antitrust Litigation (II)*, No. 1:08-md-06910 (N.D. Ill.) and *Precision Associates, Inc. v. Panalpina World Transport (Holding) Ltd.*, No. 1:08-cv-42 (E.D.N.Y). *See* Silton Decl. Ex. 8, ECF No. 336-9. Mr. Isquith at Zwerling, Schachter & Zwerling has similarly served in leadership roles in, among others, the

---

[5] Settlement Class Counsel would allocate the fee among the counsel who performed work on behalf of the Settlement Class under their direction. *See* Settlement Agreement ¶ 14.e.

following antitrust cases: *In re Packaged Seafood Products Antitrust Litigation*, No. 15-md-2670 (S.D. Cal.); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litigation*, MDL No. 2542 (S.D.N.Y.); *Nibco Inc. v. Viega LLC*, No. 1:17-cv-1739 (M.D. Pa.) and *In re Dynamic Random Access Memory (DRAM) Antitrust Litigation*, No. M:02-cv-1486 (N.D. Cal.). *See* Silton Decl. Ex. 9, ECF No. 336-10. Counsel at the law firms of Class Counsel have similarly served in leadership roles in major cases, including *In re Pork Antitrust Litigation*, No. 18-cv-01776 (D. Minn.) and *In re Flat Glass (II) Antitrust Litigation*, No. 2:08-mc-180 (W.D. Pa.), ECF No. 336-9 (Lockridge Grindal Nauen counsel cases), and *Cipro I and II*, Judicial Council Coordination Proceeding Nos. 4154 and 4220 (Super. Ct. Cal); *Lincoln Adventures, LLC v. Those Certain Underwriters at Lloyd's London Members of Syndicates,* No. 2:08-cv-00235 (D.N.J.) and *In re Restasis (Clyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 18-MD-2819 (E.D.N.Y.), ECF No. 336-10 (Zwerling, Schachter & Zwerling counsel cases). Mr. Isquith and Ms. Silton, their law firms, and all IPP counsel performing work under their direction, brought their skill and experience to bear in this case.

The quality of opposing counsel is a relevant factor in assessing the quality of class counsel. *See Thorpe v. Walter Inv. Mgmt. Corp.*, Case No. 1:14-cv-20880, 2016 WL 10518902, at *9 (S.D. Fla. Oct. 17, 2016); *In re Sunbeam Sec. Litig.*, 176 F. Supp.2d 1323, 1334 (S.D. Fla. 2001). Each of the six defendant corporate families has been represented by highly experienced counsel from some of the largest law firms in the U.S. While Defendants sometimes negotiated issues collectively, IPPs often had to respond to different or additional arguments for each defendant group. For example, each group served unique responses and objections to discovery, raised different issues related to 30(b)(6) depositions, and interpreted document production obligations differently. Moreover, Defendants raised various objections by arguing they had already produced similar material to DPPs or that IPPs had waived arguments by failing to raise them when DPPs had, even when IPPs had no notice of Defendants' negotiations with DPPs. IPP counsel invested significant time and energy negotiating with these six defendant groups on numerous issues, ranging from deposition locations and translators at depositions to contested claw-back requests and European privacy law defenses.

Class Counsel had the skill needed to litigate against these high-quality litigation opponents and to navigate the complexities of this case. These factors weigh in favor of the award requested.

11

3.      The fee sought by IPPs is customary for a complex class action in the
Eleventh Circuit and on par with similar antitrust cases nationwide.

A fee of 30% is customary for a contingent antitrust case, on par with awards in similar cases in this District, and appropriate for the amount of recovery obtained. The fifth and twelfth *Johnson* factors, "the customary fee" and "awards in similar cases," thus weigh in favor of the fee request here. *Camden I*, 946 F.2d at 772 n.3.

"The 'customary fee' in a class action lawsuit of this nature is a contingency fee because virtually no individual possesses a sufficiently large stake in the litigation to justify paying his attorneys on an hourly basis." *Thorpe*, 2016 WL 10518902, at *10. While "[t]here is no hard and fast rule mandating a certain percentage of a common fund which may be awarded as a fee," most fee awards fall between 20% to 30% of the fund, with "an upper limit of 50% of the fund." *In re Sunbeam*, 176 F. Supp. 2d at 1333 (quoting *Camden I*, 946 F.2d at 774–75). The Eleventh Circuit has affirmed a fee award where the district court found the benchmark was 30%, and after an analysis of the *Johnson* factors, adjusted that benchmark upward slightly to reach a fee award 33 1/3% of a $40 million settlement. *Waters*, 190 F.3d at 1294–95.

Courts in this District have routinely approved awards at or above the 30% rate requested here, including the court in the DPP action, which recently awarded attorneys' fees in the amount of 30% of the settlement fund. DPP ECF No. 543 at 7; *Morgan v. Public Storage*, 301 F. Supp. 3d 1237, 1252–53 (S.D. Fla. 2016) ("The Court finds that this factor supports a fee award of 33% because it is consistent with attorneys' fees awards in federal class actions in this Circuit."); *see, e.g.*, *Diakos v. HSS Sys., LLC*, Civil Action No. 14-61784, 2016 WL 3702698, at *7 (S.D. Fla. Feb. 5, 2016) (33 1/3%); *Duque v. 130 NE 40th St., LLC*, Case No. 14-23965-CIV, 2016 WL 7442797, at *3 (S.D. Fla. Jan. 27, 2016) (33%); *Gevaerts v. TD Bank, N.A.*, Case No. 11:14-cv-20744, 2015 WL 6751061, at *14 (S.D. Fla. Nov. 5, 2015) (30%); *Cifuentes v. Regions Bank*, No. 11-cv-23455, 2014 WL 1153772, at *8 (S.D. Fla. Mar. 20, 2014) (30%).[6]

---

[6] Other district courts in the 11th Circuit have approved similar awards. *See, e.g.*, *James v. JPMorgan Chase Bank, N.A.*, Case No. 15-cv-2424-T-23JSS, 2017 WL 2472499, at *2 (M.D. Fla. June 5, 2017) (30%); *Warren v. Cook Sales, Inc.*, No. 15-cv-0603, 2017 WL 325829, at *9 (S.D. Ala. Jan. 23, 2017) (30%); *Comeens v. HM Operating, Inc.*, No. 6:14-cv-00521, 2016 WL 4398412, at *4 (N.D. Ala. Aug. 18, 2016) (33 1/3%); *Camp v. City of Pelham*, No. 2:10-cv-01270, 2015 WL 12746716, at *3 (N.D. Ala. Dec. 16, 2015) (41%); *Pierre-Val v. Buccaneers Ltd. P'ship*,

Recent awards in antitrust cases from across the country similarly support the fee award requested here. *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, No. 16 C 8637, 2022 WL 6124787, at *4 (N.D. Ill. Oct. 7, 2022) (awarding 33% of a settlement fund as attorneys' fees in end-user plaintiff action); *In re Pork Antitrust Litig.*, Civil No. 18-1776 (JRT/JFD), 2022 WL 4238416, at *7 (D. Minn. Sept. 14, 2022) (awarding 33% of settlement fund as attorneys' fees in consumer indirect purchaser action); *In re Interior Molded Doors Indirect Purchaser Antitrust Litig.*, No. 3:18-cv-00850, 2021 WL 5195089, at *3 (E.D. Va. July 27, 2021) (awarding 30% of a settlement fund as attorneys' fees in indirect purchaser action); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, No. 14-md-02542, 2021 WL 2328431, at *1 (S.D.N.Y. June 7, 2021) (awarding 33 1/3% of $31 million settlement fund as attorneys' fees in indirect purchaser action); *In re Lithium Ion Batteries Antitrust Litig.*, No. 13-MD-02420, 2020 WL 7264559, at *23 (N.D. Cal. Dec. 10, 2020) (awarding "just under 30 percent" of settlement fund as attorneys' fees in indirect purchaser action); *In re Aggrenox Antitrust Litig.*, Case No. 3:18-MD-00850, 2018 WL 10705542, at *5 (D. Conn. July 19, 2018) (awarding 33 1/3% of a settlement fund as attorneys' fees in indirect purchaser action); *In re Pool Prods.*, 2015 WL 4528880, at *21 (awarding 30% of a settlement fund as attorneys' fees in indirect purchaser action); *In re Flonase Antitrust Litig.*, 291 F.R.D. 93, 103 (E.D. Pa. 2013) (awarding 33 1/3% of a settlement fund as attorneys' fees indirect action); *In re Processed Egg Prods. Antitrust Litig.*, No. 08-md-2002, 2012 WL 5467530, at *7 (E.D. Pa. Nov. 9, 2012) (awarding 30% of a settlement fund as attorneys' fees in direct action settlement). In particular, the recent settlements in the *Broiler Chicken* and *Pork* antitrust cases provide a useful benchmark, as they involve allegations of anticompetitive behavior across an industry of meat producers.

Accordingly, the fee requested here aligns both with the customary fees awarded in the Eleventh Circuit and the fees awarded in antitrust actions nationwide.

---

No. 8:14-cv-01182, 2015 WL 12843849, at *2 (M.D. Fla. Dec. 7, 2015) (32%); *Vogenberger v. ATC Fitness Cape Coral, LLC*, No. 2:14-cv-436-FTM-29CM, 2015 WL 1883537, at *4 (M.D. Fla. Apr. 24, 2015) (33%); *Amason v. Pantry, Inc.*, Case No. 7:09-cv-02117, 2014 WL 12600263, at *3 (N.D. Ala. July 3, 2014) (30%).

4.      Class Counsel obtained a significant recovery for the class and achieved a successful result in light of the risks presented by this case.

Class Counsel assumed significant financial risk in bringing this action. *See Saccoccio v. JP Morgan Chase Bank, N.A.*, 297 F.R.D. 683, 695 (S.D. Fla. 2014) ("For a complex and sophisticated case such as this one, class counsel took a considerable financial risk in pursuing the case."). Accordingly, the sixth, eighth, and tenth *Johnson* factors, which relate to the results obtained, the risk borne by counsel in this case, the contingent nature of the fee and the "undesirability" of the case, weigh in favor of the award sought here. *Camden I*, 946 F.2d at 772 n.3.

The recovery obtained here is substantial, and, especially at this stage of litigation, weighs sharply in favor of the fee award requested. *See Thorpe*, 2016 WL 10518902, at *10 (weighing results obtained in considering fee award). The settlement amount of $33 million is an excellent result for the class and will provide direct cash relief. Absent a settlement, the class would face years of protracted litigation and a risk of nonrecovery. *See, e.g.*, *Greco v. Ginn Dev. Co., LLC*, 635 F. App'x 628, 633 (11th Cir. 2015); *In re Motorsports Merchandise Antitrust Litig.*, 112 F. Supp. 2d at 1334. The amount reflects an assessment of the amount of commerce affected by Defendants' anticompetitive conduct in the 34 jurisdictions at issue. Because IPPs were well into discovery and had obtained commerce data from Defendants and third parties, they assessed the class's potential recovery and negotiated a settlement reflecting that analysis.

Contingent fee arrangements often weigh in favor of a higher fee award because "Class Counsel assumed a significant risk of non-payment or underpayment." *Gevaerts*, 2015 WL 6751061, at *13. Absent a contingency arrangement, "very few lawyers could take on the representation of a class client given the investment of substantial time, effort, and money, especially in light of the risks of recovering nothing." *Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 548 (S.D. Fla. 1988). Litigation risk is part of the *Johnson* factor that considers the "undesirability" of the litigation. *In re Checking Account Overdraft Litig.*, No. 1:09-MD-02036, 2015 WL 12641970, at *16 (S.D. Fla. May 22, 2015). The Court should evaluate the risks faced by counsel in bringing the case "as of the time they commenced the suit, not retroactively, with the benefit of hindsight." *Id.*

Indirect actions involve more risks than direct actions. *In re Dynamic Random Access Memory (DRAM) Antitrust Litig.*, MDL No. 1486, 2013 WL 12387371, at *20 (N.D. Cal. Nov. 5,

2013) ("Courts have long recognized that there is generally considerable risk in antitrust cases; one reason why [is] in a significant percentage of such cases, a fee higher than the benchmark is awarded. That is particularly true of antitrust actions commenced on behalf of indirect purchasers, as this litigation illustrates."). The complexity of a lawsuit arising under the laws of 34 different jurisdictions not only requires additional effort and skill, as discussed above, it introduces unique risks. *See, e.g.*, *In re Interior Molded Doors Indirect Purchaser Antitrust Litig.*, 2021 WL 5195089, at *2 (weighing complexity of issues related to claims under both federal and state antitrust laws); *In re Domestic Drywall Antitrust Litig.*, 2019 WL 1258832, at *3 (noting risks unique to indirect antitrust actions); *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 2021 WL 2328431, at *2 (finding risk of nonrecovery weighed in favor of settlement and fees sought in indirect purchaser action). In addition to the risks associated with litigating and certifying a class action arising under various state laws, indirect actions require additional proof of how the overcharge passed through the chain of distribution to indirect purchasers. *See, e.g.*, *In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559, at *15.

Undeterred by these risks, Class Counsel brought this action and obtained a substantial recovery for the class. Courts have noted that contingent fee awards compensate for the risk borne by counsel and serve the public interest. *See, e.g.*, *In re Broiler Chicken Antitrust Litig.*, 2022 WL 6124787, at *4 ("A substantial award is warranted here as a proper incentive for high quality counsel to take on complex cases, requiring a massive investment of time and money, with such a high risk of non-payment."); *In re Interior Molded Doors Indirect Purchaser Antitrust Litig.*, 2021 WL 5195089, at *2 ("The substantial recovery obtained by IPP Class Counsel to date serves the strong public policy of holding accountable those who violate the antitrust laws, thereby promoting fair competition and honest pricing."); *In re Southeastern Milk Antitrust Litig.*, Master File No. 2:08-MD-1000, 2013 WL 2155387, at *5 (E.D. Tenn. May 17, 2013) ("Society's interests are clearly furthered by the private prosecution of civil cases which further important public policy goals, such as vigorous competition by marketplace competitors."). Therefore, the fee award requested would appropriately compensate counsel for the recovery obtained and the risks borne in bringing this case.

In sum, the *Johnson* factors support an award of 30% of the Settlement Fund obtained in this case.

C.    **The Court Should Approve Class Counsel's Request for Reimbursement of Litigation Expenses.**

Although *Camden I* does not establish factors for assessing reimbursement of litigation expenses, courts have recognized class counsel's obligation "to establish that the costs are reasonable and necessary . . . to the prosecution of the case." *Waters*, 190 F.3d at 1299. "Upon submission of adequate documentation, plaintiffs' attorneys are entitled to reimbursement of those reasonable and necessary out-of-pocket expenses incurred in the course of activities that benefitted the class." *Morgan*, 301 F. Supp. 3d at 1258 (quoting *Waters*, 190 F.3d at 1298). Courts in this district have approved reimbursement of out-of-pocket costs and expenses class counsel incurred for "among others, fees for experts, photocopies, travel, online research, translation services, mediator fees, and document review and coding expenses." *Gevaerts*, 2015 WL 6751061, at *14; *see, e.g.*, *Lloyd v. James E. Albertelli, P.A.*, No. 20-cv-60300, 2020 WL 7295767, at *3 (S.D. Fla. Dec. 10, 2020); *Behrens*, 118 F.R.D. at 549 ("In summary, these expenses include the necessary costs associated with any action: travel, depositions, filing fees, postage, telephone, and copying."). Recently, the court in the DPP case approved reimbursement of $2,636,558.69 in litigation expenses. DPP ECF No. 543 at 9.

The expenses for which IPPs seek reimbursement are of the kind that courts have recognized are necessary for the prosecution of a complex class action, and they were reasonable and necessary in this case. Specifically, IPPs request $1,278,166.09 in reimbursement for expenses. These expenses are: (1) $670,722.50 in expert fees, including consultation and data processing; (2) $472,891.51 for foreign language document review, translation, and deposition services;[7] (3) $28,961.55 for document storage and an e-discovery platform; (4) $54,303.85 for legal research, copy fees, delivery and service of process charges, and accounting fees for the litigation fund; (5) $11,760.00 for document collection, including a document collection vendor; (6) $5,078.15 in Court fees, including CM/ECF and transcript fees; (7) $18,460.59 in mediation fees; and (8) $15,987.94 for travel. *See* Decl. of Heidi M. Silton in Supp. of Fee Motion at ¶ 12. Class Counsel has retained documentation with greater detail for these expenses and is prepared to provide such information if necessary.

---

[7] These expenses were provided by the same vendor.

The expenses incurred for document translation services were necessary because the bulk of the evidence produced by Defendants was in Norwegian. IPPs conducted their investigation into the allegations and early review of documents prior to filing the Second Amended Complaint, without the assistance of translators. This efficient work at the pleading stage reduced expenses for the class. Once discovery began, however, IPPs relied on translators, again, because most of the relevant documents central to the allegations included communications among defendants, most of which conducted business in Norwegian. These internal communications in Norwegian were key evidence for this alleged antitrust conspiracy, and IPPs needed reliable and accurate translations to prove their case and craft searches for documents. IPPs reduced the expenses for the class by sharing some of these costs with DPPs.

The expert analysis, and associated data processing expenses, were necessary to prove damages. In an indirect case, additional analysis is required to show how an overcharge that resulted from a price-fixing conspiracy was passed along to indirect purchasers through the chain of distribution. IPPs engaged an experienced and highly regarded economic expert, Michael A. Williams, Ph.D., to perform this analysis. *See* Decl. of Heidi M. Silton in Supp. of Fee Motion Ex. 1. Dr. Williams has been retained by DOJ's Antitrust Division and the Federal Trade Commission to conduct similar analyses in other cases, and he previously served as an economist with the DOJ Antitrust Division. He advised IPPs on what data would be necessary to assess damages in this case and IPPs obtained data from Defendants and third parties based, in part, on his advice. Rather than paying separately to process the data into a format usable by Dr. Williams, IPPs shared the costs of data processing with DPPs and thus reduced those expenses for the class.

Because the expenses sought were all reasonable and necessary for the prosecution of this case, and IPPs made every effort to reduce costs and expenses throughout the litigation, the Court should award $1,278,166.09 to reimburse IPPs for expenses.

## V.    <u>CONCLUSION</u>

IPPs obtained a $33 million settlement for the class early in the litigation. Class Counsel leveraged their depth of experience and skill in managing complex antitrust actions to investigate Defendants' anticompetitive conduct, engage in motion practice, and push forward with discovery to obtain evidence. The skill and efforts of Class Counsel led to the outcome here. Under the common fund doctrine, Class Counsel seek an award of 30% of the Settlement Fund as a fee award. This amount is consistent with fee awards in class cases in the Eleventh Circuit and antitrust cases

nationwide, reflects the risks borne by Class Counsel in this contingent case, and recognizes the skill shown by counsel to achieve this result. IPPs respectfully request that the Court approve a fee award of $9,900,000, which is 30% of the gross Settlement Fund, and reimbursement for $1,278,166.09 in reasonable and necessary litigation expenses.

## <u>CERTIFICATION OF PRE-FILING CONFERENCE</u>

Under the terms of the Settlement Agreement, Defendants agreed to take no position on Plaintiffs' motion for attorneys' fees and expenses. Settlement Agreement ¶ 14. On November 29, 2022, Plaintiffs informed Defendants they would file this motion and, consistent with the Settlement Agreement, Defendants took no position.

Dated: December 1, 2022                MILLER SHAH LLP

*/s/ Nathan C. Zipperian*
Jayne A. Goldstein (FBN 144088)
Nathan C. Zipperian (FBN 61525)
1625 North Commerce Parkway, Suite 320
Fort Lauderdale, FL 33326
Telephone: (954) 515-0123
Facsimile: (866) 300-7367
jagoldstein@millershah.com
nczipperian@millershah.com

*Liaison Counsel for Indirect Purchaser*
*Settlement Class*

Heidi M. Silton (*pro hac vice*)
Kristen G. Marttila (*pro hac vice*)
Joseph C. Bourne (*pro hac vice*)
Derek C. Waller (*pro hac vice*)
LOCKRIDGE GRINDAL NAUEN P.L.L.P.
100 Washington Avenue South, Suite 2200
Minneapolis, MN 55401
Telephone: (612) 339-6900
Facsimile: (612) 339-0981
hmsilton@locklaw.com
kgmarttila@locklaw.com
jcbourne@locklaw.com
dcwaller@locklaw.com

Robert S. Schachter (*pro hac vice*)
Robin F. Zwerling (*pro hac vice*)
Fred Taylor Isquith, Sr. (*pro hac vice*)
Fred Isquith, Jr. (*pro hac vice*)
ZWERLING, SCHACHTER
& ZWERLING LLP
41 Madison Avenue, 32nd Floor
New York, NY 10010
Telephone: (212) 223-3900
rschachter@zsz.com
rzwerling@zsz.com
ftisquith@zsz.com
fisquith@zsz.com

*Co-Lead Class Counsel for the Indirect*
*Purchaser Settlement Class*